**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

RECEIPT # 63632
AMOUNT $ 250
SUMMONS ISSUED Y S
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY CLK
DATE 4/19/2005

---

ROBERT M. GERBER, AS TRUSTEE OF THE
ROSALIE GERBER TRUST, WILLIAM J.
GILLIGAN AND JAYNE GILLIGAN, HUSBAND
AND WIFE, SANFORD R. HOFFMAN AND
BETH L. HOFFMAN, HUSBAND AND WIFE,

      Plaintiffs,

      v.

ROBERT S. BOWDITCH, JR.
GERALD SLAVET, STEVEN RIOFF,
And BSR ASSOCIATES,

      Defendants.

CIVIL ACTION NO.

# 05 - 10782 DPW

MAGISTRATE JUDGE

---

## COMPLAINT

Plaintiffs Robert M. Gerber, as Trustee of the Rosalie Gerber Trust, William J. and Jayne

Gilligan, husband and wife, and Sanford R. and Beth L. Hoffman, husband and wife, by and

through their undersigned attorneys and as and for their Complaint against Defendants Robert S.

Bowditch, Jr. ("Bowditch"), Gerald Slavet ("Slavet"), Steven Rioff ("Rioff"), and BSR

Associates ("BSR") (collectively, "Defendants"), hereby aver as follows:

### Nature Of The Action

1.    This action arises out of a scheme conceived and implemented by Defendants to

acquire Plaintiffs' interests in a limited partnership for substantially less than fair value.

2.    The limited partnership at issue is known as Old Salem Associates Limited

Partnership ("Old Salem" or the "Partnership"). The Partnership is a single purpose entity,

created to acquire, own, and operate four multi-unit, federally subsidized rental-housing projects

located in the Boston suburbs (collectively, the "Project").

3.      Plaintiffs are former "Investor Limited Partners" of the Partnership.  Defendants Bowditch and Slavet are Old Salem's general partners (collectively, the "General Partners"). Defendant Rioff is the Partnership's initial limited partner and the Partnership's only "Class A Limited Partner."

4.      The transaction at issue is a tender offer in which Plaintiffs tendered their interests in the Partnership to Defendant BSR for $50,000 per limited partnership unit (the "Tender Offer").  BSR is an affiliate of the General Partners and Rioff (the "Tender Offer").

5.      Plaintiffs tendered their interests in Old Salem in reliance upon Defendants' written representations concerning, among other things: (i) the market value of the Project; (ii) the amount of debt refinancing the Partnership could support; and (iii) whether the Investor Limited Partners would ever receive a cash return on their investment.

6.      Since tendering their interests in Old Salem, Plaintiffs have learned that many of Defendants' representations were false and misleading, and that Defendants failed to state material facts necessary to make such representations not false and/or misleading.

7.      Among other things, Plaintiffs have learned that at the time of the Tender Offer the Partnership was eligible to participate in a federally sponsored subsidy program known as the "Markup-to-Market Program," which permitted the Project to significantly increase its rents.

8.      Upon information and belief, the availability of the Markup-To-Market Program substantially increased the market value of the Project, and, correspondingly, Plaintiffs' respective interests in the Partnership.

9.      Defendants never even advised Plaintiffs of the existence, availability, or effect of the Markup-to-Market Program on the financial condition of the Partnership in connection with the Tender Offer.

10.    The Partnership's General Partners never took advantage of the increased rental subsidies offered by the Markup-to-Market Program prior to the Tender Offer. However, Plaintiffs have learned that within three months of the Tender Offer, Defendants sought to increase the Project's rent subsidies under the Markup-to-Market Program.

11.    Plaintiffs have further learned that based on the availability of the Markup-to-Market Program and other factors not disclosed by Defendants: (i) the market value of the Project was substantially greater that the amount represented by Defendants; and (ii) the Project could have supported a refinancing of substantially more than the amount represented by Defendants.

12.    Based on the Project's enhanced market value, the Partnership would have been able to refinance its debt or sell the Project outright to a third party as an alternative to the Tender Offer. Under either scenario, the net return to Plaintiffs would have been substantially greater than the amount they received in the Tender Offer.

13.    Had Defendants truthfully disclosed all material information concerning the Project and the Partnership, Plaintiffs would have realized that the value of their limited partnership interests was substantially greater than the amount offered by BSR, and would not have tendered their Partnership interests to BSR.

14.    The end result of Defendants' wrongful conduct is that Plaintiffs were duped into tendering their interest in the Partnership to BSR at a grossly unfair price.

15.    In this action Plaintiffs seek equitable relief in the form of rescission of the sale of their limited partnership interests to BSR as well as damages, attorneys' fees, interest, and costs for: (i) Defendants' violation of the federal securities laws; (ii) Defendants' fraud and misrepresentation; (iii) Defendant Bowditch and Slavet's breach of fiduciary duty; (iv)

3

Defendants' negligent misrepresentation; (v) Defendant Bowditch and Slavet's breach of contract; (vi) Defendants' civil conspiracy; and (v) Defendant Rioff and BSR's aiding and abetting breach of fiduciary duty.

## Jurisdiction and Venue

16.     This Court has original subject matter jurisdiction over this action under 15 U.S.C. § 78aa, which provides that "[t]he district courts of the United States . . . shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder."

17.     This Court also has original subject matter jurisdiction over this action under 28 U.S.C. § 1331, in that it arises under the Constitution, laws, or treaties of the United States, namely, Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b).

18.     This Court also has jurisdiction over this action under 28 U.S.C. § 1332, in that the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

19.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367, in that all other claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the Constitution.

20.     Venue is proper in this District under 15 U.S.C. § 78aa, in that Defendants are found in, are inhabitants of, and transact business in this District. Venue also is proper in this District under 28 U.S.C. § 1391(b), in that all Defendants reside in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## The Parties

21.     Plaintiff Robert M. Gerber is an adult individual, a citizen of the State of Connecticut, and has an address at 157 Riverside Avenue, Westport, CT 06880.

22.     Plaintiffs William J. and Jayne Gilligan are adult individuals, citizens of the State of Illinois, and have an address at 3400 N. Adams Road Oak Brook, IL 60521.

23.     Plaintiffs Sanford R. and Beth L. Hoffman are adult individuals, citizens of the State of Arizona, and have an address at 11724 E. Del Timbre Drive Scottsdale, AZ  85259.

24.     Defendant Bowditch is, upon information and belief, an adult individual, a citizen of the Commonwealth of Massachusetts, and has addresses/domiciles at 230 Congress Street, 12th Floor, Boston, MA 02110 and 99 High Street, Brookline, MA 02146.

25.     Defendant Slavet is, upon information and belief, an adult individual, a citizen of the Commonwealth of Massachusetts, and has a domicile at 15 Winthrop Road, Wellesley, MA 02482.

26.     Defendant Rioff is, upon information and belief, an adult individual, a citizen of the Commonwealth of Massachusetts, and has a domicile at 25 Oakland Street, Lexington, MA 02420.

27.     Defendant BSR is, upon information and belief, a partnership, organized and existing under the laws of the Commonwealth of Massachusetts, with its principal place of business located at 220 Forbes Road, Braintree, MA 02184.

28.     Upon information and belief, BSR is owned and controlled by Bowditch, Slavet, and Rioff.

## Background

### A.    The Partnership And Its Partners

29.    The Partnership was formed in or around December 1982 for the purposes of acquiring, owning, repairing, rehabilitating, altering, renting, leasing, and otherwise dealing with the Project.

30.    The Project is comprised of four multi-unit rental housing projects located in Beverly, Danvers, Peabody, and Salem, Massachusetts. The Project, which contains a total of 321 residential units, is commonly know as the "Fairweather Apartments."

31.    The Partnership has four classes of partners: two General Partners, one Class A Limited Partner, one Class B Limited Partner, and a number of Investor Limited Partners.

32.    Bowditch and Slavet are the Partnership's General Partners. The General Partners collectively hold an 11.9% interest in the Partnership and have controlled the business of the Partnership for over twenty years.

33.    Rioff is the partnership's Class A Limited Partner. Rioff holds a 2.1% interest in the Partnership.

34.    BVS Associates (not a party to this action) is the Partnership's Class B Limited Partner. BVS holds a 1% interest in the Partnership.

35.    Plaintiffs, along with other individuals and entities, were formerly holders of Units of Old Salem Limited Partner interests, which comprise 85% of the interest in the Partnership.

### B.    The Limited Partnership Agreement

36.    The terms and conditions of the Partnership are set forth in a written limited partnership agreement (the "Limited Partnership Agreement").

37.    Among other things, the Limited Partnership Agreement grants the General Partners the power and obligation to manage the Partnership and control its business.

38.    The Limited Partnership Agreement expressly prohibits the limited partners from participating in the Partnership's business.

39.    The General Partners do not, however, have unfettered discretion with respect to all Partnership transactions.    The Limited Partnership Agreement expressly requires limited partner approval and consent to certain, extraordinary transactions such as sales of real property, mortgage refinancing, sale/leaseback of Partnership property, and additional mortgage loans.

40.    The Limited Partnership Agreement also expressly requires that the sale of an interest in Partnership property to an affiliate of any partner be at fair market value as determined by an independent appraiser or as agreed upon by a majority of the limited partner interests.

## C.    **The Partnership's Debt**

41.    The Partnership is a party to two secured loans.

42.    One is a mortgage loan payable to and held by HUD, which is secured by a first mortgage on the Project (the "HUD Mortgage Loan").    The maturity date of the HUD Mortgage Loan is July 1, 2010.

43.    The other Partnership loan obligation is evidenced by a purchase money note, which was issued by an affiliate of the General Partners in connection with the partnership's acquisition of the Project (the "Purchase Money Loan").    The Purchase Money Loan is secured by each partners' interest in the Partnership.

44.    The maturity date of the Purchase Money Loan was August 31, 2003; however, as of September 30, 2004 it had yet to be paid, and continued to accrue interest at 12.5% per annum.

45.    Upon information and belief, as of December 31, 2003, the total unpaid principal and interest due under the HUD Mortgage Loan and the Purchase Money Loan was $9,011,929.

46.    Upon information and belief, as of December 31, 2003, the unpaid principal balance of principal and interest due under the HUD Mortgage Loan was $1,723,341.

47.    Upon information and belief, as of December 31, 2003, the unpaid balance of principal and interest due under the Purchase Money Loan was $7,288,588

**D.    HUD's Section 8 Program And The Partnership's HAP Contracts**

48.    The Project is a "Section 8" subsidized housing project, which receives subsidies provided for under Section 8 of the Housing and Community Development Act of 1974. Section 8 housing assistance is the primary means through which the Department of Housing and Urban Development ("HUD") "aid[s] low-income families in obtaining a decent place to live and . . . promot[es] economically mixed housing." 42 U.S.C. §1437f(a).

49.    Under the Section 8 Program, the federal government provides supply side, project-based subsidies. These subsidies, which are paid to the owner of the project, rather than the tenant, cover the difference between what tenants can afford to pay -- up to a maximum of 30% of household income -- and HUD's estimated fair market rent for the unit.

50.    The terms and conditions of a housing project's Section 8 subsidies are set forth in long term (typically twenty years) "Housing Assistance Payments" ("HAP") contract between the property owner and the Federal Housing Authority.

51.    Upon expiration of a HAP Contract, Section 8 property owners have the option of renewing the contract or opting out of the Section 8 Program. If the Section 8 Program property owner chooses to opt out of the Program, it is permitted to set rents to prevailing market rates.

52.    Upon information and belief, the Partnership receives rental subsidies from HUD pursuant to two Section 8 HAP Contracts, which subsidize 220 of the 321 rental units.

E.    **HUD's Markup-to-Market Program**

53.    HUD's Section 8 Program went into effect in 1974, and the first of its Section 8 HAP Contracts began expiring in the mid-1990s. In certain metropolitan areas where Section 8 fair market rent ceilings had fallen below prevailing market rates, Section 8 property owners increasingly decided not to renew their respective HAP Contracts.

54.    In response to these circumstances, HUD introduced an emergency initiative in or around June 1999, which came to be known as the Markup-to-Market Program. The purpose of the Program was to preserve the availability of below-market Section 8 multi-family housing by offering economic incentives to the owners of such projects to remain in HUD's Section 8 Program.

55.    The Markup-to-Market Program was later codified as revisions to the Multifamily Assisted Housing Reform and Affordability Act, 42 U.S.C. §1437(f) (2000).

56.    Under the Markup-to-Market Program, owners of Section 8 housing projects who remain in the Section 8 Program are able to "mark up" rent levels to market rates and distribute the increased cash flow resulting from such rents.

57.    In order to obtain the economic incentives offered by the Markup-to-Market program, property owners are required to renew their respective HAP Contracts for a minimum of five years and meet certain other criteria.

58.    Upon reconciliation of owner and HUD rent comparability studies, HUD will generally permit rent increases up to 150% of fair market rent and increase the federal rent subsidy to equal the difference between the current rents and the newly marked up rents. In

addition, properties eligible for the Markup-to-Market Program meeting certain additional criteria are eligible to apply to HUD for a waiver permitting rent increases which exceed 150% of fair market rents.

59.    Upon information and belief, the Project was among the Section 8 housing projects eligible to participate in the Markup-to-Market Program and was also eligible to apply for a waiver permitting rent increases in excess of 150% of fair market rents.

60.    Upon information and belief, prior to the Tender Offer, the Partnership had not raised unit rents at the Project to the levels permitted under the Markup-to-Market Program.

## F.    Defendants' Vast Experience In Multi-Family Rental Housing

61.    Defendants Bowditch, Slavet, and Rioff are all general partners of MB Management Company ("MB Management"), a real estate development and management company with a focus on the development of low and moderate-income multi-family rental housing.

62.    Bowditch founded MB Management in 1971; Slavet joined MB Management in 1977; Rioff joined MB Management in 1978.

63.    Bowditch, Slavet, and Rioff have extensive experience in the ownership and management of multi-family residential housing. In addition to his twenty-five plus years at MB Management, Rioff has also served as a Senior Management Officer for the Massachusetts Housing Finance Agency.

64.    Under the direction of Bowditch, Slavet, and Rioff, MB Management has developed or acquired over fifty properties, totaling over 8,000 units and valued in excess of 300 Million Dollars.

65.     Upon information and belief, Bowditch, Slavet, and Rioff have substantial knowledge and experience with HUD's Markup-To Market Program, the valuation of Section 8 Housing projects, and financing of such projects.

### Facts

66.     Some time prior to September 2004, Defendants made the decision to attempt to acquire the interests of the Investor Limited Partners of the Partnership for less than fair value.

67.     Defendants' plan was designed both to acquire these limited partners' economic interests in the Partnership, and to obtain voting control over Partnership decisions that require a majority vote of the limited partners, such as sale of the Project or refinancing of the Partnership's debt.

68.     Defendants' scheme ultimately took the form of the Tender Offer whereby BSR would acquire the interests of the Investor Limited Partners in the Partnership.

69.     In connection with the Tender Offer, Defendants prepared and submitted to Plaintiffs a written offer, dated September 30, 2004, which sets forth the terms of the Tender Offer and other information (the "September 30 Letter"). A copy of the September 30 Letter is attached hereto as Exhibit A.

70.     The September 30 Letter is written on Old Salem letterhead, and is signed by Slavet. Slavet executed and sent the September 30 letter on behalf of and as agent for Defendants.

71.     Enclosed with the September 30 Letter was a purchase agreement setting forth the terms of the proposed acquisition of Investor Limited Partner interests (the "Purchase Agreement").

72.     The September 30 Letter describes the terms of the Tender Offer as follows:

11

> *[T]he General Partners, acting through an affiliate thereof [sic] (the 'Purchaser'), are offering to purchase the interests of all Investor Limited Partners* (the 'Offer') *for a purchase price equal to $50,000 per investment unit ('Unit'). The Purchaser is offering to purchase 100% of the Units. The Offer is conditioned upon 85% of the Units (i.e. 17 of the 20 Units) being tendered by the Investor Limited Partners.* (Emphasis added).

73.    The September 30 Letter goes on to provide additional information relating to the Partnership, the Project, and the Tender Offer.

74.    This additional information contains false and misleading statements of material fact, and fails to state material facts necessary to make the statements made not misleading, with respect to, among other things, the fairness of the offering price and the value of the limited partners' interests in the Partnership.

75.    In particular, the September 30 Letter misportrays the Partnership as a tax shelter investment that had run its course for the Investor Limited Partners, and presents only the prospect of generating substantial phantom income tax liabilities, with no little or no chance of cash distributions in the future.

76.    In that regard, the September 30 Letter states:

> As you may have seen in your K-1 annual statements, in recent years Partnership losses available to the Investor Limited Partners have declined and you have been allocated income. Partnership income allocable to the Investor Limited Partners is expected to increase steadily. The Partners will eventually be subject to a large tax liability resulting from phantom income allocated to the Partners, with no material projected cash distribution. . . . It is . . . likely that no cash flow would be available for distribution to the Investor Limited Partners for many years. While the Investor Limited Partners have received substantial tax benefits over the years, those benefits have now ceased.

77.    The September 30 Letter also falsely claims that the Partnership had no current plans to refinance the Partnership debt or sell the Project. Importantly, it claims that:

In the event the Partnership does, however, pursue a refinancing of the Mortgage Loan, *it is unlikely that the proceeds of a refinancing (or a sale) would be sufficient to repay all partnership debt and return any portion of each limited Partner's capital contribution in the best case scenario.* (Emphasis added).

78.     The September 30 Letter purports to support this claim by the following example:

For example, based on current rents and expenses, *assume a $7,000,000 loan to the Partnership is supportable.* (Emphasis added). The proceeds of the loan would likely be applied as follows:

| | |
|---|---|
| New Loan: | $7,000,000 |
| Pay-Off Existing Loan: | 1,700,000 |
| Rehab | 1,250,000 |
| Transaction Costs: | 600,000 |
| Reserves: | 450,000 |
| Available to Partnership: | $3,000,000 |

79.     Building upon this example, the September 30 Letter claims:

[A]ny available capital transaction proceeds and any next available cash flow would continue to be applied to the Purchase Money Loan, and therefore, while the Investor Limited Partners will continue to be allocated income (and at a further increased amount and rate as the partnership cash flow amortizes debt) *it is unlikely that the Investor Limited Partners would receive any cash distributions for the Partnership.* (Emphasis added).

80.     The September 30 Letter concludes its discussion of the state of the Partnership with the following bleak, but inaccurate, projection:

As indicated in this discussion, and pursuant to the terms of the current Partnership Agreement, if current Project operations are maintained, *it is unlikely that the Investor Limited Partners would ever receive a cash return on their investment.* (Emphasis added).

81.     Nowhere in the September 30 Letter is any mention made of the Markup-To-Market Program or its effect on the Project's market value or the Partnership's ability to refinance its debt. The omission of this material information made the September 30 Letter profoundly misleading. The omitted information would have shown that the Partnership's

condition and prospects were excellent, and that Plaintiffs' shares had far greater value than represented in the September 30 Letter.

82.    After painting this incomplete, one-sided picture of the future of the Partnership, the September 30 Letter sets forth BSR's offer to acquire Investor Limited Partnership interests for a price of $50,000 per unit.

83.    Given Defendants' vast experience controlling the business of the Partnership and with respect to other Section 8 housing projects, Plaintiffs believe and therefore aver that Defendants knew that the omissions from and representations in the September 30 Letter concerning the Markup-To-Market Program, the market value of the Project, the amount of debt refinancing the Partnership could support, and whether the Investor Limited Partners would ever receive a cash return on their investment were misleading and/or false.

84.    Plaintiffs further believe, and therefore aver, that Defendants deliberately refrained from seeking increased rent subsidies for the Project under the Markup-To-Market Program prior to the Tender Offer in order to be better able to support their claims concerning the value of Plaintiffs' Partnership Interests.

85.    Plaintiffs further believe and therefore aver that Defendants' motivation for their omissions and misrepresentations was to: (i) acquire Plaintiffs' economic interests in the Partnership; (ii) acquire voting control over the Partnership's sale of the Project or refinancing of its debt; and (iii) enrich themselves unfairly at the expense of and to the detriment of Plaintiffs.

86.    Plaintiffs believe and therefore aver that Defendants omitted material disclosures and made misrepresentations in order to: (i) prevent the Plaintiffs from making further inquiry into the value of the Partnership; (ii) prevent the Plaintiffs from learning the partnership's true value; and (iii) induce Plaintiffs to sell their interests in the Partnership for less than fair value.

87.    In reliance upon the above representations made by Defendants in the September 30 Letter, and because of the omission of material information from the September 30 letter, Plaintiffs tendered their interest in the Partnership to BSR in accordance with the terms of the Tender Offer.

88.    In addition to acquiring the economic interests represented by the tendered Units, Defendants acquired voting control over partnership acts requiring the consent of a majority of the limited partners.  Accordingly, Defendants now have unbridled authority to undertake any and all actions concerning the Partnership and the Project, including a sale of the Project or a refinancing of the Partnership's debt.

89.    Plaintiffs have since discovered that the statements and representations made by Defendants in the September 30 Letter were false, misleading, and incomplete, thereby rendering the price paid by BSR for their respective Partnership Units patently unfair.

90.    For example, Plaintiffs have learned that on or about December 1, 2004 -- less than two months after consummating the Tender Offer -- Defendants submitted to HUD the Partnership's rent comparability study in connection with its application to increase the Project's rents under the Markup-To Market Program.

91.    Plaintiffs also have learned that at all relevant times the Partnership was capable of supporting a loan of at least $15 Million to refinance its debt.  This amount is more than twice the amount of the loan Defendants claimed that the Partnership could support.

92.    Had the Partnership pursued such a refinancing of its debt, there would have been substantial additional proceeds available to return each Investor Limited Partner's capital contribution and provide for additional cash distributions.

93.     Plaintiffs have further learned that at all relevant times the Partnership could have sold the Project for at least $15 Million, and likely much more.

94.     Had the Partnership pursued such a sale of the Project, the proceeds of the sale would have been well in excess of the amount necessary to repay all partnership debt, return each Investor Limited Partner's capital contribution, and provide for additional cash distributions.

95.     Under either scenario -- an arm's length sale of the Partnership Property or a refinance of the Partnership's debt -- Plaintiffs would have received substantial cash distributions from the Partnership, which would have greatly exceeded the amount paid by BSR for their respective Limited Partnership Units.   The Defendants' omissions and misrepresentations deprived Plaintiffs of this value.

**COUNT I**
**Violation of Section 10(b) of the Exchange Act**
**and Rule 10b-5 Thereunder**
**(Plaintiffs v. Defendants)**

96.     Plaintiffs incorporate by reference, as if set forth at length herein, each and every allegation of paragraphs 1 through 95 of this Complaint.

97.     In connection with the Tender Offer, Defendants used the means of interstate commerce, including the mails and telephone system.

98.     Plaintiffs sold securities -- their Units of limited partnership interests in the Partnership -- to BSR pursuant to the terms of the Tender Offer.

99.     Defendants made misleading statements of fact in the September 30 Letter and omitted to state facts necessary to make the statements made in the September 30 Letter not false and/or misleading.

100.    The statements and omissions made in the September 30 Letter were false and/or misleading in the ways specified *supra.*

101.    Each Defendant participated in the making of such false and misleading statements or was under a duty to disclose facts to Plaintiffs.

102.    The false and misleading statements and omissions of fact were material to Plaintiffs decision whether to sell their Units of limited partnership interests in the Partnership to BSR.

103.    Plaintiffs reasonably relied upon these misrepresentations and Defendants' duty to disclose all material facts in selling their securities to BSR.

104.    Defendants acted with knowledge of the falsity of the statements made in the September 30 Letter or with reckless disregard for their truth, and with knowledge of the misleading nature of their omissions of fact.

105.    Defendants made these false and misleading statements and omissions with the intent to deceive, manipulate, and defraud Plaintiffs.

106.    Plaintiffs were damaged by Defendants' false and misleading statements and omissions, in that such misrepresentations were the proximate cause of Plaintiffs' damages.

107.    Plaintiffs are entitled to rescission of the Tender Offer or, alternatively, damages as a result of Defendants' violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §77j and Rule 10b-5 promulgated thereunder, 17 CFR 240.10b

## COUNT II
### Rescission Pursuant to Section 29(b) of the Exchange Act
### (Plaintiffs v. BSR)

108.    Plaintiffs incorporate by reference, as if set forth at length herein, each and every allegation of paragraphs 96 through 107 of this Complaint.

109.    Plaintiffs are within the class of persons that Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §77j, and Rule 10b-5 promulgated thereunder, 17 CFR 240.10b, seek to protect.

110.    As set forth above, Plaintiffs and BSR are in contractual privity on account of the Tender Offer and BSR's purchase of Plaintiffs' Partnership interests.

111.    Each Plaintiff is an innocent party to a contract with the BSR that was made and performed in violation Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §77j and Rule 10b-5 promulgated thereunder, 17 CFR 240.10b, in the ways specified *supra*.

112.    Pursuant to Section 29(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78cc(b), Plaintiffs are entitled to rescission of BSR's purchase of their Partnership Units pursuant to the Tender Offer.

## COUNT III
### Fraud and Misrepresentation
### (Plaintiffs v. Defendants)

113.    Plaintiffs incorporate by reference, as if set forth at length herein, each and every allegation of paragraphs 108 through 112 of this Complaint.

114.    Defendants made affirmative misrepresentations of material facts in the September 30 Letter and/or omitted statements that would otherwise have made the statements made therein not misleading

115.    At the time the statements in the September 30 Letter were made, Defendants knew that they were false and/or misleading.

116.    Defendants' misrepresentations and omissions in the September 30 Letter were made for the purpose of (i) acquiring Plaintiffs' economic interests in the Partnership at a price that was substantially less than their fair value; (ii) acquiring voting control over the

Partnership's decision to sell the Project or refinance of its debt; and (iii) enriching themselves at the expense of and to the detriment of Plaintiffs.

117.    Plaintiffs justifiably relied to their detriment upon the statements made in the September 30 Letter in making their decision to sell their interests in the Partnership to BSR.

118.    Plaintiffs have suffered losses and damages as a proximate result of Defendants' misrepresentation and fraud.

119.    Defendants' fraud and misrepresentation in connection with the Tender Offer was willful, wanton, and outrageous, and performed with callous disregard for the rights of Plaintiffs.

## COUNT IV
### Breach of Fiduciary Duty
### (Plaintiffs v. Bowditch and Slavet)

120.    Plaintiffs incorporate by reference, as if set forth at length herein, each and every allegation of paragraphs 113 through 119 of this Complaint.

121.    At all relevant times, Bowditch and Slavet, as the Partnership's General Partners, stood in a fiduciary relationship with respect to the Partnership and its limited partners, including Plaintiffs.

122.    In their capacity as fiduciaries, Bowditch and Slavet owed a duty of utmost good faith, fairness, and loyalty toward the Partnership and its limited partners, including Plaintiffs.

123.    Bowditch and Slavet's fiduciary duties toward the limited partners included the obligation (i) to make full disclosure of all material information; (ii) to refrain from self-dealing and reaping an individual profit not shared with the other partners in connection with a transaction relating to the Partnership, whether directly or indirectly through an affiliate; (iii) to manage the affairs of the Partnership with skill, prudence, and judgment; and (iv) to ensure that

Plaintiffs received a fair price for their interests in the Partnership in connection with the Tender Offer.

124.    Bowditch and Slavet breached their fiduciary duties to Plaintiffs by, among other things, (i) failing to pursue increased federal rent subsidies for the Project under the Markup-To-Market Program prior to the Tender Offer; (ii) presenting false and misleading statements of material fact in the September 30 Letter concerning a sale of the Project, refinancing of the Partnership's debt, and whether the Investor Limited Partners would ever receive a cash return on their investment; (iii) failing to advise Plaintiffs that the offering price for Units of Partnership in the Tender Offer was inadequate and unfair; (iv) inducing Plaintiffs to tender their interests in the Partnership to their affiliate, BSR, at a grossly unfair price; and (v) failing to ensure that Plaintiffs received fair value for their interests in the Partnership.

125.    Plaintiffs suffered losses and damages as a result of Bowditch and Slavet's breach of their fiduciary duties.

126.    Bowditch and Slavet's conduct in breach of their fiduciary duties was willful, wanton, and outrageous, and performed with callous disregard for the rights of the Partnership or its other partners.

**COUNT V**
**Negligent Misrepresentation**
**(Plaintiffs Against All Defendants)**

127.    Plaintiffs incorporate by reference, as if set forth at length herein, each and every allegation of paragraphs 120 through 126 of this Complaint.

128.    Defendants made affirmative representations of fact in the September 30 Letter and/or omitted statements that would otherwise have made the statements made therein not misleading.

129.    Defendants knew or should have known that their representations in the September 30 Letter were false and/or that the September 30 Letter omitted statements that would otherwise have made the statements made therein not misleading.

130.    A reasonable person would have considered the representations made in the September 30 Letter to be material to their decision whether to accept or reject the Tender Offer.

131.    Plaintiffs justifiably relied to their detriment upon the statements made in the September 30 Letter in making their decision to accept the Tender Offer and transfer their interests in the Partnership.

132.    Plaintiffs have suffered losses and damages as a proximate result of Defendants' misrepresentation.

## COUNT VI
### Breach Of Contract
### (Plaintiffs Against Bowditch and Slavet)

133.    Plaintiffs incorporate by reference, as if set forth at length herein, each and every allegation of paragraphs 127 through 132 of this Complaint.

134.    Under the terms of the Limited Partnership Agreement, the General Partners were charged with both the right and the obligation to manage and operate the business of the Partnership to the advantage of all partners.

135.    Plaintiffs performed all of their respective obligations under the Limited Partnership Agreement.

136.    Bowditch and Slavet beached their obligations under the Limited Partnership Agreement by, among other things, (i) failing to increase rents to the levels permitted by HUD after the Project became eligible to participate in the Markup-to-Market Program; (ii) presenting false and misleading statements of material fact and omitting material facts in the September 30 Letter concerning the valuation of Plaintiffs' interests in the Partnerships, and the fairness of the

terms of the Tender Offer; (iii) failing to advise Plaintiffs that the Tender Offer price for their respective interests in Old Salem was inadequate and unfair; (iv) inducing Plaintiffs to tender their interests in the Partnerships to BSR, their affiliate, at a grossly unfair price; (v) failing to ensure that Plaintiffs received fair value for their interests in the Partnerships.

137.    Plaintiffs have suffered losses and damages as a result of Bowditch's and Slavet's breach of the Limited Partnership Agreement.

**COUNT VII**
**Civil Conspiracy**
**(Plaintiffs v. Defendants)**

138.    Plaintiffs incorporate by reference, as if set forth at length herein, each and every allegation of paragraphs 133 through 137 of this Complaint.

139.    Defendants conspired by and among themselves to commit one or more of the following willful acts: (i) failing to pursue increased federal rent subsidies for the Project under the Markup-To-Market Program prior to the Tender Offer; (ii) causing the issuance of false and misleading statements in the September 30 Letter in an effort to disguise the fair value of Plaintiffs' interests in the Partnership; (iii) inducing Plaintiffs to tender their interests in the Partnership at less than fair value; (iv) acquiring Plaintiffs' interests in the Partnership at less than fair value; and (v) otherwise causing the General Partners to breach their fiduciary duties to the limited partners of the Partnership.

140.    The above-described acts were committed pursuant to the mutual agreement of Defendants to act together to the detriment of Plaintiffs.

141.    Plaintiffs have suffered and will continue to suffer losses and damages as a result of the above-described acts of Defendants.

142.    Defendants' conduct in forming and implementing the above-described conspiracy was willful, wanton, and outrageous, and performed with callous disregard for the rights of Plaintiffs.

## COUNT VIII
### Aiding and Abetting Breach of Fiduciary Duty
### (Plaintiffs v. Rioff and BSR )

143.    Plaintiffs incorporate by reference, as if set forth at length herein, each and every allegation of paragraphs 138 through 142 of this Complaint.

144.    Bowditch and Slavet breached their fiduciary duties to Plaintiffs by, among other things, (i) failing to pursue increased federal rent subsidies for the Project under the Markup-To-Market Program prior to the Tender Offer; (ii) presenting false and misleading statements of material fact in the September 30 Letter concerning a sale of the Project, refinancing of the Partnership's debt, and whether the Investor Limited Partners would ever receive a cash return on their investment; (iii) failing to advise Plaintiffs that the offering price for Units of Partnership in the Tender Offer was inadequate and unfair; (iv) inducing Plaintiffs to tender their interests in the Partnership to their affiliate, BSR, at a grossly unfair price; and (v) failing to ensure that Plaintiffs received fair value for their interests in the Partnership.

145.    Rioff and BSR knowingly induced and participated in Bowditch and Slavet's breach of their fiduciary obligations to Plaintiffs.

146.    Plaintiffs have suffered losses and damages as a result of Bowditch and Slavet's breach of their fiduciary duties.

147.    The conduct of Rioff and BSR in aiding and abetting Bowditch and Slavet's breach of their fiduciary duties was willful, wanton, and outrageous, and performed with callous disregard for the rights of Plaintiffs.

23

### Prayer for Relief

WHEREFORE Plaintiffs Robert M. Gerber, William J. and Jayne Gilligan, husband and wife, Sanford R. and Beth L. Hoffman, husband and wife respectfully request that this Court enter judgment in their favor and against Defendants Robert S. Bowditch, Jr., Gerald Slavet, Steven Rioff, and BSR Associates, jointly and severally, as follows:

1.     On Count One Ordering rescission of Plaintiffs sale of their Partnership Units to BSR and/or awarding damages in an amount to be determined at trial, plus interest, costs, and such other and further relief as this Court deems just and proper.

2.     On Count Two Ordering rescission of Plaintiffs sale of their Partnership Units to BSR, plus costs, and such other and further relief as this Court deems just and proper.

3.     On Count Three awarding damages in an amount to be determined at trial, plus interest, costs, and such other and further relief as this Court deems just and proper.

4.     On Count Four awarding damages in an amount to be determined at trial, plus interest, costs, and such other and further relief as this Court deems just and proper.

5.     On Count Five awarding damages in an amount to be determined at trial, plus interest, costs, and such other and further relief as this Court deems just and proper.

6.     On Count Six awarding damages in an amount to be determined at trial, plus interest, costs, and such other and further relief as this Court deems just and proper.

7.     On Count Seven awarding damages in an amount to be determined at trial, plus interest, costs, and such other and further relief as this Court deems just and proper.

8.     On Count Eight awarding damages in an amount to be determined at trial, plus attorneys' fees, interest, costs, and such other and further relief as this Court deems just and proper.

Dated:  April _19_, 2005

THE PLAINTIFFS

By their attorneys,

Daniel Murphy
Bernstein, Shur, Sawyer & Nelson
100 Middle Street
P. O. Box 9729
Portland, Maine 04104-5029

John J. O'Connor
BBO # 555251
Peabody & Arnold LLP
30 Rowes Wharf
Boston, MA  02110
(617) 951-2077

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Gerber, Robert M., as Trustee of The Rosalie Gerber Trust
Gilliam, William J., Jayne Gilligan, husband and wife,
Hoffman, Sanford R. and Beth L. Hoffman, husband and wife

## DEFENDANTS

Bowditch, Robert S. Jr.
Slavet, Gerald
Rioff, Steven
BSR Associates

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    Fairfield County, CT
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT    Suffolk County, MA
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Daniel Murphy, Esquire        John J. O'Connor, Esquire
Bernstein, Shur, Sawyer        Peabody & Arnold LLP
& Nelson, 100 Middle Street    30 Rowes Wharf, Boston, MA
Portland, ME 04104-5029        617-951-2100

ATTORNEYS (IF KNOWN)

**05  10782 DPW**

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)                    AND ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☒ 190 Other Contract<br>☐ 195 Contract Product Liability | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury — Med. Malpractice<br>☐ 365 Personal Injury — Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other<br>**LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence<br>**HABEAS CORPUS:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | ☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS — Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions |

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

28 U.S.C. 1331, et al - breach of contract, breach of fiduciary duty, negligent misrepresentation, et al

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A CLASS ACTION
☐ UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☐ YES    ☒ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):

JUDGE _____    DOCKET NUMBER _____

DATE    April ___, 2005

SIGNATURE OF ATTORNEY OF RECORD    _John J. O'Connor_

FOR OFFICE ONLY

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only) ___ Robert M. Gerber, as Trustee v
   Robert S. Bowditch, Jr.

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See
   local rule 40.1(a)(1)).

   ☐      I.      160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

   ☐      II.     195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,      *Also complete AO 120 or AO 121
                  740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.        for patent, trademark or copyright cases

   ☒      III.    110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
                  315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
                  380, 385, 450, 891.

   ☐      IV.     220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
                  690, 810, 861-865, 870, 871, 875, 900.

   ☐      V.      150, 152, 153.

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in
   this district please indicate the title and number of the first filed case in this court.

        None

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

                                                                    YES ☐      NO  ☒

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See
   28 USC §2403)

                                                                    YES ☐      NO  ☒

   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

                                                                    YES ☐      NO  ☐

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

                                                                    YES ☐      NO  ☒

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of
   Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule
   40.1(d)).

                                                                    YES ☒      NO  ☐

   A.     If yes, in which division do all of the non-governmental parties reside?

          Eastern Division    ☒          Central Division    ☐          Western Division    ☐

   B.     If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental
          agencies, residing in Massachusetts reside?

          Eastern Division    ☐          Central Division    ☐          Western Division    ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?  (If
   yes, submit a separate sheet identifying the motions)

                                                                    YES ☐      NO  ☐

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME ___ John J. O'Connor

ADDRESS ___ Peabody & Arnold, LLP, 30 Rowes Wharf, Ste. 600 Boston, MA  02110

TELEPHONE NO. ___ 617-951-2100

(Coversheetlocal.wpd - 10/17/02)

**Old Salem Associates**
**Limited Partnership**

September 30, 2004

Investor Limited Partners of
  Old Salem Associates Limited Partnership

  *Re: Proposed Purchase of Limited Partner Units*

Ladies and Gentlemen:

      As you are aware, Old Salem Associates Limited Partnership, a Massachusetts limited partnership (the *"Partnership"*) is the owner of a rental housing project commonly known as Fairweather Apartments comprised of four complexes located in Beverly, Danvers, Peabody and Salem, Massachusetts (the *"Project"*). As you are also aware, the Project and the Partnership are subject to a first mortgage loan insured by the Department of Housing and Urban Development (*"HUD"*) under Section 236 of the National Housing Act, as well as a purchase money note and accrued interest thereon due to an affiliate of the General Partners of the Partnership. To date, the Investor Limited Partners of the Partnership (the *"Investor Limited Partners"*) have received certain tax benefits in connection with the Project. These tax benefits have diminished over the years, and will continue to diminish steadily. In fact, the Partnership generated phantom income to the Investor Limited Partners in excess of $12,000 per unit in 2003, which phantom income is expected to increase in 2004, and each year thereafter.

      In response to the requests of certain Investor Limited Partners and to avoid the continued allocation of phantom income to the Investor Limited Partners, the General Partners, acting through an affiliate thereof (the *"Purchaser"*), are offering to purchase the interests of all Investor Limited Partners (the *"Offer"*) for a purchase price equal to $50,000 per investment unit (*"Unit"*). The Purchaser is offering to purchase 100% of the Units. The Offer is conditioned upon 85% of the Units (i.e. 17 of the 20 Units) being tendered by the Investor Limited Partners.

      Below is additional information relative to the Partnership, the Project, and the proposed Offer for your review. Also enclosed is a Purchase Agreement for your signature. If you wish to accept this Offer of purchase of your Unit(s), please execute the Purchase Agreement where indicated, and return it to the General Partners in the enclosed self-addressed stamped envelope.

### Partnership Operations

      The Project was acquired by the Partnership in 1983. In connection with the acquisition of the Project, the Partnership gave a purchase money note, secured by a security interest in each Partner's interest in the Partnership, to an affiliate of the General Partners in the amount of $2,800,000 (the *"Purchase Money Note"*). The Purchase Money Note bears interest at the rate of 12.5% per annum and is paid from all available cash flow and capital

-2-

transaction proceeds. The Purchase Money Note, although due upon the earlier to occur of a sale or refinancing of the Project or August 31, 2003, has yet to be re-paid and continues to accrue interest. (Further detail is contained in the Year 2003 audited financial statement that you recently received.) **As reflected in the audited financial statements, as of December 31, 2003, the total amount due under the Purchase Money Note for principal and interest was $7,288,588 (the "Purchase Money Loan")**. In addition, as reflected in the audited financial statements, the Partnership is subject to a first mortgage loan in the amount of $1,723,341 which does not mature until July 1, 2010. The Partnership currently receives interest reduction payments from HUD as well as rental subsidies pursuant to two Section 8 Housing Assistance Payments ("HAP") Contracts that subsidize 220 of the 321 rental units. These Section 8 contracts will expire on March 31, 2005. The General Partners will request a renewal of each Section 8 contract but it is not known what rent level HUD will approve at this time.

As you may have seen in your K-1 annual statements, in recent years Partnership losses available to the Investor Limited Partners have declined and you have been allocated income. Partnership income allocable to the Investor Limited Partners is expected to increase steadily. The Partners will eventually be subject to a large tax liability resulting from phantom income allocated to the Partners, with no material projected cash distribution. In fact, as you know, as a limited dividend organization, distributions are limited by HUD. After payment of Partnership expenses (including payments in respect of the Purchase Money Note) there has been no cash flow available for distribution to the Investor Limited Partners for some time. Even if there were cash available for distribution, it would not be available to the Investor Limited Partners. Pursuant to the terms of the Amended and Restated Certificate and Agreement of Limited Partnership of the Partnership dated August 25, 1983 (as amended, the "Partnership Agreement"), Project cash flow and capital transaction proceeds must be applied to pay Partnership debt including the first mortgage and the Purchase Money Loan. It is therefore likely that no cash flow would be available for distribution to the Investor Limited Partners for many years. While the Investor Limited Partners have received substantial tax benefits over the years, those benefits have now ceased.

There are no current plans to either refinance or market the Project for sale. In the event that the Partnership does, however, pursue a refinancing of the Mortgage Loan, it is unlikely that the proceeds of a refinancing (or a sale) would be sufficient to repay all Partnership debt and return any portion of each Limited Partner's capital contribution in the best case scenario. For example, based on current rents and expenses, assume a $7,000,000 loan to the Partnership is supportable. The proceeds of the loan would likely be applied as follows:

| | |
|---|---|
| New Loan: | $7,000,000 |
| Pay-Off Existing Loan: | 1,700,000 |
| Rehab | 1,250,000 |
| Transaction Costs: | 600,000 |
| Reserves: | 450,000 |
| Available to Partnership | $3,000,000 |

-3-

Pursuant to the Partnership Agreement and the terms of the Purchase Money Loan, any available capital transaction proceeds and any next available cash flow would continue to be applied to the Purchase Money Loan, and therefore, while the Investor Limited Partners will continue to be allocated income (and at a further increased amount and rate as the Partnership cash flow amortizes debt) it is unlikely that the Investor Limited Partners would receive any cash distributions from the Partnership.

## Purchase Offer

The Purchaser is offering to purchase the interests of the Investor Limited Partners for $50,000 per Unit ($25,000 for a half Unit). This is approximately 50% of the original capital contribution made by an Investor Limited Partner who purchased one Unit. This Offer should not be construed as a representation or statement made by the Purchaser as to the value of a Unit or the fairness of the Purchase Price. The Purchase Price was not determined by the Purchaser based on any current appraisal of the value of the Project. No independent person has been retained to evaluate or render any opinion with respect to the fairness of the Purchase Price and no representation is made by the Purchaser, the General Partners or any affiliate thereof as to such fairness. Investor Limited Partners are urged to consider carefully all of the information contained herein before accepting this Offer.

As indicated in this discussion, and pursuant to the terms of the current Partnership Agreement, if current Project operations are maintained, it is unlikely that the Investor Limited Partners would ever receive a cash return on their investment. In fact, if current operations are, the Partners will continue to be charged with significant income, as much as $13,000 per Unit for 2004, with no cash distribution to them. As described herein, the Partnership Agreement provides that cash flow and the proceeds of a sale or refinancing be used to pay creditors of the Partnership, including Partners. Further, any increased cash flow must first be used to repay creditors of the Partnership including any mortgages and the Purchase Money Loan; therefore it is unlikely that any cash flow would be available for distribution to the Investor Limited Partners for many years.

To create liquidity to the Investor Limited Partners, the Purchaser is offering to purchase the interests of each Investor Limited Partner for the price of $50,000 per Unit. It is a condition to the purchase that at least 85% of the Investor Limited Partners agree to sell their Units. The Purchaser may waive any such requirement as to one or more Partners but are not required to do so. In such case, the Purchaser reserves the right to proceed with the Plan of Purchase, and the Plan of Purchase would only be applicable to those Investor Limited Partners who consent to the purchase of their Units as described below. As discussed above, it is not likely that proceeds from any refinancing would produce a distribution to the Investor Limited Partners under the terms of the current Partnership Agreement which provide for the repayment of all Partnership debt prior to distributions to the Investor Limited Partners, and it is anticipated that the Investor Limited Partners will continue to be allocated phantom income in the amount of $13,000 per Unit in 2004, taxable at the ordinary income rate. The sale of your interest now will allow you to avoid such continued allocation of phantom income at increasing rates.

-4-

The purchase of your interest will trigger a tax of approximately $69,237.50 per Unit assuming a 25% capital gains rate. As of December 31, 2003, each one Unit of Investor Limited Partner interest had a negative tax basis, as shown in the K-1s, of approximately $236,950. If you sell your Unit, such amount would result in a capital gain, federally taxable at 25% to the extent of certain depreciation previously taken and 20% for an amount in excess thereof. An Investor Limited Partner may have unused losses which may be available to offset such gain. A purchase will result in a capital gains tax on such negative basis plus the $50,000 purchase price at the capital gains rate of 25% (i.e., (.25 times $236,950) plus (.20 times $50,000) = $69,237.50) *unless an Investor Limited Partner has unused losses which could currently be treated as an ordinary loss and offset such gain, or has received a step-up in basis with respect to such Unit.*

*Each Investor Limited Partner is encouraged to seek his or her own independent advice relative to the income tax consequences of a sale of his or Unit.*

The Purchaser is prepared to purchase 100% of the Units. It is a condition to this Offer, however, that at least 85% of the Investor Limited Partners agree to sell their Units. The Purchaser may waive any such requirement as to one or more Partners, but is not required to do so. **This Offer must be accepted within 30 days of the date of this letter unless extended by the Purchaser in its sole and absolute discretion.**

### Conclusion

By consenting to the Plan of Purchase, you will avoid the allocation of phantom income, taxable at ordinary income tax rates of up to 40%, and receive a cash payment of $50,000 per Unit. Cash distributions to the Investor Limited Partners are not otherwise expected to be made in any case. We believe that this is a beneficial plan for all Partners. Please feel free to contact Kevin C. Baptista at MB Management Company (781-356-2719), x179 acting on behalf of the Purchaser, if you have any questions. Each Partner should consult his or her own accountants with respect to the particular tax considerations to him or her presented herein.

**Please sign the enclosed Purchase Agreement and return it in the postage prepaid and addressed envelope provided so that the Purchaser may work toward an expeditious closing of this transaction.**

Sincerely,

Gerald Slavet, General Partner