**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| ROBERT M. GERBER, *et al.* | : | |
| | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION NO. |
| | : | 05-10782-DPW |
| v. | : | |
| | : | |
| ROBERT S. BOWDITCH, JR., *et al.* | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**
**SECOND AMENDED COMPLAINT**

Defendants move to dismiss because the Second Amended Complaint, as with the two prior complaints, fails to plead fraud with particularity as required by the Private Securities Litigation Reform Act ("PSLRA") and Fed. R. Civ. P. 9(b), and thus fails to state a claim for securities fraud or common law fraud. Plaintiffs not only fail to allege with any specificity why Defendants' alleged statements are false, they fall far short of pleading specific facts that would give rise to a strong inference that Defendants acted with *scienter*. Instead, Plaintiffs rely on general allegations of motive, statements of property value made by unidentified sources, and conjecture concerning what Defendants' "should have known" at relevant points in time. Their allegations far short of governing pleading requirements, and require dismissal of their fraud claims.

The balance of Plaintiffs' claims are premised on the identical factual allegations as the fraud claims. These claims sound in fraud and they, too, must be dismissed for Plaintiffs' failure to plead with particularity. In addition, to the extent that Plaintiffs seek to assert allegations of

mismanagement, those claims are derivative in nature and cannot be asserted by former limited partners.

## BACKGROUND

## SUMMARY OF ALLEGATIONS

### A.     The Parties

Plaintiffs are former limited partners in a Massachusetts limited partnership known as Old Salem Associates Limited Partnership ("Old Salem" or the "Partnership"). Old Salem owns a rental housing project called Fairweather Apartments with units in Beverly, Danvers, Peabody and Salem (the "Project"). Second Am. Compl., Ex. A at 1. [1]

Bowditch and Slavet are general partners of Old Salem and Rioff is a limited partner. Second Am. Compl., ¶¶ 34-35. Defendant BSR Associates ("BSR") is a partnership which is alleged to be owned by the individual defendants. *Id.* ¶ 30.

### B.     The September 30 Letter

In response to an offer set forth in a letter dated September 30, 2004 (the "September 30 Letter"), Plaintiffs each sold their interests in Old Salem to BSR for $50,000 per unit. Plaintiffs now assert that they relied on certain information in the September 30 Letter in deciding to sell their Partnership interests and that the September 30 Letter contained misstatements or omitted material information that led them to sell their interests at an unfair price.

The September 30 Letter is attached in its entirety to the Second Amended Complaint as Exhibit A. The September 30 Letter set forth an offer to purchase Partnership interests at $50,000 per unit. Second Am. Compl. Ex. A at 1. It also stated that, "This offer should not be construed as a representation or statement made by the Purchaser as to the value of a unit or the

---

[1] Defendants refer to the allegations of the Second Amended Complaint solely for purposes of this motion and do not admit or concede them.

fairness of the Purchase Price . . . .  No independent person has been retained to evaluate or render any opinion with respect to the fairness of the Purchase Price and no representation is made by the Purchaser, the General Partners or any affiliate thereof as to such fairness." Second Am. Compl. Ex. A at 3.

The September 30 Letter also recited information about the Partnership.  For instance, it stated that the Project owned by the Partnership is federally subsidized and is subject to a first mortgage loan insured by the Department of Housing and Urban Development ("HUD"). Second Am. Compl. Ex. A at 1.  In addition, it stated that the Partnership has a loan obligation, referred to as the Purchase Money Note, to an affiliate of the General Partners of Old Salem. Second Am. Compl. Ex. A at 1.  The September 30 Letter further stated that, "After payment of Partnership expenses (including payments in respect of the Purchase Money Note) there has been no cash flow available for distribution to the Investor Limited Partners for some time. . . . Pursuant to the terms of the [Partnership Agreement] . . . Project cash flow and capital transaction proceeds must be applied to Partnership debt, including the first mortgage and the Purchase Money Note.  It is therefore likely that no cash flow would be available for distribution to the Investor Limited Partners for many years."  Second Am. Compl. Ex. A at 2.  In addition to this discussion, the September 30 Letter directed limited partners to the 2003 audited financial statements that they recently had received for further details.  Second Am. Compl. Ex. A at 2.

The September 30 Letter also contained a discussion of what is commonly referred to as "phantom income."  Second Am. Compl. Ex. A at 1, 2.  When the Partnership was initially formed, limited partners received tax benefits as a result of Partnership losses.  In recent years, however, the Partnership had received income which, while allocated to limited partners for tax purposes, was not actually distributed to them, but rather was applied to Partnership debt.

Second Am. Compl. Ex. A at 2.  The September 30 Letter noted that such "phantom income" was expected to increase in 2004, and each year thereafter. *See* Second Am. Compl. Ex. A at 1.

Finally, the September 30 Letter stated that the Partnership "currently receives interest subsidies or payments from HUD as well as rental subsidies pursuant to Section 8 Housing Assistance Payments ("HAP") Contracts that subsidize 220 of the 321 rental units.  These Section 8 contracts will expire on March 30, 2005.  The General Partners will request a renewal of each Section 8 contract but it is not known what rent level HUD will approve at this time."  Second Am. Compl. Ex. A at 2.

### C.      The Partnership's Contract Renewal

Consistent with statements in the September 30 Letter, Defendants sought to renew the Partnership's two Section 8 contracts.  Defendants submitted a proposal for renewal of the contracts on November 10, 2004.  Second Am. Compl. ¶¶ 98, 102 & Ex. C.  In conjunction with the proposal, Defendants sought an increase in rents pursuant to HUD's "Markup-to-Market Program." *Id.* ¶¶ 97-99.  According to the Second Amended Complaint, the Project could not participate in the Markup-to-Market program as of right, because it did not satisfy a "100 percent [Fair Market Rent] requirement." *Id.* ¶ 103.  As a result, Defendants were required to seek "a waiver of the requirements to participate in the Markup-to-Market program." *Id.*

In connection with their proposal for contract renewal, Defendants sought rent increases of approximately 44.6%. *Id.* ¶¶ 108-09.  HUD ultimately approved rent increases of approximately 35%.  Second Am. Compl., ¶ 112.

### D.      Plaintiffs' Allegations

In substance, Plaintiffs assert that the September 30 Letter's statements about the Partnership's inability to support cash distributions to limited partners were inaccurate.

Plaintiffs' assertion is based upon two separate contentions, neither of which is supported by particularized facts. First, Plaintiffs contend that as of September 30, 2004, the Project was worth $15 million, more than the combined total of the Project's debt of approximately $9 million and anticipated rehabilitation and other expenses of some $2.3 million. Second Am. Compl.,¶¶47, 82; Second Am. Compl. Ex. A at 2. Second, Plaintiffs contend that as a result of the Project's asserted value, it could have supported financing that would have enabled the Partnership to make distributions to limited partners.

As to Plaintiffs' first contention, they assert that they have "learned" that the Project was worth over $15 million. Second Am. Compl., ¶ 115. In support of this assertion, Plaintiffs allege that, prior to the commencement of this action, AHP Holdings Company LLC offered to purchase the Project for $14.5 million, and that the individual Defendants rejected the alleged offer. *Id.* ¶ 115-17. Plaintiffs give no details concerning the alleged offer: no dates are given; no terms or conditions are defined; and no description of AHP Holdings is provided. Neither do Plaintiffs explain what connection they may have had to AHP Holdings.

In addition, notwithstanding the uncertainty about whether an application to the Markup-to-Market Program will be favorably received and the level of any rent subsidies, Plaintiffs assert that the potential availability of rent increases through the Program increased the market value of the Project as of September 30, 2004. Second Am. Compl., ¶ 8. Plaintiffs do not explain exactly how or to what extent the possibility of future rent increases affected the Project's value.

As to the second contention, the Second Amended Complaint adds a new allegation that "Mr. Daniel Smith" informed Plaintiffs that an unidentified person at MassHousing told him in January 2005 that MassHousing would be prepared to refinance the Partnership's existing debt for at least $15 million. Second Am. Compl., ¶113. The allegations do not disclose who "Mr.

Smith" is, what his relationship is with Plaintiffs or with MassHousing, or how or when he conveyed to Plaintiffs information concerning refinancing. Moreover, Plaintiffs provide no information concerning the purported ability to refinance, such as who at MassHousing made the statement, what his or her position was at MassHousing, when the statement was made, whether it was in writing, what the terms of the financing were to be, the information upon which the statement was based, and whether the statement was conveyed to Defendants prior to its inclusion in the Second Amended Complaint. None of this information is described.

Plaintiffs further assert that the Defendants' statements in the September 30 Letter were not only inaccurate but fraudulent because Defendants allegedly knew that the Project could be refinanced or sold at a price sufficient to yield a return to limited partners. Plaintiffs do not allege personal knowledge or even direct evidence of Defendants' knowledge or state of mind. Rather, Plaintiffs assert, effectively on information and belief, facts that they claim give rise to an inference that Defendants knew the Project was worth $15 million, that it could be refinanced at a level that would support a short-term return to limited partners, and that Defendants acted with the intent to defraud. The asserted facts from which Plaintiffs seek to infer that Defendants acted with *scienter* include the allegation that Defendants had a motive to misstate the likelihood that limited partners would receive a return of capital in order to be able to purchase Partnership units at a lower price; that, as stated in the September 30 Letter, Defendants made an application for increased rental subsidies shortly after September 30; and that "AHP Holdings . . . has represented to Plaintiffs that anyone with the level of knowledge and experience in low income housing as represented in the MB Management's web site would readily understand that the Project was worth no less than $15 million. Second Am. Compl., ¶¶ 92, 96-112, 118. Plaintiffs'

*scienter* allegations often lack the requisite specificity and those that are well pleaded fail to create a strong inference of fraudulent intent.

In addition, Plaintiffs apparently seek to pursue a claim of mismanagement of the Partnership. Defendants, Plaintiffs assert, "incur[ed] inflated and excessive management and administrative fees." Second Am. Compl. ¶¶ 149, 162, 166, 171. As former limited partners, Plaintiffs lack standing to pursue any claim of this type, which is derivative in nature.

## ARGUMENT

### I.    THE COMPLAINT FAILS TO PLEAD FRAUD WITH THE PARTICULARITY REQUIRED BY THE PSLRA AND RULE 9(b).

Plaintiffs' claims under Sections 10(b) and 29(b) of Securities Exchange Act of 1934 ("Exchange Act") (Counts I and II) require that Plaintiffs prove, among other things, that Defendants made false or misleading statements with an intent to defraud, or *scienter*, upon which Plaintiffs relied and which caused loss. *See, e.g., Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 186 (1976); *In re Cabletron Sys., Inc.,* 311 F.3d 11, 27 (1st Cir. 2002).[2] Plaintiffs' claim of common law fraud and misrepresentation (Count III) requires proof of these same elements. *See, e.g., Eureka Broadband Corp. v. Wentworth Leasing Corp.,* 400 F.3d 62, 68 (1st Cir. 2005) (applying Massachusetts law). The Complaint fails to properly plead either falsity or *scienter* and therefore must be dismissed.

### A.    Plaintiffs Fail to Plead With Specificity *Why* Defendants' Statements and Omissions Were Allegedly Fraudulent.

Under the PSLRA, a securities fraud complaint must "specify each statement alleged to have been misleading, *the reason or reasons why the statement is misleading*, and, if an allegation regarding the statement is made on information and belief, the complaint shall state

---

[2] Plaintiffs' claim for rescission under Section 29(b) is derivative of the Section 10(b) claim. *See* Second Am. Compl. ¶¶ 133-137; Exchange Act § 29(b).

with particularity all facts on which that belief is formed." 15 U.S.C. §78u-4(b)(1) (emphasis added).  The statute is clear that plaintiffs must plead that the alleged statements were false when made based upon information plaintiffs know or upon information and belief; if the latter, they must set forth with particularity the facts upon with they formed the belief.  Thus, Plaintiffs must allege particularized facts that not only identify the specific statements that are alleged to be false, but that show *why* those statements were false.  *See Greebel v. FTP Software,* 194 F.3d 185, 193-94 (1st Cir. 1999) ("The PSLRA's pleading standard is congruent and consistent with the pre-existing standards of this circuit;" Rule 9(b) requires a fraud plaintiff to specify each allegedly misleading statement or omission, and to explain *why* the challenged statement or omission is misleading by providing factual support).[3]  Plaintiffs' allegations that statements in the September 30 Letter were false fail to satisfy this requirement.

The substance of the Second Amended Complaint is that the statements in the September 30 Letter concerning the likelihood that the proceeds of a refinancing or sale of the Project would be insufficient to allow cash flow to limited partners "for many years" were false.  Second Am. Compl.,¶77.  Plaintiffs alleged that these statements were false because the Project could be refinanced or sold for more than $15 million, an amount asserted to be sufficient to allow a

---

[3]Notwithstanding the plain language of the statute, one district court opinion stated that the requirement of pleading with particularity applies only to allegations identifying the statements or omissions claimed to be fraudulent and does not apply to allegations of facts to support an inference that the identified statements or omissions were fraudulent.  *In re. Allaire Corp. Secs. Litig.,* 224 F. Supp. 2d 319 (D. Mass. 2002) (Young, C.J.).  That opinion, however, does not comport with the language of the PSLRA or Rule 9(b) and has not been adopted by the First Circuit.  *See* 15 U.S.C. §78u-4(b)(1) (quoted in above text); Fed. R. Civ. P. 9(b) ("In all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity.").  Additionally, the First Circuit in *In re Cabletron,* at least inferentially rejected this position.  311 F.3d 11, 25 (1st Cir. 2002).  In that case, the court considered the sufficiency of the allegations concerning not only the "identification of materially misleading statements," but also the *"particularity of fraud pleadings." Id.* at 33, 28 (emphasis added).  Indeed, it expressly addressed the circumstances under which the falsity of a statement could be pled in reliance upon anonymous sources, a question that would not arise if falsity was not required to be supported by facts pled with specificity.  *Id.* at 29.

return to limited partners.  Second Am. Compl.,¶¶113, 115.  As discussed below, Plaintiffs'

conclusory allegations fail to plead fraud with the requisite specificity.

1.    **The Allegations Concerning the Availability of Refinancing, as Reported by "Mr. Smith," do not Meet the Particularity Requirement.**

The Second Amended Complaint alleges that "Plaintiffs have been told by Mr. Daniel

Smith that in a discussion he had with a representative of MassHousing in or around January

2005 [four months after the Tender Offer], Mr. Smith was informed that MassHousing would be

prepared to refinance the Partnership's existing debt for at least $15 Million."  Second Am.

Compl., ¶113.[4]  As an initial matter, this allegation is pure hearsay and is therefore inadmissible

since Plaintiffs offer it to prove the truth of the matter asserted - namely, as evidence of the

amount of refinancing available to the Partnership from MassHousing.  Fed. R. Evid. 802 (a

statement, "other than one made by the declarant while testifying at the trial or hearing, offered

in evidence to prove the truth of the matter asserted" is inadmissible).  *See also, Greebel,* 182

F.R.D. at 373 (granting renewed motion to dismiss and motion for partial summary judgment on

securities fraud claims, holding that Plaintiffs' intended proffer of testimony would likely be

ruled inadmissible hearsay); *Millet v. United Stated Department of the Army,* 245 F. Supp. 2d

344, 353 (D.P.R. 2002) (granting no weight on motion to dismiss to series of emails sent to

Plaintiff which constituted hearsay; the emails were nothing but "stray remarks" not attributed to

---

[4]Plaintiffs' allegations concerning the Project's value are couched in the language of what Plaintiffs and others "have learned" since the tender offer; as such, they are implicitly made on information and belief.  *See* Second Am. Compl., ¶¶113, 115.  The First Circuit, in its application of both Rule 9(b) and the PSLRA, does not allow plaintiffs who resort to such circuitous pleading techniques to evade compliance with the heightened pleading requirements. *See Romani,* 929 F.2d at 878 (affirming finding that complaint did not plead fraud with sufficient particularity where complaint was implicitly based only on information and belief).  *Cf., In re Cabletron,* 311 F.3d at 28 (requiring confidential source pleadings to comply with the "information and belief" particularity requirements of 15 U.S.C. §78u-4(b)(1)); *Van Ormer et al. v. Aspen Tech.,* 145 F. Supp. 2d 101, 103 (D. Mass. 2000) (allegations based on investigation by counsel are similar to those based on information and belief and therefore complaint must specify the facts upon which the information is based).  Under the PSLRA, if an allegation is made expressly or implicitly on information and belief, the complaint "[must] state with particularity all facts on which that belief is formed." *See* Section 21D(b)(1) of the Exchange Act, 15 U.S.C. §78U-4(b)(1).

persons with authority as to the matter in question); *Ayala-Gerena v. Bristol Myers-Squibb Company,* 95 F.3d 86, 96 (1st Cir. 1996) ("stray remarks," particularly those made by nondecisionmakers or statements made by decisionmakers unrelated to the decisional process itself, does not constitute direct evidence of actual reason for decision).

Moreover, where a plaintiff relies on unnamed sources, the sources must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *In re Focus Enhancements, Inc., Sec. Litig,* 309 F. Supp. 2d 134, 149 (D. Mass. 2001) (citation omitted). *See also In re Cabletron Sys., Inc.*, 311 F.3d at 29-30 ("there is no requirement that [confidential sources] be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." (internal citation and quotation marks omitted)); *In re Cree, Inc. Sec. Litig.*, 333 F. Supp. 2d 461, 473 (M.D.N.C. 2004) (claims supported only with general statements such as "according to Eric Hunter" and "as explained by Eric Hunter" were insufficient to show personal knowledge). In reviewing whether sufficient facts have been pled to support a strong inference of fraud, a reviewing court must evaluate, *inter alia, "*the level of detail provided by the sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *In re Cabletron Sys., 311 F.3d at 30.

Here, Plaintiffs' allegations concerning the unidentified "Mr. Smith" and his unnamed source at MassHousing provide no details that could "support the probability that [persons] in the position occupied by the source[s] would possess the information alleged." *Id.* at 29-30. There are no allegations about who Mr. Smith is, whom he works for, or what he does for a living. Nor

is any information provided about Mr. Smith's unnamed source, other than that he is "at MassHousing." Plaintiffs fail to allege the MassHousing source's position or provide *any* facts that would suggest he was knowledgeable. These allegations, accordingly, are insufficient to satisfy particularity requirements.

**2.      The Allegations Concerning an Offer to Purchase on the Eve of This Litigation Fail to Satisfy the Particularity Requirement.**

For similar reasons, Plaintiffs' vague allegations concerning an alleged offer to purchase Partnership assets made by AHP Holdings are inadequate to support their assertion that the September 30 Letter contained false statements. As with their allegations concerning the purported MassHousing offer to refinance, Plaintiffs' allegations concerning the alleged AHP Holdings' offer lack all relevant detail: they fail to disclose when (i.e., how long after the September 30 Letter) the alleged offer was made, through whom and in what form it was conveyed to "the Partnership," to whom in the Partnership it was conveyed, and what the terms and conditions of the proposed purchase were, including, for instance, whether the purchaser would continue to operate the properties as low-income housing. Rather than giving rise to an inference that the offer was *bone fide*, Plaintiffs' allegations – particularly those concerning the timing of the alleged offer and the apparent relationship between AHP Holdings and Plaintiffs[5] – equally suggest that the alleged "offer" was little more than a pre-litigation tactic by Plaintiffs to seek to generate support for a lawsuit.

---

[5] Plaintiffs do not explain how and why they came to know about AHP Holdings' alleged offer to purchase assets held by a partnership in which they no longer held any interest. Second Am. Compl. ¶ 116. They do, however, allege that AHP Holdings for whatever reason offered Plaintiffs its opinion as to the value of the Partnership as of September 2004. *Id.* ¶ 116.



In addition, courts routinely hold that evidence of unaccepted offers to purchase a given property are inadmissible as evidence in cases that involve a question as to the property's value.[6] Accordingly, the allegation of an unaccepted offer to purchase alleged in this case should be afforded no weight.

### 3. The Allegations Concerning Rent Increases Provide no Support for Plaintiffs' Allegation of Falsity.

The other allegations in the Second Amended Complaint similarly lack specificity and are inadequate to allege falsity. In their latest complaint, Plaintiffs now allege that HUD approved a 34.6% rent increase pursuant to the Markup-to-Market Program. Second Am. Compl., ¶ 112. However, even Plaintiffs' third try at pleading still fails to provide facts that show that the increased rent level, when considered in light of Project expenses and Partnership obligations, would yield sufficient net income to support a commercially reasonable financing or a sale that would yield funds sufficient, under the terms of the Partnership Agreement, to pay a return to limited partners, let alone an amount greater than that paid pursuant to the tender offer. Indeed, whatever level of rent is received as a result of a successful application to the Markup-to-Market Program, the actual receipt of payments itself is dependent on annual Congressional appropriations. See 24 C.F.R. 401.554 (appropriations); 24 C.F.R. 595 (term of the contract renewals determined by the appropriate HUD official). Moreover, continued participation in the

---

[6] See, e.g., Lee v. Lee, 47 S.W. 3d 767 (Tex. App. 2001) (unaccepted offers to purchase property are no evidence of market value of property); Bailey v. Treasure, 462 So.2d 537 (Fla. App. 1985) (unaccepted offers to purchase could not be considered as evidence of value); Dickenson v. Fitchburg, 13 Gray 546 (Mass. 1859) (amount of the unaccepted purchase offer did not tend to show value since the witness could have had special reasons for making the offer which were unrelated to its market value; unexplained offers were therefore incompetent as evidence of value); Security Ben. Ass'n v. Swartz, 70 P. 3d 16 (Kan. 1937) (evidence of unaccepted offer to purchase held inadmissible where evidence offered for purpose of proving that the subject property was sold at a sheriff's sale for an amount less than its fair market value); Chaney v. Coleman, 13 S.W. 850 (Tex. 1890) (evidence of unaccepted offer to purchase held inadmissible where evidence offered in a suit for cancellation of a deed as proof that the vendor had misrepresented the value of the property). See also Fowler v. County Comrs. of Middlesex, 6 Allen 92 (Mass. 1863) (value of an offer depends upon too many considerations to allow it to be used as a test fort the worth of property).

program will require reapplication and there is no assurance as to whether the Project will continue to be able to participate or the level of any rental subsidies. Without more, there is no basis to conclude that the effect of an application to the Markup-to-Market Program would be to allow the Partnership to yield a return to Plaintiffs on their investment by refinancing.

>    4.    **In the Absence of Adequate Allegations Concerning _Why_ Defendants' Alleged Statements Were False, the Claims Should be Dismissed.**

Plaintiffs' unsupported allegations are similar to those allegations in the multitude of claims brought against banks a decade ago asserting that loan loss reserves were inadequate and should have been higher. Without specificity as to _why_ the reserves should have been higher and without particularized facts supporting that conclusion, the allegations were repeatedly held to be insufficient. _See, e.g., Lindner Dividend Fund Inc. v. Ernst & Young,_ 880 F. Supp. 49, 58 (D. Mass. 1995) (collecting cases). Here, the assertions that the Project had a value of $15 million in September 2004 and could support a refinancing at a level sufficient to pay a return on investment to limited partners are not supported by facts pled with specificity. As a result, the Second Amended Complaint must be dismissed.

>    B.    **Plaintiffs' Allegations do not Give Rise to a Strong Inference of Scienter.**

>        1.    **The PSLRA and Rule 9(b) Require Plaintiffs to Provide Factual Support for the Allegations of Fraudulent Intent.**

Under the PSLRA, the Complaint must, "with respect to each act or omission alleged to violate [the Exchange Act], state with particularity facts giving rise to a strong inference that the Defendants acted with the requisite state of mind." Section 21D(b)(2) of the Exchange Act, 15 U.S.C. §78u-4(b)(2). For a securities fraud claim, the requisite state of mind is _scienter,_ or the "intent to deceive, manipulate or defraud." _Ernst & Ernst,_ 425 U.S. at 193 (holding that private cause of action under Section 10(b) and Rule 10b-5 will not lie in absence of allegation of

scienter, or intent to deceive, manipulate, or defraud); *Greebel*, 194 F.3d at 194. In evaluating whether a complaint pleads *scienter* with sufficient particularity, a court is to scrutinize the complaint to determine whether there are specific allegations of fact giving rise to a strong inference of fraudulent intent, keeping in mind the fact that the "pleading of scienter may not rest on a bare inference that a defendant 'must have had knowledge of the facts.'" *In re Galileo Corp. Shareholders Litig.*, 127 F. Supp. 2d 251, 264 (D. Mass. 2001) (citation omitted). Instead, "inferences of scienter survive a motion to dismiss only if they are both reasonable and 'strong.'" *Greebel*, 194 F.3d at 195-96. When "the plaintiff brings his [fraud] claim on information and belief, he must set forth the source of the information and the reasons for the belief." *Aldridge v. A.T. Cross Corp.,* 284 F.3d 72, 78 (1st Cir. 2002).

Rule 9(b) of the Federal Rules of Civil Procedure imposes parallel pleading requirements as to the *scienter* allegations of a common law claim of fraud. *See, e.g., Maldonado v. Dominguez,* 137 F.3d 1, 9 n.5 (1st Cir. 1998) (observing that the standard for pleading *scienter* under the PSLRA does not differ from that which the First Circuit has historically applied). The complaint cannot rest on bare assertions of fraudulent intent, but must instead provide some factual support for the allegations of fraud. *See, e.g., Wayne Investment, Inc. v. Gulf Oil Corp.,* 739 F.2d 11, 13 (1st Cir. 1984); *New England Data Services, Inc. v. Becher,* 829 F.2d 286, 288 (1st Cir. 1987). Under Rule 9(b), as under the PSLRA, where allegations of fraud are explicitly or implicitly based on information and belief, the complaint must set forth the source of the information and the reasons for the belief. *Romani,* 929 F.2d at 878.

### 2. Plaintiffs' *Scienter* Allegations Fail to Create a Strong Inference of Fraud.

Here, the essential premise of Plaintiffs' assertion of fraud is that, at the time of the September 30 Letter, Defendants knew that the Project could be refinanced or sold for an amount

that would pay existing debt and anticipated expenses and allow a return to limited partners in the short-term. Plaintiffs advance three clusters of allegations in support of this contention:

- first, because Defendants were offering to purchase Plaintiffs' Partnership units, Defendants had a motive to understate the value of the units;

- second, shortly after the September 30 Letter, Defendants applied to renew HUD contracts for the Project and, in conjunction with that application, sought increases in rent subsidies; and

- third, in the opinion of AHP Holdings, Defendants should have known that the Project was worth at least $15 million.

These allegations, viewed separately or *en masse*, fall woefully short of giving rise to *any* inference that Defendants acted with *scienter*, much less the strong inference of *scienter* required under the PSLRA. As discussed below, bald allegations of motive are inadequate to satisfy the pleading requirement. As to the HUD application, the fact that an application would be filed was disclosed in the September 30 Letter and, in all events, there is no allegation that Defendants had knowledge at the time of the letter (i) that the contracts would be renewed, (ii) that rent subsidies would be increased and by how much, or (iii) that any increase would translate into a short-term return to limited partners. Finally, as to the AHP Holdings opinion, the complaint fails to offer any description of what AHP Holdings is, much less how it was in a position to accurately opine on the Project's value or Defendants' knowledge of the Project's value. For these reasons, Plaintiffs have failed to adequately plead *scienter*, requiring dismissal of the Second Amended Complaint.

### a.  Plaintiffs' Bare Allegations of Motive Lack Factual Support and are Insufficient to Give Rise to a Strong Inference of Fraud.

Plaintiffs' assertion of fraudulent intent comes down largely to motive: Defendants were offering to purchase Partnership units and had reason to wish to pay less rather than more. But motive, even coupled with opportunity, is not sufficient under the heightened pleading requirements of Rule 9(b) and the PSLRA. *See Greebel,* 194 F.3d at 197 ("merely pleading motive and opportunity, regardless of strength of inference to be drawn of scienter, is not enough"); *Baron v. Smith,* 285 F. Supp. 2d at 108-09 (same; evidence of actual intent to deceive or extreme departure from the standards of ordinary care is required). The rationale for this proposition is evident: any buyer (or seller) has a motive to pay less (or receive more). Unless specific facts that create a strong inference of *actual* fraudulent intent are required, the PSLRA (and Rule 9(b)) would be unable to function as a screen to separate out meritless claims from those that at least warrant discovery. *See,* e.g., *Acito v. IMCERA Group,* 47 F.3d 47, 54 (2d Cir. 1995) (permitting a finding of *scienter* based solely upon financial interest or motive and opportunity to mislead would expose "virtually every company in the United States"); *Sturm v. Marriott Marquis,* 26 F. Supp. 2d 1358, 1370 (D. Ga. 1998) (allegations of motive and opportunity to defraud, unaccompanied by "facts constituting strong circumstantial evidence of reckless or conscious misbehavior by the Defendants" were not sufficient to state a claim for securities fraud).

To adequately plead *scienter*, a plaintiff must plead specific facts tending to show that the defendant engaged in some form of tangible misconduct giving rise to a strong inference that a challenged statement was knowingly false when made and that the defendant deliberately or recklessly made the false statement. *Baron,* 285 F. Supp. 2d at 108-09 (granting motion to dismiss where plaintiffs alleged motive and opportunity alone but no additional misconduct).

Here, Plaintiffs have entirely failed to plead that Defendants engaged in any form of misconduct whatsoever that could support an inference of *scienter*. Instead, they have alleged motive alone, with no specific factual support creating a strong inference that Defendants actualized that alleged motive. Their bare motive and opportunity allegations must be set aside completely and should be afforded no weight.

The opinion in *Sturm v. Marriott Marquis* is particularly instructive because the allegations parallel those in this case. There, the plaintiff limited partners alleged that Marriott understated the value of a hotel in a consent solicitation for a merger transaction and that it was worth more than $300 million. Plaintiffs further alleged that through the merger, the general partner and its parent corporation were "taking the equity, value and profits of the Hotel from the Limited Partners and giving it to themselves." 26 F. Supp. 2d at 1366. While the plaintiffs pled that the defendants had a motive to defraud the limited partners by misstating the value of the hotel, the Court found that the plaintiffs had not alleged facts constituting strong circumstantial evidence of *scienter* in connection with the statements in the consent solicitation regarding the hotel's value. The Court thus dismissed the claim on the basis that the allegations of motive and opportunity to defraud were not sufficient to state a claim for securities fraud. *Id.* at 1370.

After the *Sturm* plaintiffs amended their complaint and the defendants moved to dismiss a second time, the Court again dismissed the securities fraud claim insofar as it was based on the omission of certain information allegedly relevant to the hotel's value (although it allowed the claim to go forward based on other allegations). *Sturm v. Marriott Marquis Corp.,* 85 F. Supp. 2d 1356, 1371-72 (D. Ga. 2000). The Court explained that plaintiffs merely "alleged an abundance of facts establishing that the limited partnership merger benefited the Defendants to the detriment of the Plaintiffs," which was itself insufficient. *Id.* at 1371. Moreover, no strong

inference of *scienter* arose from the omissions themselves (which included the alleged omission of a higher appraised value of the hotel) and even if the omitted facts were material to the hotel's value, the plaintiffs still had not alleged sufficient facts to establish *scienter*. *Id.* at 1372. Instead, one could easily draw the opposite inference: that the omitted facts were not disclosed because the defendants did not want to mislead the limited partners through the implications to be drawn from their inclusion. *Id.*

As in *Sturm*, the Second Amended Complaint here, is entirely lacking in specific factual allegations showing either that the project had a value of $15 million or that Defendants knew or believed that it had such value at the time of the September 30 Letter.

> **b.** **The Timing of the Tender Offer Relative to the Application to Markup-to-Market and the Results of the Rent Comparability Study do not Give Rise to any Inference of Fraudulent Intent.**

Plaintiffs seek to make much of their allegation that Defendants applied to HUD to increase rents shortly after the September 30 Letter. This allegation does not contradict the September 30 letter, which, after noting that the existing Section 8 contracts would expire on March 31, 2005, expressly stated that "the General Partners will request renewal of each Section 8 contract but it is not known what rental level HUD will approve at this time." Second Am. Compl. Ex. A at 2. The notes to the audited financial statements referenced in the September 30 Letter make clear that the Partnership's efforts to seek rent increases through the Markup-to-Market Program were no secret. Roberts Aff. Ex. B at §§1, 8 (describing the Project's two HUD contracts and referencing "a request to markup-to-market").[7]

---

[7] On this motion, the Court may properly consider the the financial statements because they are referenced in the September 30 Letter upon which Plaintiffs base their claim and which Plaintiffs incorporated in their Complaint. *See In re Raytheon Securities Lit.,* 157 F. Supp. 2d 131, 146 (D. Mass. 2001) (court may consider documents "pertinent to the action or referenced in the complaint"); *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1220 (1st Cir. 1996) (court may consider entirety of document integral to or relied on in framing the complaint); *Watterson v. Page,* 987 F.2d 1, 3 (1st Cir. 1993) (affirming propriety of considering documents referred to in complaint on motion to dismiss). *See also,* Fed. R. Evid. 106 ("When a writing or recorded statement or part thereof is introduced

Plaintiffs also attempt to plead *scienter* by alleging that the Defendants' Rent Comparability Study was dated October 21, 2004, nine days before the expiration of the tender offer period and that, while HUD ultimately granted a lower increase in rent subsidies, the Partnership sought a 44.6% increase.  Second Am. Compl., ¶104, 109.  Plaintiffs contend that *Defendants "must have known" that HUD would approve increased rent subsidies at a level that would result in a cash return to the limited partners in the short-term.*  These allegations are inadequate to plead *scienter*.

Specifically, the alleged inference of fraud flies in the face of Plaintiffs' own allegations that reflect the uncertainty of the Markup-to-Market Program.  Indeed, according to the Second Amended Complaint, the Partnership had to request a waiver of the requirements of the program to renew its contracts and seek a rent increase.  Moreover, Plaintiffs' pleadings in this case demonstrate the uncertainties about the level of any increased rental subsidies.  While the First Amended Complaint alleged that Defendants acted with *scienter* because, "[u]pon information and belief, the Project was . . . eligible to apply for a waiver permitting rent increases in excess of 150% of fair market rents" (First Am. Compl., ¶60), the Second Amended Complaint alleges that Defendants actually sought increases of 44.6% – not over "fair market rents," but over the outdated rents the Partnership was receiving under the expiring contracts.  Of course, Plaintiffs also now allege HUD, in the end, awarded increases that were substantially lower than requested.  Far from giving rise to a strong inference that Defendants acted with fraudulent intent at the time of the September 30 Letter, Plaintiffs' allegations, and the evolution of those allegations, illustrate the accuracy of Defendants' statement in the September 30 Letter that "it is not known

---

by a party, an adverse party may require the introduction at that time of any other part or any other writing . . . which ought in fairness to be considered contemporaneously with it."); *United States v. Boyland,* 898 F.2d 230 (1st Cir. 1988) (whether a separate document must be admitted will depend on the facts - specifically whether the separate document is necessary to place the evidence in context, so as to correct an otherwise misleading impression from the evidence admitted).

what rent level HUD will approve at this time."[8]  *See Kaplan v. Rose,* 49 F. 3d 1363, 1373 (9th Cir. 1994) (unknown or unknowable facts at the time the alleged omission occurred are not actionable); *Castlerock Mgmt. Ltd. v. Ultralife Batteries, Inc.,* 68 F. Supp. 2d 480, 488 (D.N.J. 2000) (same).  Indeed, the evolution of the allegations directly implicates the PSLRA's concern with preventing groundless suits, and should inform the Court's assessment of the Plaintiffs' third complaint.[9]

Plaintiffs also assert, again without stating the basis, that they believe that Defendants deliberately refrained from seeking increased rent subsidies prior to the tender offer, essentially to depress the value of the Project.  Second Am. Compl., ¶91.  Without providing a factual basis for Plaintiffs' belief (or any explanation of whether and if so how rent increases were available to the Partnership prior to the tender offer), the allegation affords the Court no opportunity to examine the strength of any proffered inference that Defendants intended to defraud Plaintiffs. Certainly, the September 30 Letter advises of the Partnership's intention to apply to renew its HUD contracts with new rent levels to be determined in connection with that application, negating any suggestion that Plaintiffs did not know that an increase in rent levels was a possibility.  In addition, the financial statements referenced in the September 30 Letter explain that approximately 160 of the units have previously participated in the Markup-to-Market Program.  *See* Financial Statements at § 8.  The allegation that Defendants intentionally bypassed

---

[8] Apparently, Plaintiffs anticipate the potential for further evolution of their claims.  *See,* Second Am. Compl. ¶163 ("There may be other instances of breach of contract by Bowditch and Slavet of which Plaintiffs are unaware, and Plaintiffs reserve their right to assert claims for such additional breaches following discovery.").

[9] *See, In re Cabletron,* 311 F. 3d at 22 n.4, 30.  *See, e.g., United States v. Karvelas,* 360 F.3d 220, 229 n.9 (1st Cir. 2004) (the First Circuit has strictly applied the heightened pleading requirements in securities fraud cases, due to its concern that "a plaintiff with a largely groundless claim will bring a suit and conduct extensive discovery in the hopes of obtaining an increased settlement.") (citation omitted); *Konstantinakos v. FDIC,* 719 F. Supp. 35, 38 (D. Mass. 1989) ("The rule is especially important in securities fraud cases where the strike suit value of a complaint is high.").

available rent increases prior to the September 30 Letter is conclusory, unsupported by any factual pleadings, and should be given no weight.

      c.    **The New Allegations Concerning AHP Holdings' Opinions Fail to Give Rise to an Inference of *Scienter*.**

Plaintiffs also allege that "AHP Holdings . . . has represented to Plaintiffs that anyone with the level of knowledge and experience in low-income housing as represented in MB Management's web site would readily understand that the Project was worth no less than $15 million at all relevant times." Second Am. Compl., ¶118. As with the allegation about Mr. Smith, the allegation about AHP Holdings fails to provide any information about the identity of AHP, beyond its name, to support the probability that it is in a position to possess the information alleged. *Id.* at 9. Indeed, although providing no information about AHP Holdings, Plaintiffs in essence suggest it is an expert on Defendants' state of mind and the conclusions Plaintiffs "must have reached" about the value of the Project. This assertion adds nothing to the allegation that Defendants have experience in low-income housing and fails to create a strong inference, or any inference, that Defendants knew the Project was worth more than $15 million. *See, e.g., Suna v. Bailey Corp.,* 107 F.3d 64, 68 (1st Cir. 1997) (affirming dismissal where plaintiffs "offer[ed] no factual support for their conclusory allegations that [defendant] knew of adverse information"); *Romani,* 929 F.2d at 881 ("Without any shred of factual support for plaintiff's hypothetical tale of deception, we are faced with precisely the sort of fishing expedition for fraud that Rule 9(b) is designed to prevent."). *See also, e.g., Baron v. Smith,* 285 F. Supp. 2d 96, 108 (D. Mass. 2003) (*scienter* allegations insufficient where the evidence of *scienter* was "simply that the defendants were in a position to know the allegedly omitted facts"); *In re Sepracor, Inc. Secs. Litig.,* 308 F. Supp. 2d 20, 31 (D. Mass. 2004) ("scienter by status" is insufficient).

Plaintiffs' allegations concerning the alleged offer to purchase made by AHP Holdings in advance of this litigation likewise provides no reinforcement for the Second Amended Complaint's weak *scienter* allegations. Again, AHP Holdings allegedly made an offer to the Partnership to purchase its assets for $14.5 million. The Partnership rejected the offer, allegedly "evidencing or at least suggesting their understanding that the Project was worth more than $14.5 Million." Second Am. Compl., ¶¶116, 117. This allegation, however, is not probative of fraud. To start, the alleged offer was made well after the September 2004 letter and, thus, could not be proffered as having provided notice to Defendants of the value of the Project. Beyond this, as noted previously, the Second Amended Complaint provides no details about the offer: its terms and conditions; when it was made; whether the potential purchaser had the ability to perform, or whether the offer was a sham, made only for purposes of seeking to bolster a shaky claim by someone with an interest in the outcome of the case. Likewise, the Complaint alleges no facts about why the offer was not accepted. The allegations do not give rise to *any* inference of *scienter*.

The Second Amended Complaint thus fails to plead *scienter* with the specificity required by the PSLRA and Rule 9(b) and, therefore, must be dismissed.

## II.    THE BALANCE OF PLAINTIFFS' CLAIMS SOUND IN FRAUD AND THEREFORE MUST BE DISMISSED FOR THE SAME REASON.

When a plaintiff's claims sound in fraud, as Plaintiffs' claims do here, the claims must satisfy the strict pleading requirements of Rule 9(b). *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1223 (1st Cir. 1996). In assessing whether a complaint sounds in fraud, the court looks beyond the title of its claims and asks if "fraud lies at the core of the action." *Hayduk v. Lanna*, 775 F.2d 441, 443 (1st Cir. 1985); *In re Computervision Corp. Sec. Litig.*, 869 F. Supp. 56, 63 (D. Mass. 1994) ("It is the allegation of fraud, not the 'title' of the claim, that brings the policy

concerns of the First Circuit to the forefront." ); *Hershey v. MNC Fin., Inc.*, 774 F. Supp. 367, 376 n.11 (D. Md. 1991) (Rule 9(b) applies when claims are part of one "organic whole").

Here, all of Plaintiffs' Counts IV through VIII sound in fraud since they arise out of the very same set of operative facts as the fraud claims. *See Computervision*, 869 F. Supp. at 63. Specifically, all of Plaintiffs' claims, by their express terms, arise out of the September 30 Letter and the allegation that Defendants collectively made misrepresentations and omissions in connection with that letter. Second Am. Compl., ¶¶149, 154, 162, 166, 171. Indeed, each count incorporates by reference each of the preceding factual allegations in the Second Amended Complaint, which is itself indicative of their indistinguishable factual foundations. *See Ellison v. American Image Motor Co.*, 36 F. Supp. 2d 628, 639 (S.D.N.Y. 1999) (holding that claims sound in fraud where, *inter alia*, plaintiff "incorporates by reference into the . . . claim each of the preceding allegations in the complaint, which unambiguously sound in fraud"); *In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 690 (S.D.N.Y. 2000) (holding that claims sound in fraud where plaintiffs made "little . . . effort to differentiate" fraud from non-fraud claims). Moreover, the fiduciary duty claim includes an allegation that "Bowditch and Slavet's conduct in breach of their fiduciary duties was willful, wanton, and outrageous, and performed with callous disregard for the rights of the Partnership or its other partners." Second Am. Compl., ¶152. This claim, like the other claims, sounds in fraud because the "alleged breach itself is a scheme to defraud." *Precision Vascular Sys., Inc. v. Sarcos L.C.*, 199 F. Supp. 2d 1181, 1191 (D. Utah 2002) ("a claim for breach of fiduciary duty must be pled with particularity where the alleged breach itself is a scheme to defraud;" "the threshold inquiry is whether the Plaintiffs' breach of fiduciary duty claim is based on fraud or negligence").

Rule 9(b) therefore applies to Plaintiffs' other claims, and it requires their dismissal for the same reasons that it mandates the dismissal of Plaintiffs' fraud claims. *See, e.g., S.G. Frota v. Prudential-Bache Sec., Inc.*, 639 F. Supp. 1186, 1193 (S.D.N.Y. 1986) ("Rule 9(b) extends to all averments of fraud or mistake, whatever may be the theory of legal duty--statutory, common law, tort, contractual or fiduciary"); *Mosko v. Defillipo*, No. 91-10675-Z, 1991 WL 191211, at *2 n.2 (D. Mass. Sept. 10, 1991) (Zobel, J.) (breach of contract claim "premised upon fraud" must comport with the requirements of Rule 9(b)) (citing *Hayduk*, 775 F.2d at 443-44); *Smith v. Office of Servicemembers Group Life Ins.*, No. 97-CV-5862, 1997 WL 786535, at *3 (E.D. Pa. Nov. 24, 1997) ("because plaintiffs' breach of contract claim is essentially premised upon a theory of fraud or mistake, their complaint must meet the heightened pleading requirements of Fed. R. Civ. P. 9(b)").

## III.    THE SECONDARY CLAIMS MUST FAIL SINCE PLAINTIFFS HAVE FAILED TO SUFFICIENTLY PLEAD THE UNDERLYING FRAUD CLAIM.

In addition to sounding in fraud, the conspiracy and the aiding and abetting claims also fail because neither claim is an independent and freestanding tort. As such, Plaintiffs must make out the underlying tort before liability attaches. *Beck II v. Prupis*, 529 U.S. 494, 503 (since liability for civil conspiracy depends on performance of some underlying tortious act, the conspiracy is not independently actionable); *In re McMullen*, 386 F.3d 320, 332 (1st Cir. 2004) (aiding and abetting liability is derivative in nature and there can be no finding of aiding and abetting liability where there has been no primary violation).

Here, where Plaintiffs fail to allege proof of the underlying tortious conduct with sufficient particularity, these secondary claims must necessarily fail, as well. *Cf. In re Segue Software*, 106 F. Supp. 2d 161, 172 (D. Mass 2000) (without a violation of Section 10(b) of the

Securities Exchange Act, there can be no Section 20(a) liability); *In re Galileo Corp.,* 127 F.

Supp. 2d at 271 ("In the absence of a primary violation, secondary . . . liability cannot exist.").

**IV.    PLAINTIFFS' CLAIMS OF MISMANAGEMENT ARE DERIVATIVE IN NATURE AND MUST BE DISMISSED.**

**A.    Plaintiffs' Mismanagement Claims are Derivative Claims Held by the Partnership, not Plaintiffs.**

In the Second Amended Complaint, Plaintiffs have added a new allegation that the

Defendants incurred "inflated and excessive management and administration fees." Second Am.

Compl., ¶¶149, 162, 166, 171. These new claims must be dismissed because they are derivative

claims[10] and Plaintiffs cannot bring a derivative claim, on behalf of the Partnership in which they

are no longer partners. A limited partner may not bring a direct action against an alleged

wrongdoer for harm suffered by the partnership. *See* G.L. c. 105, § 58 (Massachusetts Uniform

Limited Partnership Act). A decrease in value of a stakeholder's interest that "reflects the

decrease in value of the firm" calls for a derivative rather than a direct claim. *Hurley v. Fed.*

*Deposit Ins. Corp.*, 719 F. Supp. 27, 30 (D. Mass. 1989). *See also, e.g., Blasberg v. Oxbox*

*Power Corp.,* 934 F. Supp. 21, 27 (D. Mass. 1996) (holding that if a plaintiff alleges

mismanagement of funds, the claim is derivative; the plaintiff's injury would accrue due to his

role as investor in the corporation, in the form of a loss in investment). *See also Rand v.*

*Anaconda-Ericsson, Inc.*, 794 F.2d 843, 849 (2d Cir. 1986) (applying Massachusetts law);

*Municipal Light Co. of Ashburnham v. Commonwealth*, 608 N.E. 2d 743, 749 (Mass. App. Ct.

1993).

Here, Plaintiffs assert claims based on the alleged overcharging of management and

---

[10] Courts do not defer to Plaintiffs' pleading choices when determining whether a claim is properly derivative or direct; rather, courts examine the substance of the complaint. *See, e.g., Jackson v. Stuhlfire,* 547 N.E.2d 1146, 1147 (Mass. App. Ct. 1990). "We treat pleadings according to their nature and substance." *Id.* (citations omitted). Thus, Plaintiffs' characterization of their actions as direct, rather than derivative, is not binding on this Court.

administrative fees. Of course, it was the Partnership that paid any excessive fees, and it is the Partnership that possesses any claim for redress. Any harm suffered as a result of this alleged overcharging was suffered in the first instance by the Partnership; to the extent limited partners felt the effects of this harm, they did so equally as stakeholders in the Partnership. This is the stuff of derivative, not direct, claims. *Blasberg,* 934 F. Supp. at 26 (claim for excessive payments to affiliated parties of partnership was derivative); *In re KMF Actions,* 56 F.R.D. 128 (D. Mass. 1972) (motion to dismiss for failure to make demand granted in derivative suit alleging claims of excessive management fees); *Jones v. PriceWaterhouseCoopers, LLP,* 2004 WL 3140909 (N.Y. Sup. Ct. 2004) ("As it was the Partnership that paid the [allegedly excessive management and incentive based] fees, any claim that Plaintiffs assert to recover those fees is derivative in nature."). *See also, Bessette v. Bessette,* 434 N.E.2d 206, 208 (Mass. 1982) (claim of excessive compensation to majority shareholders belongs to corporation, not shareholders); *Jackson v. Stuhlfire,* 547 N.E.2d 1146, 1148 (Mass. App. Ct. 1990).

Because Plaintiffs have asserted derivative claims yet have failed to bring them derivatively, those claims must be dismissed. *See Green v. Nuveen Advisory Corp.,* 186 F.R.D. 486 (N.D. Ill. 1999) (Section 34(b) claim by shareholders in Massachusetts and Minnesota closed-end funds against the funds' adviser alleging false, incomplete and misleading SEC filings dismissed as derivative); *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98 Civ. 4318 (HB), 2000 WL 10211 (S.D.N.Y. Jan. 6, 2000) (claim arising out of undisclosed self-dealing by fund portfolio manager and his investment in allegedly risky micro-cap securities was derivative claim). As discussed below, even if the Second Amended Complaint correctly characterized the mismanagement claims as derivative, it would still fail for a variety of

reasons.[11]

**B.    Plaintiffs are no Longer Limited Partners and Therefore Lack Standing to Bring This Derivative Suit.**

In all events, a plaintiff in a derivative action must be a stakeholder at the time suit is brought. *See* G.L. Ch. 109, §58 ("In a derivative action, the plaintiff must be a partner at the time of bringing the action and . . . at the time of the transaction of which he complains . . . ."); Fed. R. Civ. P. 23.1 (same). Plaintiffs, by their own allegations, are no longer limited partners of the Partnership. They therefore lack standing to pursue any derivative claims.

## CONCLUSION

Scrutiny under Rule 9(b) in the securities context is "especially strict" in the First Circuit. *See, e.g., In re Boston Technology, Inc. Sec. Litig.,* 8 F. Supp. 2d 43 (D. Mass. 1998). Here, where Plaintiffs fail to plead falsity and *scienter* with the particularity required by Rule 9(b) and the PSLRA, the entire Complaint must be dismissed. Plaintiffs lack standing to pursue derivative claims arising from alleged mismanagement of the Partnership.

Pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b), and the PSLRA, the Defendants respectfully ask the Court to dismiss this case, with prejudice.

---

[11] Beyond the reasons set forth in the text, Plaintiffs have failed to name the Partnership – an indispensable party to any derivative claim – and, under the Federal Rule, the complaint was required to be verified. *See* Fed. R. Civ. P. 23.1; *Blasberg,* 934 F. Supp. at 23; *Abeloff v. Barth,* 119 F.R.D. 332, 334 (D. Mass. 1988).

Respectfully submitted,

**ROBERT S. BOWDITCH, JR.,**
**GERALD SLAVET,**
**STEVEN RIOFF, AND**
**BSR ASSOCIATES,**
By their attorneys,


_____/s/ Christina N. Davilas_____
Steven W. Hansen ( BBO# 220820)
Donald J. Savery (BBO# 564975)
Christina N. Davilas (BBO# 655477)
Bingham McCutchen LLP
150 Federal Street
Boston, MA  02110
(617) 951-8000

Dated: October 11, 2005

<u>CERTIFICATE OF SERVICE</u>

I, Christina N. Davilas, hereby certify that on this 11th day of October, 2005, I served the foregoing document by causing a true copy of same to be delivered by first-class mail to counsel for the Plaintiffs.

/s/ Christina N. Davilas
Christina N. Davilas