**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

_____
                                    :
ROBERT M. GERBER, *et al.*,         :
                                    :
            Plaintiffs,             :   CIVIL ACTION NO: 05-10782-DPW
                                    :
      v.                            :
                                    :
ROBERT S. BOWDITCH, JR., *et al.*,  :
                                    :
            Defendants.             :
_____:

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS SECOND
AMENDED COMPLAINT**

Plaintiffs Robert M. Gerber, as Trustee of the Rosalie Gerber Trust, William J. and Jayne

Gilligan, husband and wife, Sanford R. and Beth L. Hoffman, husband and wife, and James D.

Burns (collectively, "Plaintiffs"), by and through their undersigned attorneys, submit this

Memorandum of Law in opposition to the Motion to Dismiss Second Amended Complaint (the

Complaint") filed by Defendants Robert S. Bowditch, Jr. ("Bowditch"), Gerald Slavet ("Slavet"),

Steven Rioff ("Rioff"), and BSR Associates ("BSR") (collectively, "Defendants").

**<u>Preliminary Statement</u>**

The genesis of this case is the purchase of limited partner interests by an affiliate of the

partnership's general partners pursuant to a self-styled "Tender Offer."  In the Tender Offer, the

general partners made affirmative representations concerning the partnership's current financial

condition, as well as its prospects for the future.  The general partners painted a grim picture of a

low-income housing partnership that would not have enough cash after servicing and/or retiring

its debt to make distributions to its partners, but that would generate so-called phantom income

on which partners would have to pay taxes out of their pockets.  More specifically, the general

partners declared that under the "best-case scenario," the most the partnership could borrow in a refinancing transaction would be $7 Million, a sum that would be insufficient to provide for cash distributions to the limited partners after repayment of the partnership's existing debt and other expenses. Based on these affirmative statements, a number of the partnership's limited partners sold their interests to the general partners' affiliate.

It is an indisputable fact (at least for purposes of the pending motion) that the statements made by the general partners in the Tender Offer regarding the partnership's inability to generate value for its partners through a refinancing of its mortgage debt proved to be untrue. Within approximately 150 days following the stated closing date of the Tender Offer, the general partners obtained an annual increase of more than $620,000 in the partnership's subsidized rents. This, in turn, enabled the partnership to refinance its existing mortgage for millions more than $7 million.[1] It is also an indisputable fact that the general partners initiated action to obtain this rent increase within the Tender Offer period by commissioning a rent comparability study that is required by HUD as condition of obtaining a rent increase. Finally, it is an indisputable fact that the general partners did not disclose that they were intending to seek a rent increase or its potential economic benefit to the limited partners when they painted their "best case scenario" in their Tender Offer.

By withholding this material information from the limited partners, the general partners deprived them of the opportunity to weigh the potential effect of a rent increase on the value of their investment. Given the general partners' self interest in minimizing the purchase price of the limited partners' interests, it is reasonable to infer that the omission of this important information was intentional or at the very least reckless.

---

[1]    Applying a conservative capitalization rate of 8%, the $620,000 rental increase equates to a $7.75 Million increase in partnership value. Assuming a loan to value ration of 80%, the net effect of the rental increase was a $6.2 Million increase in the partnership's ability to borrow.

Plaintiffs are certain limited partners who sold their interests to the general partners' affiliate pursuant to the Tender Offer. Their eight-count Complaint includes claims of securities fraud and common law fraud. It is axiomatic that each of these claims can encompass sins of both commission and omission. *Chiarella v. United States*, 445 U.S. 222, 227-30 (1980). Thus, where there is a duty to disclose, a plaintiff may recover in circumstances where the defendant (i) failed to disclose all facts material to the transaction, *or* (ii) failed to ensure that the disclosures made were truthful, accurate, and not misleading. *See, e.g.*, Rule 10b-5, 17 C.F.R. §240.10b-5 (1988). In addition to establishing the existence of a fraudulent statement of material fact, a fraud plaintiff also has the burden of demonstrating that the defendant acted with the requisite state of mind, or *scienter*. Just as there are two species of fraudulent statements -- affirmative misrepresentations and omissions -- so *scienter* can be proved in one of two ways. The requisite showing of *scienter* can be made by demonstrating either that the defendant consciously intended to defraud or acted with a high degree of recklessness.

Plaintiffs' fraud claims are subject to the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA") and Fed. R. Civ. P. 9(b). Under the PSLRA and Rule 9(b), a complaint must (i) specify false or misleading statements and omissions, and the reasons why such statements or omissions are misleading; and (ii) plead with particularity facts giving rise to a strong inference that the defendant acted with *scienter*. Defendants have moved to dismiss the Complaint, contending that it fails under both of these PSLRA and Rule 9(b) pleading prongs. Defendants are wrong. Their arguments betray a fundamental misunderstanding of the requirements of the PSLRA and this Court's Rule 9(b) jurisprudence, and are based upon a myopic, self-serving reading of the Complaint.

The Motion to Dismiss effectively ignores Plaintiffs' claim of fraud by *omission* and the

Complaint's myriad allegations supporting that theory of recovery. Similarly, Defendants' *scienter* arguments are focused on the Complaint's asserted failure to prove that Defendants acted with a conscious intent to defraud, while ignoring its ample allegations supporting the finding that Defendants acted recklessly.

But even the arguments Defendants do make fall wide of the mark. In addressing Plaintiffs' allegations of Defendants' affirmative misstatements, motive, opportunity, and intent to defraud, the Motion to Dismiss improperly views targeted allegations in isolation, while ignoring the many other, specific averments supporting those claims. Defendants' arguments similarly fail to account for the reasonable inferences to be derived from those averments. Furthermore, rather than demonstrating why certain, targeted allegations do not satisfy the PSLRA and Rule 9(b), Defendants attack the admissibility of the alleged facts at trial.

Contrary to Defendants' suggestion, a securities fraud plaintiff is not required to plead with particularity every single fact upon which the fraud claim is based. On the contrary, "courts will allow private securities fraud complaints to advance past the pleadings stage when some questions remain unanswered, provided the complaint as a whole is sufficiently particular to pass muster under the PSLRA." *In re Cabletron Sys., Inc.*, 311 F.3d 11, 29 (1st Cir. 2002). Nor, as Defendants would have it, does the PSLRA alter the standards governing a motion to dismiss, which require that the allegations of the Complaint must be viewed as a whole, as true, and with all reasonable inferences drawn in Plaintiffs' favor. *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 78 (1st Cir. 2002). Defendants' Motion to Dismiss turns this principle on its head, disputing the truth of the Complaint's allegations and attempting to deny Plaintiffs the benefit of all reasonable inferences to which they are entitled at this procedural juncture. In effect, Defendants seek to impose on Plaintiffs a non-existent requirement of pleading every element of their trial evidence

in their Complaint.  The First Circuit has roundly rejected the approach urged by Defendants, and this Court should not hesitate to do so as well.  *Cabletron*, 311 F.3d at 33.  Accordingly, Defendants' Motion to Dismiss should be denied.

### Factual Background

Old Salem Associates Limited Partnership ("Old Salem" or the "Partnership") owns and operates four multi-unit, federally subsidized rental-housing projects located in the Boston suburbs (collectively, the "Project").  Complaint ¶2.  Plaintiffs are former "Investor Limited Partners" in Old Salem.  *Id* ¶3.  Defendants Bowditch and Slavet are the General Partners of the Partnership and Defendant Rioff is the Partnership's initial Limited Partner and only Class A Limited Partner.  *Id.* ¶3.  The terms of the Tender Offer were set forth in a letter dated September 30, 2004 (the "September 30 Letter"), which was sent to Plaintiffs and the Partnership's other limited partners.  *Id.* ¶75 and Ex B.  In reliance upon Defendants' statements made in connection with the Tender Offer, Plaintiffs tendered their Partnership units for less than fair value to Defendant BSR Associates, an affiliate of Defendants Bowditch, Slavet and Rioff.  *Id.* ¶94.

**A.     Allegations Of Defendants' Fraud And Misrepresentation**

The fraudulent statements at issue in this case are contained in the September 30 Letter. The Complaint alleges fraud by commission -- through affirmative misstatements in the Letter -- and by omission -- by the Letter's failure to state material facts necessary to make the statements made not false and/or misleading.

**1.     Affirmative Misrepresentations**

The Complaint specifically identifies the false and misleading statements contained in the September 30 Letter as follows:

(i)     The Partnership was a tax shelter that had run its course.  Complaint ¶82 and Ex B at 2.

(ii)    The Partnership's future prospects for Investor Limited Partners were limited to generating substantial phantom income tax liabilities.  *Id.* ¶82 and Ex B at 2.

(iii)    The Partnership had little or no chance of future cash distributions for Investor Limited Partners.  *Id.*

(iv)    A refinancing in the best-case scenario would not likely result in proceeds sufficient to repay all partnership debt and return capital to Investor Limited Partners.  *Id.* ¶84 and Ex B at 2.

(v)    Under a best-case scenario, a $7 Million loan to the Partnership would be supportable, implying this amount was the maximum that the Partnership could borrow.  *Id.* ¶85 and Ex B at 2.

(vi)    It was unlikely that the Investor Limited Partners would receive any cash distributions under the best-case scenario.  *Id.* ¶86 and Ex B at 2.

(vii)    It is unlikely that an Investor Limited Partner would ever receive a cash return on their investment.  *Id.* ¶87 and Ex B at 3.

## 2.   <u>Omitted Material Facts</u>

After tendering their interests in the Partnership, Plaintiffs learned of certain new information that was material to the Partnership's value, and thus Plaintiffs' decision whether to sell their respective Partnership interests.  This information, which was known to Defendants but never disclosed to Plaintiffs, included:

(i)    That the federal government's Markup-To-Market Program, through which existing rents at the Project could be "marked up" to 150 percent or more of Fair Market Rent ("FMR") levels, was available to the Partnership.  Complaint ¶¶7-9, 61.

(ii)    That at the time of the Tender Offer, Defendants were preparing to make application under the Markup-To-Market Program for substantial rent increases at the Project.  *Id.* ¶¶97, 105.

(iii)    That the rent increases available under the Markup-To-Market Program increased the value of the Partnership and its corresponding borrowing capacity well beyond the amounts represented in the September 30 Letter.  *Id.* ¶88.

The Complaint describes in detail the Markup-To-Market Program, including:

(i)     That the Program allows owners of Section 8 housing projects who remain in the Section 8 Program to "mark up" rent levels to market rates and distribute the increased cash flow resulting from such rents.  *Id.* ¶59.

(ii)    That upon reconciliation of owner and HUD rent comparability studies, HUD will generally permit rent increases of up to 150% of FMR and increase the federal rent subsidy to equal the difference between the current rents and the newly marked up rents.  *Id.* ¶61.

(iii)   That properties not meeting all of HUD's criteria can still qualify for a Markup-to-Market discretionary waiver under HUD's so-called "Option 1-B" if (i) the project has a high percentage (>50%) of units rented to elderly, disabled or large families; (ii) the project is located in a low-vacancy area (<3%) where tenant-based assistance is difficult to be used and there is a lack of comparable housing; and/or (iii) the project is a high priority for the local community as evidenced by State or local funding.  *Id.* ¶62.

The Complaint goes on to describe in exacting detail the steps Defendants took to obtain significant rent increases at the Project under the Markup-To-Market Program shortly after sending out the September 30 Letter, including the specific allegations that:

(i)     Pursuant to a letter dated November 10, 2004 -- just eleven days after the stated close of the Tender Offer period (excluding discretionary extensions) -- Defendants sent a request to HUD seeking rent increases under the Project's two HAP Contracts (the "Markup Request"), asserting that "[i]t is clear that the current contract rents, whether Section 8 or Section 236, are well below market." Complaint ¶¶98-100 and Ex C.

(ii)    In relation to the Markup Request and in conjunction with HUD contract renewal, Defendants submitted to HUD a Rent Comparability Study ("RCS"), which provided estimated current market rents for the 220 Project units that were the subject of Defendants' Markup Request.  *Id.* ¶104 and Ex C.

(iii)   The RCS, which was commissioned by Defendants and submitted to HUD for purposes of the Markup Request, is dated October 21, 2004, which is well within the stated Tender Offer period.  *Id.* ¶104.

(iv)    The RCS makes it abundantly clear, as emphasized by Defendants themselves in the Markup Request, that the Project's market rents were significantly undervalued, with rents under HAP Contract 189 undervalued by 97.9 percent, or $351,432 annually and rents under HAP Contract 185 undervalued by 31.3 percent, or $447,480 annually.  *Id.* ¶¶100, 106-09.

(v)     Defendants' Markup Request sought increases for the Project's rents under HAP

Contracts 189 and 185 in the amounts set forth in the RCS. *Id.* ¶¶98-99, 104, 109 and Ex C.

(vi)    In the Markup Request, Defendants also stated that the Project qualified for discretionary participation in the Markup-to-Market Program under Option 1-B. *Id.* ¶101 and Ex C.

(vii)   In conjunction with the Markup Request, Defendants also submitted to HUD a Contract Renewal Form, dated November 3, 2004, pursuant to which they sought to participate in the Markup-to-Market Program pursuant to Option 1-B, representing that the Project met not one, but two of the eligibility criteria for participation under Option 1-B, namely that (i) the project has a high percentage (>50%) of units rented to elderly, disabled or large families; (ii) the project is located in a low-vacancy area (<3%) where tenant-based assistance is difficult to be used and there is a lack of comparable housing. *Id.* ¶¶102-03.

On April 5, 2005 HUD approved Defendants' Markup Request, resulting in an aggregate annual rent increase of $798,912. Complaint ¶110 and Ex D. Although these rent levels were later slightly decreased based on the Partnership's concurrent participation in a separate government interest-rate subsidy program (and not on any decrease in market valuations for rents submitted by Defendants in the RCS), the Partnership will realize $620,928 in additional annual income pursuant to the Markup-to-Market Program. *Id.* ¶111-12.

**B.    Allegations Of Defendants' *Scienter***

**1.    Defendants' Knowledge And Experience**

The Complaint alleges, upon information and belief, that Defendants Bowditch, Slavet, and Rioff have substantial knowledge and experience with HUD's Markup-To-Market Program, the valuation of Section 8 Housing projects, and financing of such projects. Complaint ¶69. These assertions are supported by specific factual allegations concerning these Defendants' background and experience, which are in turn based on information found on the Internet web site of MB Management Company ("MB Management"), of which Bowditch, Slavet, and Rioff are the general partners. Among other things, this website advertises to the public that:

(i)    Bowditch, Slavet, and Rioff have extensive experience in the ownership and management of multi-family residential housing. Complaint ¶67 and Ex A.

(ii)    Defendant Rioff also has served as a Senior Management Officer for the MassHousing. *Id.*

(iii)    Under the direction of Bowditch, Slavet, and Rioff, MB Management has developed or acquired over fifty properties, with a value exceeding $300 million. *Id.* ¶68 and Ex A.

(iv)    MB Management's consulting services include "[a]sset management services including highest and best use analysis, financing recommendations and packaging, and restructuring analysis/implementation (including HAP renewals and 'Mark to Market' processing)." *Id.* ¶70 and Ex A.

(v)    Defendants Bowditch, Slavet and Rioff have extensive experience in relation to the development, acquisition and management of affordable multi-family housing. *Id*. ¶71 and Ex A.

The September 30 Letter itself contains express representations that further support Plaintiffs' allegations concerning Defendants knowledge and experience in valuing and financing of Section 8 housing projects. *Id.* ¶¶75, 80-87. In that regard, the September 30 Letter reveals that the valuation was made by Defendants without "any current appraisal of the value of the Project," and that "[n]o independent person [w]as retained to evaluate or render any opinion with respect to the fairness of the Purchase Price." *Id.* Ex B at 3. It goes on to express an opinion as to the amount of debt the Partnership could support. *Id.* at 2.

## 2.    **Defendants' Motive And Opportunity**

Defendants' motivations for their omissions and misrepresentations are clearly articulated in the Complaint to include:

(i)    Acquiring Plaintiffs' economic interests in the Partnership. Complaint ¶73.

(ii)    Acquiring voting control over the Partnership's sale of the Project or refinancing of its debt. *Id.*

(iii)    Enriching themselves unfairly at the expense of and to the detriment of Plaintiffs. *Id.* ¶92.

(iv)    Preventing Plaintiffs from making further inquiry into the value of the Partnership. *Id.* ¶93.

(v)     Preventing Plaintiffs from learning the Partnership's true value. *Id.*

(vi)    Inducing Plaintiffs to sell their interests in the Partnership for less than fair value. *Id.*

Through the Tender Offer, Defendants created the opportunity to acquire the benefits that motivated their fraudulent misstatements and wrongful omissions. Complaint ¶¶74-75.

### 3.    Additional Allegations Supporting A Strong Inference Of *Scienter*

As set forth above, the Complaint alleges that within or shortly after the stated Tender Offer period, Defendants were aware that current market rents for the Project's HAP Contract units were "well below market" (Complaint ¶100 and Ex C), and that the Project was qualified to participate in the Markup-to-Market Program because it met no less than two of the three potential criteria for participation under HUD's so-called Option 1-B waiver. *Id.* ¶¶101, 103 and Ex C.

Plaintiffs also have alleged that at all relevant times, the Partnership was capable of supporting a loan of $15 million. *Id.* ¶113. This allegation is supported by information provided by Mr. Daniel Smith, who, in a discussion he had with a representative of MassHousing in or around January 2005, was informed that MassHousing would be prepared to refinance the Partnership's existing debt for at least $15 million, more than twice the amount of the $7 million loan that Defendants claimed the Partnership could support. *Id.*

Plaintiffs have further alleged that at all relevant times, the Partnership could have sold the Project for at least $15 Million, and likely much more. *Id.* ¶115. This allegation is supported by the specific averment that prior to the commencement of this Action, AHP Holdings Company, LLC ("AHP Holdings"), an investor in low-income housing projects, made an offer to

the Partnership to purchase its assets -- *i.e.*, the Project -- for $14.5 million. *Id*. ¶116. As security for its performance, AHP Holdings agreed to put up an earnest money deposit of $250,000, which the Partnership would be entitled to retain if AHP Holdings was not able to finance the purchase or obtain regulatory approval.[2] *Id*. The Partnership, presumably acting through Bowditch, Slavet and Rioff, rejected this offer, evidencing or at least suggesting their understanding that the Project was worth more than $14.5 million. *Id*. ¶117.

The Complaint goes on to allege that AHP Holdings also has informed Plaintiffs that it would have paid at least $14.5 million for the Partnership in September, 2004 and at any time thereafter. *Id*. ¶118. In addition, AHP Holdings has represented to Plaintiffs that anyone with the level of knowledge and experience in low-income housing as represented in MB Management's web site would readily understand that the Project was worth no less than $15 million at all relevant times. *Id*.

The Complaint avers that had a sale of the Project been pursued, the proceeds of the sale would have been well in excess of the amount necessary to repay all Partnership debt, return each Investor Limited Partner's capital contribution, and provide additional cash for distributions. Complaint ¶119. Under either a refinance or sale scenario, Plaintiffs would have received substantial cash distributions from the Partnership, which would have greatly exceeded the amount paid by BSR for their respective Limited Partnership interests. *Id.* ¶120.

---

[2]  Defendants protest that the Complaint does not provide more detailed allegations concerning the AHP Holdings' offer. Defendants' Memorandum at 11. To the extent the Court deems such additional information necessary or helpful, Plaintiffs have attached a copy of the AHP Holdings' offer as Exhibit A to the Affidavit of John J. O'Connor ("O'Connor Aff."), which is being submitted herewith. Consideration of that document is entirely proper on this Motion for the reasons set forth in Defendants' Memorandum at note 7.

**Legal Argument**

**POINT I**
**THE APPLICABLE LEGAL STANDARDS**

**A.     The Standard Of Review**

When considering a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the Court must take well-pleaded allegations in the complaint as true and make all reasonable inferences in favor of the plaintiff. _Aldridge_, 284 F.3d at 78. A complaint should not be dismissed under Fed. R. Civ. P 12(b)(6) unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." _Medina-Claudio v. Rodríguez-Mateo_, 292 F.3d 31, 34 (1st Cir. 2002) (internal quotation and citation omitted). Dismissal under Rule 12(b)(6) is only appropriate when there is no hope of prevailing on any theory contained in the complaint. _See_ _Rogan v. Menino_, 175 F.3d 75, 77 (1st Cir. 1999).

**B.     Pleading Requirements Under The PSLRA And Rule 9(b)**

In an action asserting claims of securities and common law fraud, the PSLRA and Rule 9(b) impose heightened pleading standards with respect to allegations concerning (i) the statements claimed to be fraudulent, and (ii) whether the defendant acted with _scienter_. _See_ 15 U.S.C. § 78u-4(b)(1)&(2); _Greebel v. FTP Software, Inc._, 194 F.3d 185, 191 (1st Cir. 1999). In this Circuit, "PSLRA and Rule 9(b) pleading standards are for all practical purposes identical." _Garvey v. Arkoosh_, 354 F.Supp.2d 73, 80 (D. Mass. 2005).

**1.     Pleading Fraud With Particularity Under 15 U.S.C. § 78u-4(b)(1) And Rule 9(b)**

The PSLRA's pleading requirements for allegations of fraud provides, in pertinent part, that:

> The complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading,

> and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. §78u-4(b)(1) ("Section (b)(1)").  The First Circuit has interpreted Section (b)(1) as requiring a securities fraud complaint to: (i) specify the time, place, and content of each allegedly misleading statement; (ii) explain and provide factual support for why the statement is fraudulent; (iii) provide specific factual allegations to support a reasonable inference that adverse circumstances existed at the time of the statement and were known and deliberately or recklessly disregarded by defendants; and (iv) set forth the source of the information and reasons for the belief when allegations regarding the statement or omission are made on information and belief. *Greebel*, 194 F.3d at 193-94.  The First Circuit has also held that the requirements set forth in Section (b)(1) "were largely imposed under First Circuit law," and that "the strict pleading requirements under Rule 9(b) are . . . consistent with the PSLRA."  *Id.*

Importantly, the First Circuit has rejected the notion that every allegation in a complaint must satisfy the PSLRA's and Rule 9(b)'s particularity requirements.  *Cabletron*, 311 F.3d at 32-33.  Rather, in this Circuit, courts must look to the "'totality of the circumstances'" and determine whether "the complaint *as a whole* is sufficiently particular to pass muster under the PSLRA."  *Id.* at 31, 32 (Emphasis added).

### 2.    Pleading *Scienter* Under 15 U.S.C. § 78u-4(b)(2) And Rule 9(b)

The PSLRA also provides that a complaint must, with respect to each allegedly fraudulent act or omission, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. §78u-4(b)(2) ("Section (b)(2)"). That state of mind -- *scienter* -- is defined as the "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976).  The First

13

Circuit has held that the Section (b)(2)'s pleading standards for *scienter* are congruent and consistent with its pre-existing standards for pleading fraud with particularity under Rule 9(b). *Id.* at 193.

The requisite showing of *scienter* sufficient to satisfy the pleading requirements of Section (b)(2) and Rule 9(b) can be made by demonstrating either that the defendants "consciously intended to defraud" or acted with "a high degree of recklessness." *Aldridge*, 284 F.3d at 82; *Geffon v. Micrion Corp.*, 249 F.3d 29, 35 (1st Cir. 2001). With respect to the first category of knowing conduct, the plaintiff must prove that defendants knew (i) that the statement [or omission] was false or misleading, and (ii) that it made reference to a matter material to investors. *See id.* at 35.

The second category of recklessness, a lesser form of intent, but more than mere negligence, can render a defendant liable if the defendant's conduct constitutes:

> a highly unreasonable omission [or statement], involving not merely simple, or even inexcusable, negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it.

*Greebel*, 194 F.3d at 198 (quoting *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977)). A plaintiff seeking to prove *scienter* by recklessness must allege, with sufficient particularity, that the defendants "had full knowledge of the dangers of their course of action and chose not to disclose those dangers to investors." *Maldonado v. Dominguez*, 137 F.3d 1, 9 n. 4 (1st Cir. 1984); *see also In re PLC Systems, Inc.*, 41 F.Supp.2d 106, 114 (D. Mass. 1999).

**POINT II**

**THE COMPLAINT ALLEGES WITH SUFFICIENT PARTICULARITY THAT THE STATEMENTS IN THE SEPTEMBER 30 LETTER UPON WHICH PLAINTIFFS RELIED WERE FALSE AND MISLEADING**

Defendants' argument that Plaintiffs have failed to plead fraud with sufficient particularity is focused almost exclusively on the Complaint's allegations concerning Defendants *affirmative* misstatements. According to Defendants' construct, Plaintiffs have not met the requirements of the PSLRA or Rule 9(b) because the Complaint fails to provide adequate factual support to conclusively establish (i) that the Project could be sold for $15 Million, and/or (ii) that the Partnership's debt could be refinanced for $15 Million, and/or (iii) that the Markup-to Market Program enabled a sale or refinance at $15 Million. As will be demonstrated below, Plaintiffs have provided ample, particularized factual support regarding each of these averments as required under the PSLRA and Rule 9(b). However, Defendants' syllogism -- centering on the Project's alleged $15 Million valuation or refinancing capacity -- is more fundamentally flawed. This straw-man argument fails to account for the Complaint's numerous allegations concerning Defendants' fraudulent *omissions,* which render the September 30 Letter hopelessly fraudulent and misleading.

**A.    The Motion To Dismiss Fails To Address The Complaint's Allegations Concerning The September 30 Letter's Fraudulent Omissions Of Material Facts**

The Complaint contains a surfeit of particularized allegations concerning information that was (i) known to Defendants, and (ii) material to Plaintiffs' decision to accept or reject the Tender Offer, but (iii) never disclosed to Plaintiffs. These allegations of Defendants' fraudulent omissions included their failure to disclose to Plaintiffs (i) the existence of the Markup-To-Market Program; (ii) Defendants' intention to pursue rent increases at the Project pursuant to the Program; (iii) the potential impact of such rent increases on the Project's value and financing

capacity; and (iv) Defendants' efforts in pursuit of considerable rent increases at the Project under the Program during the Tender Offer period.

Defendants have not questioned the materiality of this information. As general partners of the Partnership, and fiduciaries, Defendants were duty bound to disclose these matters in connection with the Tender Offer transaction. *See* *Fulco v. American Cable Sys.*, 1989 WL 205356 *3 (D. Mass. 1989) ("a general partner has a duty to disclose all material facts to its limited partners when soliciting their consent to partnership action, especially when there are conflicts of interest") (citing *Pavlidis v. New England Patriots Football Club*, 737 F.2d 1227, 1231 (1st Cir. 1984). Defendants' failure to disclose this material information in connection with the Tender Offer constitutes an actionable omission under both the federal securities laws and Massachusetts' common law of fraud. *Greebel*, 194 F.3d at 193-94.

**B.    The Complaint Provides Ample, Particularized Factual Support To Explain Why Defendants' Affirmative Misstatements Were Fraudulent**

The Motion to Dismiss attacks the Complaint's allegations concerning the Partnership's refinancing capacity, its value, and rent increases at the Project. These arguments are dealt with separately below.

**1.    Allegations Concerning Refinancing**

Defendants' do not challenge the merits of Plaintiffs' allegation that the Project could have supported twice as much financing as stated in the September 30 Letter. Instead, their criticism is that MassHousing's statement to Mr. Daniel Smith in January 2005 that it was prepared to refinance the Partnership's existing debt for at least $15 Million may not be considered because (i) it constitutes inadmissible hearsay; and (ii) the Complaint does not identify the MassHousing representative. These arguments are without merit.

In the first place, the First Circuit has made it abundantly clear that there is no

requirement to plead admissible evidence in a complaint. *See, e.g.*, *Cabletron*, 311 F.3d at 33 ("[T]his court has said repeatedly that the rigorous standards for pleading securities fraud do not require a plaintiff to plead evidence."); *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1225 (1st Cir. 1996) ("[I]n determining the adequacy of a complaint under that rule [9(b)], we cannot hold plaintiffs to a standard that would effectively require them, pre-discovery, to plead evidence.) Rather, in deciding this Motion, the Court is bound to accept all factual allegations as true. *Aldridge*, 284 F.3d at 78.

Moreover, the cases cited by Defendants in support of their hearsay argument are simply inapposite. None of these decisions involved the situation presented here -- a pre-discovery motion to dismiss. On the contrary, they were all decisions that followed extensive pre-trial discovery or an evidentiary hearing. For example, *Greebel v. FTP Software, Inc.*, 182 F.R.D. 370 (D. Mass 1998) was a decision on a motion for partial summary judgment and a renewed motion to dismiss after close to year of discovery. *Id.* at 372. *Millet v. United States Dept. of the Army*, 245 F. Supp.2d 344 (D. P.R. 2002) involved a motion for temporary restraining order and motion to dismiss following a full hearing. And *Ayala-Gerena v. Bristol Myers-Squibb Co.*, 95 F.3d 96 (1st Cir. 1996) was an affirmance of a district court's grant of post-discovery motion for summary judgment.

Defendants' attack on the Complaint's failure to identify the MassHousing representative who communicated the agency's position on refinancing to Mr. Smith is similarly unavailing. MassHousing is responsible for administering the Project's HAP Contracts and also facilitated the Defendants' Markup Request, pursuant to which they sought substantial rent increases on both HAP Contracts. Complaint ¶55, 110 and Ex C and D. According to its Internet web site, MassHousing is "the state's affordable housing bank. . . . Since making [its] first loan in 1970, [it

has] provided more that $7.8 billion to finance more than 60,000 apartments and 50,000 home mortgages throughout the Commonwealth." *See* http://masshousing.com. Far from being in no position to "possess the information alleged" (Defendants' Memorandum at 10), the MassHousing representative was in a prime position to know the actual value of the Project pursuant to the Markup Request, HUD Contract Renewal Form and RCS, all of which were all submitted to MassHousing in close proximity to the Tender Offer, and the amount of financing it could support. Complaint Ex C.

Finally, there simply is no requirement that the Complaint identify the MassHousing representative referred to in the Complaint. The First Circuit has stated that where "plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that defendant's statements were false." <u>Cabletron</u>, 311 F.3d at 29. The allegation concerning the MassHousing representative's statement to Mr. Smith, when considered in conjunction with the additional facts alleged regarding Defendants' Markup Request and related submissions made to MassHousing, *see* Complaint ¶96-112 and Ex C, provide more than an adequate basis for believing that Defendants' statements that the Partnership could only support a maximum loan of $7 Million were false and misleading.

### 2.    <u>Allegations Concerning Sale Of The Project</u>

Defendants do not deny that AHP Holdings made an offer to the Partnership to purchase the Project for $14.5 Million before the commencement of this action, and that Defendants rejected this offer. Complaint ¶¶116-17; *see* O'Connor Aff. Ex A. Instead, Defendants again challenge just the admissibility of the allegation regarding the value of the Project. Defendants' Memorandum at 12. As noted previously, this argument is unavailing since the First Circuit has

clearly held that there is no requirement to plead admissible evidence in a complaint. *See Cooperman v. Individual, Inc.*, 171 F.3d 43, 49 & n.8 (1st Cir. 1999) ("[We cannot hold plaintiffs to a standard that would effectively require them, pre-discovery, to plead evidence.").

Defendants also claim that AHP Holdings' offer was not *bona fide*, but instead amounted to a "pre-litigation tactic" by Plaintiffs. Defendants' Memorandum at 11. Aside from the fact that this charge is patently false, as evidenced by AHP Holdings' agreement to put up an earnest money deposit of $250,000 as security for its performance (Complaint ¶116 and O'Connor Aff. Ex A), it also attempts to deny Plaintiffs the benefit of all reasonable inferences to which it is entitled. *See Aldridge*, 284 F.3d at 79 ("The district court did not 'giv[e] plaintiff[] the benefit of all reasonable inferences" as it should have on a motion to dismiss, *Greebel*, 194 F.3d at 201, but appears to have drawn its inferences in the defendants' favor. We take the plaintiff's allegations to be true and draw inferences in the plaintiff's favor."). The reasonable inference to be drawn from the AHP Holdings' offer and its statement to Plaintiffs is that the Project was worth at least $14.5 Million dollars at the time of the Tender Offer, thereby establishing the falsity of Defendants' statements concerning the Project's value in the September 30 Letter.

### 3.    Allegations Concerning Rent Increases

Defendants zero in on the Complaint's allegations regarding the Project rent increases allowed by HUD pursuant to Defendants' Markup Request, and argue that Plaintiffs have failed to establish that this increase in Partnership income would have been sufficient to allow the Partnership to refinance or sell the Project and provide a return to limited partners. Defendants' Memorandum at 12. This argument misses the mark. The exact dollar amount by which the Markup-to-Market Program increased the value of the Project -- whether it be $8 Million, $80 Million, or even $800,000 -- is beside the point. What is pertinent, and what is sufficiently pled

in the Complaint, is the failure of the Defendants to disclose the availability of the Markup-to-Market Program, the preliminary steps taken by the Defendants to take advantage of the Program, and the potential for significant increases in Project rents and the positive effect of such increases on the value of the limited partners' interests.

Defendants attempt to hide behind the contention that a rental increase was not a certainty, as if, in the absence of certainty the information is non-material. That is not the test of materiality. What is material, and what the limited partners were entitled to know in deciding whether to accept or reject the Tender Offer, was the *potential* for obtaining a rent increase in the "best case scenario."[3] As subsequent events proved, that potential was not some remote possibility or chimera of a hope. The Defendants, being experienced owners and operators of subsidized housing projects, knew or should of known that likelihood of obtaining a substantial increase in Project rents was high. Indeed, it is strains credulity for the Defendants to argue on one hand that the prospect of obtaining rent increases was so remote as to not be immaterial in the context of the Tender Offer, and at same time to put the partnership to the expense and effort of trying to obtain a rent increase. The two positions are internally inconsistent.

The Project rent increases approved by HUD amounted to an additional $620,928 in annual net income for the Partnership. Complaint ¶112. It bears repeating that applying a reasonable capitalization rate of 8 percent, this increase in net income yields an increase in the value of the Project of over $7.75 Million. Using the figures set forth in the September 30 Letter, it is an eminently reasonable inference that this additional value would have permitted a refinancing or sale with cash available after payment of existing debt and expenses.

---

[3]  *See, e.g.*, <u>Anthony v. Padmar, Inc.</u>, 465 S.E.2d 745, 753 (S.C. Ct. App. 1995) ("In determining whether the general partners complied with this disclosure requirement, it need not be shown that the general partners' omissions or acts would have changed the way the limited partners voted on the sale or their overall view of the transaction; rather, it is enough to show that the fact in question, *i.e.,* how modification of the discretionary authority provision would be treated, would have been relevant to the limited partners in making a decision on the vote.")

Defendants' suggestion that the September 30 Letter's statements cannot be deemed fraudulent because Defendants had no way of knowing whether their Markup Request would be approved or at what rate is similarly unpersuasive.  The Markup-To-Market Program itself is an emergency initiative authorized by Congress to preserve the availability of Section 8 housing by providing economic incentives to owners as an enticement to renew their HAP Contracts. Complaint ¶¶57, 59-60.  The key feature of the Program is that *it permits Section 8 project owners to mark up rent levels to market rate and distribute cash flow resulting from such rents*. *Id.* ¶59.  This hardly amounts to uncertainty in any way for payment on existing HAP Contracts. Moreover, as Markup-To-Market experts (*id.* ¶70 and Ex A), Defendants were aware that the Project qualified under not one but two eligibility criteria for participation in the Markup-to-Market Program under Option 1-B.  Complaint ¶100-01 and Ex C.  Finally, Defendants' claims regarding the Program's uncertainty are belied by MassHousing's stated willingness to loan the Partnership $15 Million even before the Partnership's Markup Request was approved by HUD. *Id.* ¶113.

### POINT III
### THE ALLEGATIONS OF PLAINTIFFS' COMPLAINT GIVE RISE TO A STRONG INFERENCE OF *SCIENTER*

Defendants' arguments that the Complaint's allegations fail to give rise to a strong inference of *scienter* suffer from the same fundamental defects as their arguments regarding pleading fraud with particularity.  Once again, Defendants have virtually ignored an entire strand of the pertinent analysis -- that recklessness can amount to *scienter* -- and have focused almost exclusively on the argument that the Complaint does not establish Defendants' conscious intent to defraud.  In making that argument, Defendants once more insist on examining certain factual allegations in isolation, an analytical approach that has been rejected by the First Circuit.  When

making a *scienter* determination pursuant to Section (b)(2) and Rule 9(b), courts are required to employ a case-by-case, fact-specific approach, considering allegations of the complaint as a whole**.**  *Cabletron*, 311 F.3d at 40 ("Each individual fact about *scienter* may provide only a brushstroke, but the resulting portrait satisfies the requirement for a strong inference of *scienter* under the PSLRA.").   An inference of *scienter* must be reasonable and strong, "but not irrefutable . . . Plaintiffs need not foreclose all other characterizations of fact, as the task of weighing contrary accounts is reserved for the fact finder." *Aldridge*, 284 F.3d at 82.  Under this standard, the Complaint satisfies the PSLRA's and Rule 9(b) pleading requirements concerning *scienter*.

A.   **Taken Together, The Complaint's Allegations Concerning Defendants' Knowledge And Experience, The Markup-To-Market Program, And The Project's Valuation Give Rise To A Strong Inference Of** *Scienter*

Plaintiffs have provided precise allegations that Defendants possessed substantial knowledge and experience concerning the issues related to valuation and financing of the Project and the availability and effect of the Markup-To-Market Program.  Complaint ¶¶65-69.  These allegations are supported by inferences properly derived from Defendants' express representations contained in the September 30 Letter, which clearly evidence Defendants' knowledge in valuing the Project and predicting its financing prospects.  *Id.*  ¶¶76-87.  The Partnership's 2003 audited financial statements provide further, direct evidence that Defendants had substantial knowledge and experience with the valuation and financing for Section 8 Housing projects as well as HUD's Markup-To-Market Program, including in relation to the Project itself.  Roberts Aff., Ex B. §8, p. 13.  Finally, the Complaint alleges that AHP Holdings -- like Defendants a sophisticated investor in low-income housing projects  (*see* O'Connor Aff. Ex A) has represented to Plaintiffs that anyone with the level of knowledge and experience in low-

income housing as represented in MB Management's web site would readily understand that the Project was worth no less than $15 million at all relevant times. Complaint ¶118.[4]

The Complaint further alleges that Defendants made specific fraudulent statements, affirmatively misportraying the Partnership, the Project, and their future prospects. *See* Complaint ¶¶76-87. It goes on to describe the material omissions from the September 30 Letter, including the failure to disclose any information regarding the Markup-to-Market Program or its impact on the valuation of the Project, the amount of refinancing the Partnership could support, or the value of Plaintiffs Partnership interests. *Id.* ¶¶50-62, 88. Finally, the Complaint provides specific details as to how Defendants, during the Tender Offer period, moved forward with a request to increase the Project's rents to market levels. *Id.* ¶¶96-108.

Certain guiding principles set down by *Greebel*, the First Circuits' seminal case on pleading *scienter* under the PSLRA and Rule 9(b), are particularly relevant here. First, neither the statue nor the rule oblige Plaintiffs to make direct allegations, supported by evidence admissible at trial, that Defendants possessed the requisite state of mind. On the contrary, the standard requires only an *inference* of *scienter*, which can be proved by indirect and circumstantial evidence. 194 F.3d. at 195. Relatedly, the necessary inference is not limited to Defendants' conscious intent to defraud. *Id.* at 199-200. On the contrary, *scienter* is properly alleged if the Complaint's averments give rise to a strong inference that Defendants acted recklessly; *i.e.*, they "had full knowledge of the dangers of their course of action and chose not to disclose those dangers to investors." *Maldonado v. Dominguez*, 137 F.3d at 1 n. 4; *In re PLC*

---

[4] Just as they did with respect to the Complaint's allegations of Mr. Smith's statements concerning MassHousing's willingness to refinance the Partnership's debt for $15 Million, Defendants do not challenge the accuracy of AHP Holdings' claim, but rather its admissibility at trial. Regardless of the merit of their evidentiary argument, Defendants' objection is premature at this procedural juncture. *Cabletron*, 311 F.3d at 33 ("[T]his court has said repeatedly that the rigorous standards for pleading securities fraud do not require a plaintiff to plead evidence."); *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1225 (1st Cir. 1996) (same).

*Systems, Inc.*, 41 F.Supp.2d at 114.

Unlike the many cases cited in Defendants' Memorandum, this is not some class action strike suit seeking to capitalize on a drop in stock price. This is a case of fiduciary self-dealing, in which highly sophisticated and experienced general partners convinced their limited partners to sell back their partnership interests at a low-ball price based on demonstrably false and incomplete statements concerning the Partnership's operations and income potential. During or shortly after the Tender Offer period, the general partners clandestinely applied for substantially increased federal rent subsidies at the Project. This application was no crap-shoot; as Defendants own submission to HUD declared, the Project met the Markup-To-Market Program's waiver criteria, clearing the way for the current rents at the Project -- which were "well below market" -- to be marked up to market levels. Complaint ¶¶100, 103 and Ex C. Certainly it is a reasonable inference from these well-pleaded facts that the general partners intended to "deceive, manipulate, or defraud" Plaintiffs, or at a minimum proceeded with the Tender Offer despite actual knowledge that the September 30 Letter's statements regarding the Project's income, value, and financing capability were false and misleading. *Ernst & Ernst v. Hochfelder*, 425 U.S. at 193 n. 12.

Defendants' "motive-opportunity argument" (*see* Defendants' Memorandum at 16-17) does not alter this conclusion. As a threshold matter -- and contrary to Defendants' assertions -- the First Circuit *has* recognized that facts showing motive and opportunity may be sufficient to permit the drawing of a strong inference of *scienter*. *Greebel*, 194 F.3d at 197. More importantly, however, the strong inference of *scienter* in this case does not arise merely from the Complaint's allegations concerning Defendants' motive and opportunity. It is the Complaint's motive and opportunity allegations, *combined with all of the other facts and circumstances*

*alleged therein*, that give rise to the strong inference of Defendants' *scienter*. Defendants' invitation for this Court to consider the motive/opportunity allegations in a vacuum is inconsistent with the First Circuit standard, which requires the Court consider *all* of the allegations of the Complaint. <u>Cabletron</u>, 311 F.3d at 40.

Defendants place great reliance on <u>*Sturm v. Marriott Marquis Corp.*</u>, 85 F. Supp.2d 1356 (N.D. Ga. 2000) "because the allegations parallel those in this case." Defendants' Memorandum at 17. Notwithstanding a resemblance of certain facts, <u>*Sturm*</u> offers no help to Defendants, whose description of that decision is hopelessly confused. In <u>*Sturm*</u>, the court held that the defendant general partners' failure to disclose information concerning the value of the partnership *did* constitute an actionable omission under Section 10(b). 85 F. Supp.2d at 1368.[5] Moreover, <u>*Sturm*</u> *did* find that "[*scienter*] [wa]s adequately pled to allow Plaintiffs' Section 10(b) claims to go forward." *Id.* at 1372.

Importantly, what tipped the balance for the <u>*Sturm*</u> court on the *scienter* issue was the fact that the subject of the omitted information "was the critical fact that Defendants used to justify" the challenged transaction. *Id.* at 1371. That is exactly the case here. The critical facts that Defendants used to justify the Tender Offer were (i) that "*based on current rents* and expenses" the partnership could only support a refinancing $7 Million (Complaint ¶85 and Ex B at 2 (emphasis added)); and (ii) "*if current operations are maintained*, it is unlikely that the Investor Limited Partners would ever receive a cash return on their investment." *Id.* ¶87 and Ex B at 3 (Emphasis added). Within the Tender Offer Period Defendants knew -- but hid from Plaintiffs -- the fact that they were already in the process of seeking aggregate rent increases of more than

---

[5] The <u>*Sturm*</u> court's rejection of the plaintiffs' claims of fraud based on the defendants' failure to disclose information related to the partnership's value was based solely on the finding that the information was not material. 85 F. Supp.2d at 1370. Its comments regarding the whether the defendants acted with *scienter* in connection with this omission was mere *dictum*. *Id.* at 1372.

44% or approximately $800,000 per year. Complaint ¶109. In these circumstances, "the only reasonable inference that can be drawn is that there was an intention to deceive." 85 F. Supp.2d at 1372.

**B.    Neither The September 30 Letter, The Partnership's 2003 Audited Financial Statements, Nor The Markup Request Negate A Strong Inference Of *Scienter***

Defendants assert that all inferences of *scienter* are negated by information contained in the September 30 Letter and its passing reference to the "audited financial statements that you recently received." Defendants also contend that *scienter* inferences are negated by their statement contained in the September 30 Letter that "the General Partners will request renewal of each Section 8 contract but it is not known what rental level HUD will approve at this time." *Id.* p. 18-19. Rather than negating inferences of *scienter*, the two documents cited by Defendants give rise to a remarkably strong inference of *scienter*.

First, the September 30 Letter's statement concerning HAP contract renewal is completely devoid of any mention of the availability of the Markup-To-Market Program or its effect on the value of the Project. Admittedly, the Letter asserts that the rental levels are unknown; however, it conveniently fails to disclose that an increase of 150 percent or more of FMR was potentially available pursuant to the Markup-To-Market Program. This omission is particularly egregious when considered against the backdrop of the September 30 Letter's bleak, but inaccurate, portrayal of the Project as a tax shelter that had run its course, with only the prospect of generating tax liabilities and little or no likelihood of generating cash distributions for Investor Limited Partners. Complaint ¶¶82-83. The September 30 Letter's mention of the Partnership's 2003 audited financial statements is similarly obscure. The Letter refers the reader to the financial statements for an explanation of the details of the Partnership's Purchase Money Note, not for any other purpose, and certainly not the Markup-to Market Program of the

valuation of the Project or Plaintiffs' Partnership interests.  *Id.* Ex B.

In effect, Defendants seek to utilize assertions in the 2003 audited financial statements concerning the Markup-To-Market Program as a proxy for full and fair disclosure in relation to the Tender Offer.  However, a cursory examination of these statements, which were *not* submitted to Plaintiffs at the same time they received the Tender Offer, reveals that they at once say too much and too little regarding the Markup-To-Market Program and its effect on the Project's value.

Buried in the minutiae of 2003 audited financial statements is a brief declaration that the Partnership was "in the process of completing a request to mark up to market," while also vaguely alluding to the "increases pursuant to MAHRA."  Roberts Aff., Ex §8 at 13.  The level of explanation contained in these terse statements cannot be fairly characterized as a meaningful disclosure of material facts concerning the Program or its effect on the Project's value, especially under the attenuated "disclosure by proxy" scenario suggested by the Defendants.  It is undisputed that a party who discloses material facts in connection with securities transactions "assume[s] a duty to speak fully and truthfully on those subjects," and may not choose to deal in incomplete disclosures or half-truths.  *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001); *see also V.S.H. Realty, Inc. v. Texaco*, Inc., 757 F.2d 411, 415 (1st Cir. 1985) ("a party who discloses partial information that may be misleading has a duty to reveal all the material facts he knows to avoid deceiving the other party.").

Finally, Defendants suggest that the "uncertainty of the Markup-To-Market Program" with regard to "the level of increased rental subsidies" justifies the September 30 Letter's incomplete disclosure concerning expected increases in Project rents, and militates against a strong inference of *scienter*.  Defendants' Memorandum at 19.  Once again, Defendants have

missed the point. The accuracy, *vel non*, of the September 30 Letter's assertion that 'it is not known what rent levels HUD will approve'" is not what matters here. Even if this statement was technically accurate, the fact remains that Defendants concealed from Plaintiffs that rent levels were capable of rising dramatically in the near term, and that Defendants were already in the process making those rent increases a reality.

Thus, far from negating *scienter*, the September 30 Letter, the Partnership's 2003 audited financial statements, and the Markup Request and related materials conclusively demonstrate that Plaintiffs have alleged particularized facts and circumstances sufficient to raise a strong inference of *scienter*. *See Aldridge*, 284 F.3d at 83 (stating that published statements made with knowledge of facts suggesting the statements are inaccurate or misleadingly incomplete is "classic evidence of scienter."); *Greebel*, 194 F.3d at 196 (stating as relevant to a *scienter* determination, *inter alia*, divergence between internal reports and external statements on the same subject; closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; disregard of the most current factual information before making statements).

## POINT IV
## PLAINTIFFS' INDEPENDENT AND SECONDARY CLAIMS ARE NOT SUBJECT TO DISMISSAL

Defendants also seek dismissal of the remaining Counts of the Complaint, which sound in breach of fiduciary duty, negligent misrepresentation, and breach of contract, civil conspiracy, and aiding and abetting breach of fiduciary duty. Defendants' argument here runs as follows: (i) each of these claims arise out of the same set of operative facts as the Counts asserting fraud; (ii) because these claims assertedly "sound in fraud" the pleading requirements of Rule 9(b) apply; and therefore (iii) since fraud has, assertedly, not been pled with particularity, each of these

counts must also be dismissed.

This flawed syllogism is founded upon erroneous premises, which are bootstrapped to a faulty legal proposition. While there is necessarily some overlap of the allegations pertinent to these claims and those pertaining to Counts One through Three -- hardly surprising given that all of the claims arise out of a single transaction -- each of the distinct claims pled in the Complaint is based on differing elements and supported by different factual allegations. Simply put, although Counts Four through Eight of the Complaint involve the same parties and subject matter, these claims arise independent of the claims arising out of Defendants' fraud and/or violation of the federal securities laws.

Furthermore, the assertion that Rule 9(b)'s pleading requirements pertain to claims other than fraud is, quite simply, false. As to those claims, Rule 8 alone applies. And the Complaint certainly sets forth "a short and plain statement of the claim showing that the pleader is entitled to relief" with respect to each of those claims as required under Rule 8. Fed. R. Civ P. 8. The cases cited in Defendants' Memorandum lend no support to their argument. One group, including _In re Computervision Corp. Sec. Lit._, _Ellison v. American Image Motor Co._, _In re Ultrafem, Inc. Sec. Lit._, and _Hershey v. MNC Fin., Inc._, deals with the issue of whether Rule 9(b) applies to claims made under Sections 11 and 12 of the Securities Act of 1933 that "sound in fraud." The other group, including _Frota v. Prudential-Bache Sec., Inc._, _Mosko v. Defilippo_, and _Smith v. Office of Servicemembers Group Life Ins._, involved claims that while called something else, were based solely on allegations of fraudulent conduct. Neither factual matrix is involved in this case, rendering these decisions inapposite.

Defendants' final argument -- that Counts Seven and Eight must be dismissed because the claims asserting the underlying torts (fraud and breach of fiduciary duty) must also be

dismissed -- fails as well. The Complaint has sufficiently pled both the underlying torts. Accordingly, the derivative claims of conspiracy and aiding and abetting stand as well.

This Court should reject Defendants' cursory, generalized assertion that Plaintiffs' remaining claims and secondary claims are derivative of their claims that sound in fraud, and therefore must be dismissed. Neither the PSLRA nor Rule 9(b) apply to these claims. But even if they did, Plaintiffs' Complaint sufficiently alleges the "time, place, and content" of the false and misleading statements and omissions, the reasons why such statements are false and misleading, and particular facts giving rise to a strong inference of *scienter*. *See* 15 U.S.C. § 78u-4(b)(1)&(2); *Greebel*, 194 F.3d at 191. Thus, whether sounding in fraud or not, each and every remaining claim applies against Defendants with full effect.

## POINT V
### BECAUSE THE INJURY ALLEGED IS PERSONAL TO PLAINTIFFS, PLAINTIFFS' CLAIMS OF MISMANAGEMENT ARE PROPERLY PLED AS DIRECT CAUSES OF ACTION

Defendants seek dismissal of Plaintiffs' claims for the General Partners' "incurring inflated and excessive management and administrative fees." Complaint at ¶¶142, 162, 166, 171. Defendants' argument for dismissal is that these claims are "derivative," and Plaintiffs have not brought, and indeed cannot bring, such claims derivatively. The premise of this argument is erroneous. In fact, claims for mismanagement of a partnership may be brought either as individual or derivative claims. *See generally* BROMBERG AND RIBSTEIN ON PARTNERSHIP §15.04(h).[6] Although a shareholder or limited partner may not bring a direct action for

---

[6]   In the analogous corporate context, a claim for breach of fiduciary duty brought by minority shareholders, even when it involves allegations of mismanagement, is a direct action. *Horizon House-Microwave v. Bazzy*, 21 Mass.App. 190, 196 (1985) ("To the degree that the gravamen of [plaintiff's] action was abuse of fiduciary duty by a majority stockholder, he was not required to bring a minority stockholder's derivative suit against Microwave but could move against that corporation and [the majority stockholder] directly.")

mismanagement if the only injury alleged is a diminution of the corporation's net worth, s/he may bring a direct action if the mismanagement claims are accompanied by claims such as fraud and misrepresentation that result in direct harm to individual investors. _Hurley v. Federal Deposit Ins. Corp._, 719 F. Supp. 27, 30 (D. Mass. 1989)[7]; _Blasberg v. Oxbow Power Corp._, 934 F. Supp. 21, 26 (D. Mass. 1996). In essence, the proper focus is on the nature of the injury rather than the allegation itself to determine if a claim is derivative or personal, and no blanket rule exists excluding mismanagement claims from the universe of personal actions.

Defendants argue that Plaintiffs did not suffer a direct injury by the General Partners' mismanagement because all stakeholders in the Partnership suffered to the same extent. That is not so. The complained of excessive management and administrative fees include sums paid by the Partnership to the Bowditch, Slavet, Rioff, or their affiliates. _See_ 2003 audited financial statements, Roberts Aff., Ex B at 12. Bowditch, Slavet, and Rioff are partners in the Partnership, yet they were enriched, not harmed, through these self-dealing transactions. Accordingly, it cannot be said that Plaintiffs harm is indistinguishable from that of their fellow partners, and therefore properly characterized only as derivative.

To the extent Defendants charged the Partnership excessive fees as alleged in the Complaint, this had an adverse impact on the Partnership's financial condition by depressing its net income and available cash flow. This, in turn, negatively affected the Partnership's value and financing prospects. These issues are intimately bound up in Plaintiffs' decisions to sell their Partnership interests to Defendants. The injury flowing from that transaction is hardly derivative; rather, it inflicted harm personally on each Plaintiff, for which each may properly

---

[7] Defendants' reliance on _Hurley_ is curious, because it undermines rather than bolsters their position. In _Hurley_, the court held that because the plaintiffs alleged "more than mere corporate mismanagement," including counts under 10b-5 for material misrepresentation and common law fraud, the general prohibition on shareholders bringing a direct 10b-5 claim based on corporate mismanagement was inapplicable.

bring a direct action under Massachusetts law.

Finally, Defendants' argument fails to account for the fact that Plaintiffs are seeking rescission of the Tender Offer.  To the extent Plaintiffs prevail on their rescission claims, they will be returned to their status as limited partners.  In that case they clearly do have standing to pursue derivative claims, to the extent their mismanagement claims are properly labeled as such. Mass. G.L. Ch. 109, §58.

## Conclusion

For all of the foregoing reasons, Plaintiffs respectfully request that Defendants' Motion to Dismiss be denied.

Dated:  October 31, 2005                    Respectfully submitted,


                                            /s/ Paul McDonald
                                            Paul McDonald
                                            (*Pro Hac Vice* Granted)
                                            Daniel Murphy
                                            BBO # 656021
                                            Bernstein, Shur, Sawyer & Nelson
                                            100 Middle Street
                                            P. O. Box 9729
                                            Portland, Maine 04104-5029
                                            (207) 774-1200


                                            /s/ John J. O'Connor
                                            John J. O'Connor
                                            BBO # 555251
                                            Peabody & Arnold LLP
                                            30 Rowes Wharf
                                            Boston, MA  02110
                                            (617) 951-2077


                                            Attorneys for Plaintiffs

PABOS2:JOCONNO:625504_1
14941-91178