IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT M. GERBER, *et al.*, | : |
| Plaintiffs, | : CIVIL ACTION NO: 05-10782-DPW |
| v. | : |
| ROBERT S. BOWDITCH, JR., *et al.*, | : |
| Defendants. | : |

AFFIDAVIT OF JOHN J. O'CONNOR IN SUPPORT
OF PLAINTIFFS' MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT

I, John J. O'Connor, hereby depose under oath and say:

1. I am co-counsel for Plaintiffs Robert M. Gerber, as Trustee of the Rosalie Gerber Trust, William J. and Jayne Gilligan, husband and wife, Sanford R. and Beth L. Hoffman, husband and wife, and James D. Burns (collectively, "Plaintiffs") in this action.

2. I submit this Affidavit in support of Plaintiffs' Memorandum of Law in Opposition to the Defendants' Motion to Dismiss Second Amended Complaint.

3. Attached hereto is a true and correct copy of a letter dated April 4, 2005 (with attachment) that was sent by Eric F. Saunders, counsel to Plaintiffs and AHP Holdings Company, LLC ("AHP Holdings"), to Stephen W. Hansen in his capacity as counsel for Defendants in this action and Old Salem Associated Limited Partnership ("Old Salem).

4. In the April 4, 2005 letter, Mr. Saunders conveys AHP Holdings' offer to purchase the assets of Old Salem for a purchase price of $14,500,000.00. Mr. Saunders also

attached the April 4, 2005 letter a form of a Purchase and Sale Agreement for use in the proposed transaction.

SIGNED AND SWORN UNDER THE PAINS AND PENALTIES OF PERJURY THIS 31ST DAY OF OCTOBER, 2005.

John J. O'Connor

625467_1
14941-91178

# Bernstein, Shur, Sawyer & Nelson, P.A.

Counselors at Law

100 Middle Street, West Tower, P.O. Box 9729, Portland, Maine 04104-5029
207-774-1200  Fax 207-774-1127
Internet: bssn.com

Eric F. Saunders
esaunders@bssn.com

April 4, 2005

*Via Federal Express*
Steven W. Hansen, Esq.
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110-1726

RE:   Old Salem Associates Limited Partnership

Dear Mr. Hansen:

In your letter to me of March 30, 2005, you state with respect to the draft complaint that I previously sent to your partner, Ms. Foley, that "[t]he allegations are wholly without merit." My clients are prepared to back up their allegations with money to test whether your clients really meant what they said to induce them to sell.

In addition to those former limited partners identified as plaintiffs in the draft complaint that I previously sent to your partner, Ms. Foley (the "Limited Partners"), our firm represents AHP Holdings Company LLC ("AHP"), an investor in low-income housing projects. On behalf of both AHP and the Limited Partners, we are submitting to you the following purchase offer.

AHP hereby offers to purchase from Old Salem Associates Limited Partnership (the "Partnership") for a purchase price of **Fourteen Million Five Hundred Thousand Dollars ($14,500,000)** all of the Partnership's assets, including real estate, reserve accounts, and all materials related to the Partnership's pending request for rent increases under HUD's Mark-up to Market program. The purchase price will be paid by an assumption of the existing first mortgage debt on the real estate and by payment of the balance in cash.

As security for its performance, AHP will put up an earnest money deposit of **Two Hundred and Fifty Thousand Dollars ($250,000)**. The Partnership shall be entitled to retain the deposit if AHP is unable either to finance its purchase of the Partnership's assets or to obtain regulatory approval.

I am attaching a form of Purchase and Sale Agreement that we have used in past transactions of a similar nature and propose to use in this transaction.

In addition to paying the purchase price, AHP, at significant cost to it, will obtain from the Limited Partners releases of their claims against the Partnership's general partners which will

April 4, 2005
Page 2

be delivered at the closing.

If your clients were sincere in their representation to the limited partners that "it is unlikely that the proceeds of a refinancing (or sale) would be sufficient to repay all Partnership debt and return any portion of each Limited Partner's capital contribution in the best case scenario" (emphasis added), then they should not hesitate in accepting AHP's offer, not only for the benefit of those limited partners who still remain in the Partnership but for their own benefit as well.

AHP will hold its offer open until 5 PM on April 8, 2005 at which time it will expire unless it is extended.

Sincerely,

Eric F. Saunders

Enclosure

cc:   Matt Orne

# AGREEMENT FOR THE PURCHASE AND SALE OF HOUSING PROJECT

AGREEMENT made and entered into this ___ day of _____, 200_, by and between [name of seller], a [state of domicile] limited partnership (the "Seller") with a business address of [address] and [name of buyer] and/or assigns having an address, for purposes of this Agreement, at [address] ("Buyer").

## WITNESSETH AS FOLLOWS:

1. <u>Purchase And Sale</u>. The Seller agrees to sell to the Buyer, and the Buyer agrees to buy from the Seller, on the terms and conditions hereinafter set forth, all of the Seller's assets (the "Assets"), including without limitation, the following:

(a) Certain land and buildings located in [location and description of project] consisting of a ___ unit federally subsidized low-income housing project known as [name of project], all as more particularly described on **Exhibit A** attached hereto and made a part hereof (the "Project");

(b) All items of personal property, tangible or intangible, owned by the Seller, or in which the Seller has an interest, located on the Project and/or used in connection with the operation and maintenance of the Project, including, without limitation, all furniture, fixtures, equipment, machines, appliances, supplies, tools, spare parts and materials, the trade name, telephone numbers, stationary, invoices, rental receipt records, advertising contracts and listings, and lists of former and prospective tenants (the "Personal Property"). There is excluded from the Personal Property those items listed on **Exhibit B** that belong to the Managing Agent;

(c) To the extent transferable, all books, records, plans, specifications, surveys, permits, licenses, approvals, guaranties, warranties, utility contracts or other rights owned by the Seller and used in connection with or related to the ownership, use, operation, and maintenance of the Project;

(d) All leases and tenancy at will agreements with respect to the Project together with all tenant security deposits with the interest accrued thereon, if any;

(e) To the extent transferable, all contracts and agreements pertaining to the operation of the Project listed on **Exhibit C** (copies of which have been provided to the Buyer simultaneously

with the execution of this Agreement) plus those additional contracts, if any, that the Buyer specifically agrees in writing to assume subsequent to the date of this Agreement; and

(f) All cash, cash equivalents, insurance claims, credits, refunds, rebates, accrued rents, investment accounts, escrow accounts, operating accounts and reserve accounts of the Seller, including without limitation, all operating, debt service, replacement, and capital improvement reserves funded out the revenues of the Seller to the extent of the Seller's interest therein and all rights of the Seller in the funds that are now held in escrow by the [regulatory agency]. Attached hereto as **Exhibit D** is a list of the Seller's reserve accounts and their approximate balances as of the date of this Agreement. The balances in such reserve accounts as of the Closing shall be not less than amounts shown on **Exhibit D** unless otherwise approved by the Buyer.

2. Purchase Price. Subject to any adjustments and pro-rations as may be hereinafter described, the Buyer agrees to pay for the Assets the sum of [amount] ($_____). The Purchase Price shall be payable as follows:

(a) The Buyer shall pay to the Seller upon the execution of this Agreement a deposit in the amount of [amount] Dollars ($_____) (the "Deposit");

(b) The Buyer shall either assume or payoff of the Seller's existing first mortgage debt upon the Project as of the Closing (the "Mortgage Debt"); and

(c) The Seller shall pay by wire transfer to an account designated by the Seller the amount by which the Purchase Price exceeds the sum of the Deposit plus the principal balance of the Mortgage Debt as of the Closing.

In addition to paying the Purchase Price as aforesaid, the Buyer shall assume as of the Closing and pay when due the Seller's payables arising in the ordinary course of business, exclusive of any outstanding loans, fees, or other amounts owed to the Seller's general partners and affiliates, provided the aggregate amount of payables assumed hereunder shall not exceed the balance of Seller's operating accounts as of the Closing.

3. Title. The Seller shall convey to the Buyer at the Closing by quitclaim deed with covenant good and marketable or insurable title to the Project (i.e., title, including a certified survey of the Project, which is insurable with a title insurance company licensed to do business in the State of [location of the Project] for the full amount of the Purchase Price, subject only to standard exceptions) free and clear of all liens and encumbrances except for the following (the "Permitted Encumbrances"):

2

(a) tenant leases that comply with the requirements of the HAP Contract;

(b) such other easements and restrictions of record or other liens and encumbrances existing as of the date of this Agreement which do not singly, or in the aggregate, render title to the Project in any way unmarketable or substantially impair or restrict the use and occupancy of the Project as an low and moderate income housing project in substantially the manner same is presently being used by the Seller; and

(c) deed restrictions and regulatory agreements required by the U.S. Department of Housing and Urban Development ("HUD") and any state or local agency that regulates or provides subsidies, including tax abatements, to the Project (collectively, the "Regulatory Agencies").

If the Seller is unable to convey title as aforesaid, the Seller shall be given a period of ninety (90) days in which to remedy any title defects and the term of this Agreement shall be extended by said period. In the event that said defects cannot be corrected or remedied within said period, then the Buyer may terminate this Agreement and recover the Deposit and thereafter, the Buyer and the Seller shall be under no further obligation to one another hereunder, or, in the alternative, the Buyer may elect to close this transaction notwithstanding said defects and without any abatement in the Purchase Price. The Buyer shall pay the costs of title insurance and survey. The Seller shall transfer to the Buyer the Personal Property and other non-real estate Assets by bill of sale with a warranty covenant as to title and shall assign to the Buyer the HAP Contract and all tenant leases by instruments mutually satisfactory to the Buyer's counsel.

4. Term of Agreement. This Agreement shall be for an initial term of **[length of contract]**, provided that the Buyer shall have the right to extend the Agreement for **[number]** additional period[s] of **[length of extension]** upon notice to the Seller, provided at the time of such extension all conditions to the Buyer's obligations to close under Paragraph 12, with the exception of **[list exceptions]** have been satisfied or waived by the Buyer and the Buyer is proceeding diligently to satisfy the other conditions.

5. The Closing. The Closing shall be held on a business day designated by the Buyer upon not less than ten (10) days notice to the Seller and shall take place at the office of the Seller's attorney or such other location as is mutually agreeable to the parties. At the Closing, the Seller shall execute and deliver to the Buyer, against payment of the Purchase Price, the Seller's quitclaim deed with covenant to the Project (the "Deed"), bills of sale, and an assignment of the HAP Contract and other contract rights.

The Seller further agrees to execute and deliver to the Buyer at the Closing a Certificate of Non-Foreign Status (as required by Internal Revenue Service regulations) and a title insurance policy "Seller's

Affidavit of Title" regarding mechanics liens and persons in possession and, if the Seller is a corporation, partnership or other legal entity, evidence of authority and good standing reasonably satisfactory to the Buyer's title insurance company.

There shall be no proration of revenues or expenses such as rents and real estate taxes.

6. <u>Risk of Loss, Damage and Insurance</u>. The risk of loss to the Project prior to the Closing shall be borne by the Seller. The Seller shall keep the Project fully insured against fire and other extended coverage risks until the Closing. In the event that, prior to the Closing, the improvements which are part of the Project are destroyed, or substantially damaged in excess of $100,000, and the Seller is unwilling to repair or restore the improvements so damaged or destroyed, the Buyer may either (a) terminate this Agreement and secure a return of the Deposit, or (b) accept the insurance proceeds payable by reason of such damage or destruction and close this transaction without abatement in Purchase Price notwithstanding said damage.

7. <u>Due Diligence Investigation</u>. Upon reasonable notice to the Seller, the Buyer and its agents and consultants shall have the right to enter upon Project and to gain full and unrestricted access to the Seller's books and records (including those books and records in the possession of third parties) for the purpose of conducting at its expense such due diligence investigations, inspections, tests, studies, examinations, and other information gathering as the Buyer deems appropriate (the "Due Diligence Investigation"). The Buyer's Due Diligence Investigation shall be conducted in such a manner as to not unduly interfere with the Seller's operations or disturb the tenants of the Project. The Buyer shall have the right to terminate this Agreement and recover its Deposit if within ninety (90) days of the date of this Agreement (the "Due Diligence Period") it notifies the Seller that it is not satisfied with the results of its due diligence investigations. The Buyer shall have the right to extend the Due Diligence Period up to an additional ninety (90) days if, in the course of its Due Diligence Investigation, the Buyer discovers any latent condition or undisclosed problem requiring further tests or studies. The Due Diligence Investigation shall be solely for the benefit of the Buyer and shall not relieve the Seller of any duty it may have to disclose to the Buyer any conditions having a material adverse impact on the Project of which it has actual knowledge. The Buyer understands that it is purchasing the property on an "as is" basis.

8. <u>Possession of the Premises</u>. The Project shall be delivered to Buyer at the time of the Closing free and clear of all tenancies or occupancies excepting those tenancies and occupancies set forth in a schedule to be provided by the Seller to the Buyer within thirty (30) days of the execution of this

Agreement. This shall include the license for the roof antenna structure on the roof of the high rise building. Tenants listed on the schedule (to be annexed and incorporated herein as **Exhibit E**) shall occupy their apartments pursuant to a standard form HUD lease (or similar form acceptable to HUD); and provided, further, that the Project may be subject to tenancies and occupancies not listed in **Exhibit E** if created after the date hereof and either (i) are occupied by low-income persons pursuant to standard form HUD lease (or similar form acceptable to HUD), or (ii) are not disapproved of by the Buyer within ten (10) days of the Buyer receiving notice of such tenancies or occupancies. The Seller covenants with the Buyer that subsequent to the date of this Agreement, the Seller shall not lease units within the Project to non-qualified tenants (i.e., tenants who not considered low-income tenants for purposes of low income tax credit under §42 of the Internal Revenue Code).

All of the security deposits paid by tenants prior to the Closing shall be paid over to the Buyer at the time of the Closing and the Seller shall provide all tenants with written notice of the transfer of the Project and security deposits to the Buyer. Within five (5) days of the Buyer's request, the Seller shall make available for review and copying by the Buyer, at the Seller's office or at the office of its Management Agent and at the Buyer's expense, all available plans, letters, leases, files, documents and other papers or printed materials related to or concerning the Project and the tenants occupying the same.

9. <u>Representations and Warranties of Seller</u>. The Seller represents and warrants to the Buyer that the following statements are substantially true in all material respects as of the date of this Agreement and will be substantially true, in all material respects, as of the Closing:

    (a) The Seller is a limited partnership duly organized and validly existing under the laws of the **[Seller's domicile]** and has all necessary power to enter into this Agreement and to perform all of its obligations hereunder;

    (b) The execution and delivery of this Agreement and any other documents delivered in connection herewith and the consummation of the transactions described therein by the Seller have been duly authorized by all requisite action on the part of the Seller and do not violate, contravene, or conflict with any law, regulation, ruling, order, or agreement by which the Seller or the Project are bound;

    (c) This Agreement constitutes the valid and binding obligation of the Seller and is legally enforceable against the Seller in accordance with its terms;

(d) There are no outstanding, pending, or threatened claims or demands against the Seller by any tenant or other person respecting the Seller's ownership, use, occupancy, or management of the Project other than disputes with tenants in which the amount in dispute or the potential financial impact on the Seller or the Project is less than Ten Thousand Dollars ($10,000), and there are no outstanding, pending or threatened liens, claims, rights of first refusal, or encumbrances against the Project except for the Permitted Encumbrances;

(e) To the best of the Seller's knowledge, all financial information regarding the operation of Project provided by the Seller or its agents to the Buyer is accurate and complete in all material respects; and

(f) As of the date hereof, the Seller has not been declared in default under the HAP Contract, the Regulatory Agreement, the Mortgage Loan, or any other agreement pertaining to the Project.

The Seller shall cause its legal counsel to furnish an opinion to the Buyer at the Closing as to subparagraphs (a) through (c) above.

11. Representations and Warranties Of Buyer. The Buyer represents and warrants to the Seller that the following are true, in all material respects, as of the date of this Agreement and will be true as of the Closing:

(a) The Buyer is a for-profit entity duly organized, validly existing under the laws of the State of Maine, and has all necessary power to execute and deliver this Agreement and to perform all of its obligations hereunder;

(b) The execution and delivery of this Agreement and any other documents delivered in connection herewith and the consummation of the transactions described therein by the Buyer have been duly authorized by all requisite action on the part of the Buyer and do not violate, contravene, or conflict with any law, regulation, ruling, order, or agreement by which the Buyer is bound;

(c) This Agreement constitutes the valid and binding obligation of the Buyer and is legally enforceable against the Buyer in accordance with its terms; and

(d) There is no litigation or proceeding pending which would prevent the Buyer from complying with any of its obligations under this Agreement.

The Buyer shall cause its legal counsel to furnish an opinion to the Seller at the Closing as to subparagraphs (a) through (d) above.

12. <u>Conditions to Closing</u>. The parties' obligations under this Agreement are subject to the following conditions:

    (a) The [current lender] shall have agreed to the assumption of the Mortgage Debt.

    (b) The Regulatory Agencies shall have approved the sale of the Project to the Buyer or its assignee.

    (c) The partners of the Seller shall have approved the sale of the Project to the Buyer on the terms set forth herein in accordance with the requirements of the Seller's partnership agreement. In executing this Agreement on behalf of the Seller, the Seller's general partner agrees that it will approve such sale and that it will initiate appropriate action to obtain the approval of the Seller's limited partners to such sale. If the approval of the Seller's limited partners is not obtained within forty-five (45) days of the date of this Agreement, the Buyer may terminate this Agreement and obtain a refund of the Deposit.

    (d) All representations and warranties of the Seller contained in this Agreement shall be true as of the Closing.

    (e) The Project shall be at least same condition it was in as of the date of this Agreement, normal wear and tear excepted.

If any of the foregoing conditions are not satisfied or waived by the Buyer prior to the expiration of this Agreement, the Seller shall refund the Deposit to the Buyer and neither party shall be under any further obligation to the other.

13. <u>Default and Remedies</u>. If the Seller fails to close this transaction for any reason other than a default by the Buyer, the Buyer's sole and exclusive remedies hereunder shall be to recover its Deposit and to seek specific performance against the Seller. If the Buyer fails to close hereunder for any reason other than a default by the Seller or the failure to satisfy the conditions of Paragraph 12, the Seller shall retain the Deposit as liquidated damages in lieu of any other legal or equitable remedy.

14. <u>General Provisions</u>. This instrument maybe executed in multiple originals and is to be construed under the laws of [state]. Except as otherwise expressly stated herein, time is not automatically of the essence of this Agreement, but either party may make time of the essence as to any obligation herein provided upon ten (10) days written notice to the other party after the performance date herein provided first expires. This Agreement is binding upon and inures to the benefit of the parties hereto, their respective heirs, successors and assigns, and except for the occurrence of the condition subsequent in

paragraph 5 above, may be canceled, modified, or amended only by a writing executed by the parties hereto or their legal representatives. All notices, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given on the date of service if served personally on the party to whom notice is to be given or on the date of mailing. If mailed, all notices are to be sent by first class mail, postage prepaid, certified, return receipt requested, addressed as follows with copies sent by fax:

TO SELLER:

WITH A COPY TO:

TO BUYER:

WITH A COPY TO:   Eric F. Saunders, Esq.
Bernstein Shur Sawyer & Nelson
100 Middle Street
Portland, ME  04101

Either may change his address for purposes of this paragraph by giving the other party notice of the new address in the manner described herein. All representations and warranties made by the Buyer and the Seller shall survive the Closing of this transaction. If any provision of this Agreement is determined to be invalid or unenforceable, it shall not affect the validity and enforcement of the remaining provisions hereof.

**IN WITNESS WHEREOF**, the Seller and the Buyer have executed this Agreement as of the date first above written.

WITNESS:                                              BUYER:

8

_____     By:_____
                                  Its

                              SELLER:

                              By: _____
By:_____
                                  Its