THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT M. GERBER, *et al.*, : | |
| : | |
| Plaintiffs, : | |
| : | CIVIL ACTION NO. |
| v. : | 05-10782-DPW |
| : | |
| ROBERT S. BOWDITCH, JR., *et al.*, : | |
| : | |
| Defendants. : | |

**REPLY MEMORANDUM IN SUPPORT OF
<u>DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT</u>**

Despite Plaintiffs' mischaracterizations of the September 30 Letter, the documents on which Plaintiffs' claims are based show that, far from hiding the Partnership's plans to seek federal rent adjustments, Defendants affirmatively advised all limited partners of the Markup-to-Market Program and the Partnership's plans to seek renewal of its Section 8 contracts. Plaintiffs were in possession of the core information they claim was fraudulently omitted from the September 30 Letter. This aside, the allegations concerning alleged refinancing and sale opportunities embellished in Plaintiffs' Opposition do not give rise to *any* inference of falsity or of fraudulent intent. This shortcoming dooms all of Plaintiffs' claims, as they all are premised on allegations of fraud. Plaintiffs' only factually distinct theory of liability – premised on alleged excessive management fees – is a derivative claim that Plaintiffs have no standing to pursue.

**1.    Plaintiffs repeatedly mischaracterize or misconstrue the contents of the September 30 Letter.**

To start, the thrust of Plaintiffs' argument is that the September 30 Letter effectively misrepresented to the limited partners the value of a Partnership unit. This notion is simply false. The September 30 Letter expressly states:  "This offer should not be construed as a

representation or statement made by the Purchaser as to the value of a Unit or the fairness of the Purchase Price." Sept. 30 Letter at 3.[1] It further warns that the purchase price offered "was not determined . . . based on any current appraisal of the value of the Project." *Id*. These plain statements belie the notion that the September 30 Letter made *any* representation concerning the value of the Partnership or its units.

Plaintiffs attempt to twist a misrepresentation out of the September 30 Letter by taking the letter's language out of context, arguing that "the general partners declared that under the 'best-case scenario,' the most the partnership could borrow in a refinancing transaction would be $7 Million."[2] Opp. at 2. Once again, this is not what the letter says. It actually states that, in the event of a refinancing or loan, it was "unlikely" that the proceeds "would be sufficient to repay all Partnership debt and return any portion of each Limited Partner's capital contribution in the best case scenario." Sept. 30 Letter at 2. The letter continues immediately: "For example, *based on current rents and expenses*, assume a $7,000,000 loan to the Partnership is supportable." *Id.* (emphasis added). The letter then works through the allocation of the proceeds from any such loan. The letter neither states nor suggests that a $7 million loan – which was used merely to illustrate the likely allocation of proceeds from any refinancing – represented the "best-case scenario," as Plaintiffs argue. Moreover, it was plain that such a scenario was "based on current rents and expenses," as Plaintiffs themselves point out in their Opposition, not on any future increases in rents as a result of the contract renewal applications referenced in the letter. Opp. at 25.

Plaintiffs further incorrectly contend that the letter failed to inform the limited partners of the Partnership's plans to seek contract renewal and rent subsidies through the Markup-to-Market Program. Opp. at 15-16. For instance, Plaintiffs assert that Defendants failed to disclose

---

[1] Second Am. Compl., Ex. B.
[2] At the time of the tender offer, the Partnership did not even have a plan to refinance or sell the Project. *See* Sept. 30 Letter at 2. Although irrelevant to the pending motion, the General Partners now have decided to explore a potential sale of the Project. This is occurring in connection with a recently developed business strategy of exploration of the sale of all properties held by partnerships for which Mr. Bowditch and Mr. Slavet, and in some instances, Mr. Rioff, serve as general partners.

both their "intention to pursue rent increases at the Project pursuant to the Program" and their "efforts in pursuit of considerable rent increases at the Project under the Program during the Tender Offer period." *Id*. In fact, the September 30 Letter explicitly advised the limited partners of the Partnership's plans to apply to renew its Section 8 contracts with new rent levels to be determined in connection with that application: "The General Partners will request a renewal of each Section 8 contract but it is not known what rent level HUD will approve at this time." Sept. 30 Letter at 2. While Plaintiffs still claim this disclosure is incomplete for its lack of explicit reference to "the existence of the Markup-to-Market Program," they nonetheless concede (as they must) that the Partnership's audited financial statements referenced in the September 30 Letter explained that the Partnership was participating in the program.[3] Opp. at 15, 22; Fin'l Stmts. § 8.[4] Indeed, the notes to those financial statements refer to (i) the Partnership's "request to Markup-to-[M]arket," (ii) the fact that HUD subsidies are "subject to annual appropriations *and increases pursuant to* [the Multifamily Assisted Housing and Reform and Affordability Act of 1998 ("MAHRA")]," and (iii) the fact that "contract rent adjustments are to be determined based on an operating cost adjustment factor as outlined in MAHRA and related regulations." Fin'l Stmts § 8.[5] (emphasis added).

2.   **Plaintiffs had the information that they claim was omitted from the September 30 Letter; there was no duty to say more than was said.**

Plaintiffs' Opposition faults Defendants for a number of purported "Omitted Material Facts," all focusing on the Partnership's plans to apply for rent adjustments under the HUD

---

[3] Plaintiffs point to one of the September 30 Letter's references to the financial statements to support the inaccurate contention that the letter referred to the financial statements for the sole purpose of providing "an explanation of the details of the Partnership's Purchase Money Note, not for any other purpose." Opp. at 26. In fact, the September 30 Letter refers to the financial statements three times, relating to both the Purchase Money Note and a first mortgage to HUD – all in the context of a background discussion that preceded the letter's analysis of how proceeds from a refinancing would have to be allocated before any distributions could be made to limited partners. It is obvious from these references that the financial statements were a sensible starting place for any limited partner desiring more information.

[4] Roberts Aff., Ex. B.

[5] Portions of Plaintiffs' arguments concerning the Section 8 program suggest that they misunderstand Defendants' position. Defendants are not arguing that there was, as of September 2004, any "uncertainty in any way for payment on *existing HAP Contracts*." Opp. at 21 (emphasis added). Payments under those contracts may well have been certain. The uncertainty stemmed from the fact that those contracts were set to expire in March 2005 and that the Partnership was required to seek a discretionary renewal.

Markup-to-Market Program. Opp. at 6-7, 15-16. Given the disclosures reflected in the very documents Plaintiffs rely on in the Second Amended Complaint, their argument cannot withstand scrutiny.

To start, Plaintiffs assert that Defendants failed to disclose that the Markup-to-Market Program "was available to the Partnership." Opp. at 6. Again, far from hiding this information from their limited partners, the General Partners affirmatively stated in the September 30 Letter that they intended to "request a renewal of each Section 8 contract but it is not known what rent level HUD will approve at this time." Sept. 30 Letter at 2. In addition, the 2003 audited financial statements referenced in the letter described the program. The notes to the financials expressly describe the Partnership's "request to Markup-to-[M]arket," and discuss the basis for rent increases under the Program. Fin'l Stmts. § 8.

Plaintiffs' contention that Defendants failed to disclose their intent to apply for rent increases under the Markup-to-Market Program is likewise belied by the documents on which they rely. Opp. at 6. Again, the September 30 Letter expressly stated that the Partnership planned to "request a renewal" of its Section 8 contracts, and it noted that HUD would have to "approve" new rent levels. Given the financial statements' explicit reference to the Partnership's participation in the Markup-to-Market Program, as well as the statements' discussion of the fact that HUD subsidies were "subject to … increases" under that program, the possibility of a *markup*, or increase, of rent subsidies in connection with contract renewal was obvious. Plaintiffs' assertion that Defendants "clandestinely applied" for increased rental subsidies is baseless. Opp. at 24.

Plaintiffs' next assertion – that Defendants failed to disclose that rent increases could "increase[] the value of the Partnership and its corresponding borrowing capacity" – is unavailing for a different reason. Opp. at 6. The fact that increased rents could increase the value of the Partnership is self-evident and defendants had no duty to state the obvious. *Ward v. Succession of Richard W. Freeman,* 854 F.2d 780, 791 (5th Cir. 1988), *cert. denied,* 490 U.S. 1065 (1989) ("not a violation of any securities law to fail to disclose a result that is obvious even

to a person with only an elementary understanding of the stock market") (internal citations and quotations omitted).

Plaintiffs make much of the fact that the Project ultimately qualified for increased rents pursuant to the Markup-to-Market Program, intimating that Defendants *must* have been hiding something. The audited financial statements, however, disclosed that 220 of the Project's housing units were already participating in the program as of December 2003. There was certainly no suggestion in the September 30 Letter that the Project would *not* be found eligible for the program.

Having disclosed (i) the Partnership's participation in the Markup-to-Market Program (2003 financial statements), (ii) the possibility of rental subsidy increases under that program (2003 financial statements), (iii) the Partnership's intent to "request a renewal of each Section 8 contract" (September 30 Letter), and (iv) the fact that "it is not known what rent level HUD will approve" (September 30 Letter), Defendants were under no obligation to do anything further. While Plaintiffs fault Defendants for failing to predict "the potential impact of [possible] rent increases on the Project's value and financing capacity", Defendants were simply not required to give any further explanation of publicly available HUD regulations or procedures, nor were they required to handicap the Partnership's chances at a renewal or a rent increase by forecasting the level of any rent increase.[6] Opp. at 15-16. *See* 24 C.F.R. §§401-579; *Section 8 Renewal Policy*, Chapter 3 (HUD) *available at* www.ifahome.com/docs/Section8/Sec8_Renewal_Policy.pdf (addressing criteria considered for rent adjustments); *Cf. Ward,* 854 F.2d at 793 (because passage of a statute is "as a matter of law in the public domain," there is no duty of disclosure in context of a tender offer).

---

[6] Any limited partner interested in learning more about the Program after reading the September 30 Letter and the financial statements could have contacted the Partnership for more information, per the invitation in the September 30 Letter. *See* Sept. 30 Letter at 4 ("Please feel free to contact Kevin C. Baptista at MB Management Company . . . if you have any questions."). Alternatively, he or she could have accessed the HUD website for more information or consulted his or her own advisors, also per the September 30 Letter. *See* http://www.hud.gov/offices/hsg/omhar/readingrm/sitemap.cfm; Sept. 30 Letter at 4 ("Each Partner should consult his or her own accountants with respect to the particular tax considerations to him or her presented herein.").

Plaintiffs' criticism of Defendants for failing to disclose that "an increase of 150 percent or more of [fair market rents] was potentially available" is highly misleading. Opp. at 26. As noted above, Defendants had no obligation to disclose the particulars of the applicable regulations. Moreover, whether or not increases to that level were theoretically possible, the Partnership's request sought increases only to 95% of potential fair market rents, and the subsidy actually allowed was substantially lower. *See* MB Assocs. Nov. 10, 2004 letter to HUD[7]; Second Am. Compl. at ¶¶ 109, 111.

Relatedly, the premise of Plaintiffs' contention that Defendants should have disclosed that the "likelihood of obtaining a substantial increase in Project rents was high" is unsupported. Opp. at 20. While Plaintiffs cite to general information about the Markup-to-Market Program and its status as an "emergency initiative," this information reveals nothing about the level of rent subsidies that would be allowed. Opp. at 21. Moreover, Plaintiffs essentially complain that, because HUD granted rent increases in 2005, Defendants should have offered Plaintiffs more for their interests in 2004. However, a purchaser through a tender offer has no obligation to offer a particular price. Since the limited partners are free to decline the offer, neither federal nor state law mandates the amount. Defendants made no claim that the offer price was objectively fair or had been reviewed by any third party. On the contrary, the tender offer states: "No independent person has been retained to evaluate or render any opinion with respect to the fairness of the Purchase Price and no representation is made by the Purchaser, the General Partners or any affiliate thereof as to such fairness." Sept. 30 Letter at 3.

3. **The few well-pleaded facts do not support a strong inference that Defendants either intentionally *or* recklessly misrepresented or omitted information.**

The linchpin of Plaintiffs' argument, however packaged, continues to be that the Project was worth $15 million, that Defendants knew it, and that a project of such value could generate a return on the investment of its limited partners. Defendants, according to Plaintiffs, intentionally

---

[7] Second Am. Compl., Ex. C.

or recklessly misled Plaintiffs by not advising them of this.[8]  While the Opposition relies on a number of unpled facts,[9] the bottom line is still the same: the well-pleaded facts do not support a strong inference or even a reasonable inference that the Project was worth $15 million in September 2004 *or* that Defendants believed that it was.

      **a.**    **The expanded allegations concerning AHP show that its purported offer was illusory.**

Plaintiffs attempt to buttress their allegations concerning AHP and its proposal to purchase the Partnership's assets by including with their Opposition a letter and draft agreement sent to counsel for Defendants shortly before Plaintiffs filed suit.  Far from supporting their falsity and *scienter* assertions, the timing and content of the alleged "offer" actually shows why it should be given no weight whatsoever.  On the face of the documents proffered by Plaintiffs, the "offer" was illusory.

Paragraph 7 of the draft agreement allowed AHP not to proceed with the purchase were it "not satisfied" for any reason after a lengthy due diligence period.  *See* Draft Agreement § 7.[10]  Even if AHP determined to proceed after diligence, its obligation was capped at $250,000, the amount of its "earnest money deposit," making the proposal effectively an option to purchase, for which AHP would pay, at most, $250,000.

Moreover, there was no representation and there is now no allegation that AHP had or was capable of obtaining necessary financing.  While Plaintiffs attempt to strengthen their claims by alleging in their Opposition that AHP is a "sophisticated investor in low-income housing projects", the Second Amended Complaint alleges neither this conclusory "fact" nor any information concerning AHP's ability to purchase.  Opp. at 22.

---

[8] The well-pleaded facts no more support an inference of recklessness than of intent to defraud.

[9] *See, e.g., Schneider v. Cal. Dep't of Corr.,* 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) (court cannot take into account additional facts or allegations found outside of complaint in memorandum in opposition to motion to dismiss), *remanded to* 91 F. Supp. 2d 1316 (N.D. Cal. 2000); *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996) (plaintiff may not amend complaint in opposition brief).  *See also* 2 MOORE'S FEDERAL PRACTICE, § 12.34[2] (Matthew Bender 3d ed.) ("The court may not ... take into account additional facts asserted in a memorandum opposing the motion to dismiss, because such memoranda do not constitute pleadings under Rule 7(a).").

[10] Attachment to O'Connor Aff.

In all events, the AHP "offer" was plainly a litigation tactic. The proposal was communicated by the same law firm that represents Plaintiffs in this matter, and it was sent *after* Plaintiffs' lawyers had threatened Defendants with this lawsuit and sent them a draft complaint. *See* Saunders Apr. 4, 2005 letter.[11] Of course, the Partnership had no obligation to sell the property to *any* potential buyer, much less one closely associated with Plaintiffs; it was free to decline AHP's offer for any reason, which it did. No inferences of value should be drawn from this series of events.[12]

The purported opinion of AHP concerning Defendants' state of mind adds nothing to the equation. The allegation in Plaintiffs' Opposition, that AHP is a "sophisticated investor in low-income housing projects," is both improper (not having been pled) and conclusory. Opp. at 22. The timing and substance of AHP's "offer" to purchase the Partnership's assets undermines any suggestion that AHP speaks with credibility in this dispute.

**b.    The expanded allegations concerning the purported MassHousing refinancing opportunity are both improper and inadequate to give rise to any inferences.**

Even as embellished in their Opposition, Plaintiffs' allegations of a purported refinancing opportunity communicated through the anonymous MassHousing "representative" to "Mr. Smith" still provide no details that could "support the probability that [persons] in the position occupied by the source[s] would possess the information alleged." *In re Focus Enhancements, Inc., Sec. Litig.*, 309 F. Supp. 2d 134, 149 (D. Mass. 2001) (citation omitted) (holding that standard was satisfied where amendments to complaint named the source and identified his position). *See also In re Cabletron Sys., Inc.*, 311 F.3d 11, 29-30 (1st Cir. 2002). The new "allegation" that "the MassHousing representative was in a prime position to know the actual value of the Project . . . and the amount of financing it could support" still does not provide any

---

[11] Attachment to O'Connor Aff.
[12] Courts have shown a distrust for inferring value absent an actual transaction. *See* Defs' Memo at 12 & n.6. Particularly in these circumstances, an unaccepted offer should not be viewed as showing value. Instead of addressing this point and the supporting authority cited in Defendants' motion, Plaintiffs simply argue the irrelevant point that they are not required to plead their evidence. Opp. at 18. They *are* required to plead facts that give rise to a strong inference of fraud and AHP's illusory "offer" does not.

information concerning the undisclosed MassHousing source that would suggest the statements attributed to him should be given weight: the source's position is not given; his responsibilities are not described; and his familiarity with the Project is not described. Opp. at 18. For all Plaintiffs tell us, the MassHousing source could be a data entry clerk who, for some unexplained reason, shared his thoughts on refinancing with "Mr. Smith" (about whom we know even less). The allegations simply do not contribute to any inference that Defendants made a false statement or acted with the intent to defraud.

Plaintiffs concede that the alleged second-hand information concerning the purported refinancing opportunity is hearsay, although they spend time trying to show why that should not matter. Putting aside the absence of any authority actually supporting Plaintiffs' position,[13] Defendants' point is simply that the hearsay nature of Plaintiffs' allegations is another reason that they should not be accorded weight and fail to support an inference of falsity or *scienter*. *See, e.g., In re U.S. Aggregates, Inc. Secs. Litig.*, 235 F. Supp. 2d 1063, 1074-75 (N.D. Cal. 2002) (vague assertions and hearsay allegations insufficient to satisfy PSLRA).

    **c.**    **Plaintiffs' effort to calculate the Project's value and financing capacity is misleading and not based on the allegations in their pleading.**

Plaintiffs' Opposition attempts to advance the argument that the Project was worth $15 million through a calculation applying an 8% capitalization rate, which they characterize as "conservative" and "reasonable," to the 2005 rent levels. Opp. at 2 n. 1, 20. Once again, Plaintiffs stretch their briefing beyond the allegations of their pleading: the Second Amended Complaint contains *no* discussion of any capitalization rates, "conservative" or otherwise, much less any calculation of the Project's value. In all events, Plaintiffs' argument is highly dependent on the choice of capitalization rate. For instance, using Plaintiffs' analysis, a capitalization rate of 12% would result in an unadjusted increase in Partnership value of $5.17 million. Assuming,

---

[13]Plaintiffs mischaracterize *In re Cabletron Sys., Inc.*, 311 F.3d 11, and *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194 (1st Cir. 1996). Opp. at 13. Those two cases do not hold that the hearsay rule is irrelevant to the assessment of a plaintiff's allegations at the motion to dismiss stage; rather, they stand for the very different proposition that a plaintiff need not plead the evidence he intends to offer at trial. *In re Cabletron,* 311 F.3d at 33; *Shaw,* 82 F.3d at 1225.

as Plaintiffs did, a loan-to-value ratio of 80%, the increase would result in $4.13 million in additional borrowing capacity, an amount that if available in 2004 (and assuming financing at such a level would have been prudent) would have been insufficient to support a return of capital to limited partners.

>   d.   **Plaintiffs' argument that the "whole" of their *scienter* allegations are greater than the sum of its parts is unavailing.**

Plaintiffs fault Defendants for "considering certain factual allegations in isolation" and argue that the Second Amended Complaint must be examined "as a whole." Opp. at 21-22. While the Court should consider the totality of Plaintiffs' allegations, it must still consider the strength of each claimed inference in light of the underlying alleged facts. A stack of weak inferences does not result in a pleading that satisfies the PSLRA or Rule 9(b). Here, viewed individually or collectively, Plaintiffs' scant well-pleaded allegations simply do not give rise to a strong inference of *scienter*.

While Plaintiffs assert that Defendants are knowledgeable concerning low-income housing investments, they have provided no well-pleaded factual basis to infer that Defendants believed that the Project had a value of $15 million or acted with the intent to defraud. The two opinions in *Sturm,* which arose in the context of a general partner's solicitation of consents from limited partners to a merger and refinancing, illustrate the deficiencies in Plaintiffs' attempt to plead *scienter*. In the initial *Sturm* opinion, the court held that even though the general partner had a motive and opportunity to defraud – the solicited consents benefited the general partner – this was insufficient to state a claim of fraud regarding the value of the partnership's property and the ability of the partnership to refinance without the merger transaction. 26 F. Supp. 2d 1358, 1369-70 (N.D. Ga. 1998). Plaintiffs, however, were allowed to amend their complaint to assert, among other things, that while defendants' consent solicitation stated that they could not identify a potential lender of sufficient funds to provide an alternative to the proposed merger and refinancing, they in fact had received two proposals to provide such financing. In the words of the court about one of those potential lenders: "On its face, the Goldman Sachs proposal

appears to be exactly what the Defendants denied having." 85 F. Supp. 2d 1356, 1367 (N.D. Ga. 2000). In discussing *scienter*, the court again pointed out that the general partner's potential motivation, at least alone, was insufficient to plead fraud. 85 F. Supp. 2d at 1371. It went on to sustain the pleading not based on an allegation of possible alternatives to the merger and refinancing but based on the allegation that, contrary to the consent solicitation, the general partner had located two lenders to refinance the mortgage without the necessity of the merger transaction. The distinction was outcome determinative: "If the plaintiffs alleged that the Defendants made an inadequate attempt to locate other lenders [without the necessity of the merger transaction], that would be insufficient to draw the strong inference of an intent to deceive: an inference of negligence could be drawn as easily as an inference of an intent to deceive." 85 F. Supp. 2d at 171-72. Here, Plaintiffs make no allegation, to parallel that in *Sturm*, that Defendants had a $15 million financing proposal (or sales agreement) in hand when they made the tender offer. Rather, they argue only that Defendants must have been aware, because of their knowledge of the industry, that superior alternatives existed or would exist. This is simply not enough to create a strong inference of fraud.

**4.    Because all of Plaintiffs' state-law claims purport to arise out of Defendants' alleged misrepresentations, all are subject to heightened pleading requirements.**

Plaintiffs' attempt to evade Rule 9(b) by pointing out that the elements of certain of their state-law claims differ from those of a pure fraud claim is unavailing. Plaintiffs concede that "all of [their] claims arise out of a single transaction" and that *that* transaction resulted only from Defendants' misrepresentations in the September 30 Letter. Opp. at 29. Plaintiffs rely on precisely the same factual allegations of fraudulent conduct for *all* of their claims. *See, e.g., S.G. Frota v. Prudential-Bache Sec., Inc.*, 639 F. Supp. 1186, 1193 (S.D.N.Y. 1986) ("Rule 9(b) extends to all averments of fraud or mistake, whatever may be the theory of legal duty--statutory, common law, tort, contractual or fiduciary"). As a result, *all* of their claims are held to a heightened pleading standard under Rule 9(b). Plaintiffs offer no authority to support their position that any lesser standard should govern.

Regarding their secondary claims for conspiracy and aiding and abetting, Plaintiffs concede that such claims should fail if the Court determines that the primary claims from which they derive are dismissed. Opp. at 29-30. These claims should thus be dismissed not only for sounding in fraud, but also because Plaintiffs have failed to plead any underlying actionable claims.

5.  **Plaintiffs' claims for excessive management fees are derivative claims, which Plaintiffs have no standing to bring.**

Plaintiffs attempt to cast their allegations of "inflated and excessive management and administration fees" as a direct,[14] as opposed to a derivative, claim by arguing that, because the General Partners had benefited from the alleged wrongful conduct, not all interest-holders in the Partnership suffered harm equally. In other words, so long as a defendant in a securities case happens to be a shareholder, any claim against that defendant, according to Plaintiffs, can be brought directly. Plaintiffs do not support their theory with a citation to any case, because an exception this large would overwhelm the rule governing when a claim must be brought derivatively. Prerequisites to derivative claims and standing requirements could be bypassed in virtually all cases involving, for instance, insider trading, self-dealing, or other instances of alleged director or officer misconduct.

Despite Plaintiffs' argument, regardless of a defendant's status as shareholder, if his conduct harms the corporation, all shareholders *including the defendant* suffer harm. Put in the context of this case, even assuming Defendants charged the Partnership excessive management fees, the Defendants' respective interests in the Partnership suffered harm just as Plaintiffs' interests did. Their excessive management fees claim is derivative since such fees would have

---

[14] Even setting aside their derivative nature, the excessive management fee claims must be dismissed under Rule 12(b)(6). As recently stated by this Court in *Yameen v. Easton Vance*, "Although a claimant need not set out in detail the facts upon which she bases her claim, it bears restating that '[a]t the pleading stage, a complaint must state more than a legal conclusion that a fee is excessive.' The plaintiff must allege some relationship between the fees charged and the services rendered that, if true, would support a claim that the fees are excessive.'" 2005 WL 2709116, *4 (D. Mass. 2005) (Woodlock, J.). Here, Plaintiffs allege *no* facts supporting their claim. As the Court explained in *Yameen,* "Conclusory allegations in a complaint, if they stand alone, are a danger sign that the plaintiff is engaged in a fishing expedition." *Id.* at *2.

diminished the total assets of the Partnership and, in turn, the interests of *all* partners.  *Cf. Stegall v. Ladner,* 2005 WL 2709127, *4 (D. Mass. 2005) (Woodlock, J.) (where a plaintiff's allegations relate to a diminution in the total assets of a mutual fund, the injury harms the fund's shareholders only derivatively).  Courts in this jurisdiction and beyond have uniformly reached the same conclusion when considering excessive fee claims.  *See* Defendants' Memo. at 25-26 (collecting numerous cases).[15]  There is nothing distinguishable about Plaintiffs' excessive management fee claims in this case to warrant a different outcome here.

Plaintiffs alternatively argue that their pursuit of a rescission remedy permits them to bring derivative claims because if they prevail and rescission is granted, they will be returned to their status as limited partners.  Opp. at 27.  In support, they cite to a provision in the Massachusetts Limited Partnership Act that says no such thing.  *See* G.L. c. 109, §58 ("In a derivative action, the complaint shall set forth with particularity the effort of the plaintiff to secure initiation of the action by a general partner or the reasons for not making the effort.").  In the absence of some authority to support their creative standing argument, Plaintiffs' claims must be dismissed because Plaintiffs were not partners at the time they brought this action.  *See* G.L. c. 109, §57 (unambiguously stating that a plaintiff in a derivative action must be a stakeholder at the time a lawsuit is initiated); Fed. R. Civ. P. 23.1 (same).

## CONCLUSION

For all the reasons stated herein and in their initial memorandum, Defendants respectfully request that the Court dismiss this case, with prejudice.

---

[15] *Hurley v. Federal Deposit Ins. Corp.*, 719 F. Supp. 27 (D. Mass. 1989), which articulates the standard for determining when a claim is derivative, does not at all support Plaintiffs' position.  *See id.* at 31 n. 7.  In that case, the Court considered whether claims of misrepresentations and omissions in a bank's quarterly and annual reports and FDIC disclosure forms were derivative, and concluded that such claims could be brought by shareholders in a direct action.  *Id.* at 30.  Here, we are dealing with the distinct issue of whether claims based on excessive management fees allegedly charged to a partnership are derivative.

        Respectfully submitted,
**ROBERT S. BOWDITCH, JR.,
GERALD SLAVET,
STEVEN RIOFF, AND
BSR ASSOCIATES,**
By their attorneys,


      /s/ Christina N. Davilas
Steven W. Hansen ( BBO# 220820)
Donald J. Savery (BBO# 564975)
Christina N. Davilas (BBO# 655477)
Bingham McCutchen LLP
150 Federal Street
Boston, MA  02110
(617) 951-8000

Dated: November 9, 2005

## CERTIFICATE OF SERVICE

      I, Christina N. Davilas, hereby certify that on this 9th day of November, 2005, I served the foregoing document by causing a true copy of same to be delivered by first-class mail and facsimile to counsel for Plaintiffs.

                                              /s/ Christina N. Davilas
                                             Christina N. Davilas