UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


| | |
|---|---|
| ROBERT M. GERBER, AS TRUSTEE ) | |
| OF THE ROSALIE GERBER TRUST, ) | |
| WILLIAM J. GILLIGAN AND ) | |
| JAYNE GILLIGAN, HUSBAND AND ) | |
| WIFE, SANFORD R. HOFFMAN, ) | |
| BETH L. HOFFMAN, HUSBAND ) | |
| AND WIFE, AND JAMES D. BURNS, ) | |
| Plaintiffs, ) | |
| ) | CIVIL ACTION NO. |
| v. ) | 05-10782-DPW |
| ) | |
| ROBERT S. BOWDITCH, JR., ) | |
| GERALD SLAVET, STEVEN RIOFF, ) | |
| AND BSR ASSOCIATES, ) | |
| Defendants. ) | |


MEMORANDUM AND ORDER
May 8, 2006

The Plaintiffs are former Investor Limited Partners of Old Salem Associates Limited Partnership ("Old Salem" or "Partnership").  Pursuant to a written offer, they tendered their interests in the Partnership to Defendant BSR Associates ("BSR"), an affiliate of Old Salem's General Partners, Defendants Robert S. Bowditch and Gerald Slavet, and Defendant Steven Rioff.  The Plaintiffs claim that in the tender offer, the Defendants misrepresented the value of the Plaintiffs' interests and failed to disclose material information, thereby inducing the Plaintiffs to tender their interests at below market value.  The Second Amended Complaint alleges violation of Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. §78j(b), Rule 10b-5 under that Act, 17 C.F.R. §240.10b-5, and seven other counts,

including common law fraud and breach of fiduciary duty. The
Defendants have moved to dismiss the claims.

## I. BACKGROUND

Because this is a motion to dismiss, I describe the facts in
the case in the light most favorable to the non-moving party,
here the Plaintiffs. See Aldridge v. A.T. Cross Corp., 284 F.3d
72, 75 (1st Cir. 2002).

Old Salem is a limited partnership created to acquire, own,
and operate four multi-unit, federally subsidized rental-housing
projects located in Beverly, Danvers, Peabody, and Salem,
Massachusetts (collectively, the "Project"). Second Amended
Complaint ("Complaint") at ¶¶ 31, 32. The Project, commonly
known as the Fairweather Apartments, contains a total of 321
residential units. Id. at ¶ 32.

Old Salem has four classes of partners: two General
Partners, one Class A Limited Partner, one Class B Limited
Partner, and several Investor Limited Partners. Id. at ¶ 33.
Bowditch and Slavet are the General Partners. Id. at ¶ 34. They
collectively hold an 11.9% interest in the Partnership and have
controlled its business for over twenty years. Id. Rioff is the
Class A Limited Partner and holds a 2.1% interest in the
Partnership. Id. at ¶ 35. BVS Associates is the Class B Limited
Partner and holds a 1% interest in the Partnership.[1] Id. at ¶
36. The Plaintiffs, along with other individuals and entities,

---

[1] BVS Associates is not a party to this suit.

formerly held Investor Limited Partner interests, which comprised the remaining 85% of the Partnership. Id. at ¶ 37.

In a letter dated September 30, 2004 ("September 30 Letter"), the General Partners, acting through BSR, offered to purchase the interests of the Investor Limited Partners. Id. at ¶ 75 (Exhibit B). Slavet, writing on behalf of himself and Bowditch, began the letter with a brief description of the Partnership, the Project, and the Partnership's debt.[2]

He then explained that the Plaintiffs faced a potential "phantom income" problem:

> To date, the Investor Limited Partners of the Partnership (the "Investor Limited Partners") have received certain tax benefits in connection with the Project.  These tax benefits have diminished over the years, and will continue to diminish steadily.  In fact, the Partnership generated phantom income to the Investor Limited Partners in excess of $12,000 per unit in 2003, which phantom income is expected to increase in 2004, and each year thereafter.

September 30 Letter at 1.[3]

---

[2] The Partnership had two loans at the time: a first mortgage insured by HUD with an outstanding balance of approximately $7.3 million and a purchase money note with a balance of approximately $1.7 million.  September 30 letter at 1-2; Complaint at ¶¶ 48, 49.

[3] "Phantom income" refers to income that was allocated to the Investor Limited Partners, but was never distributed to them. When the Partnership was initially formed, Investor Limited Partners received tax benefits from the Partnership's losses.  In recent years, the Partnership experienced gains, but because of the order of distribution of funds mandated by the Amended and Restated Certificate and Agreement of Limited Partnership of the Partnership, dated August 25, 1983 ("Partnership Agreement"), Investor Limited Partners received no distributions.

The Partnership Agreement states that income produced by the Partnership's business activities goes first to pay Partnership expenses.  September 30 Letter at 2.  It then must be applied to

In order to avoid the continued allocation of phantom income to the Investor Limited Partners, Slavet extended the following offer ("Tender Offer"):

> [T]he General Partners, acting through an affiliate thereof (the "Purchaser") are offering to purchase the interests of all Investor Limited Partners (the "Offer") for a purchase price equal to $50,000 per investment unit ("Unit"). The Purchaser is offering to purchase 100% of the Units. The Offer is conditioned upon 85% of the Units... being tendered by the Investor Limited Partners.

September 30 Letter at 1.

Slavet then provided additional information about the Partnership, the Project and the Offer. Id. at 1-2. He discussed the Partnership's debt obligations in detail and its relationship with HUD. Id. Specifically, he noted that the Partnership had two Section 8 rental subsidy contracts with HUD that subsidize 220 of the 321 rental units. Id. at 2. Those contracts were due to expire on March 31, 2005, and although the General Partners would request a renewal, "it is not known what rent level HUD will approve at this time." Id.

Slavet elaborated on the severity of the phantom income problem, predicting that "[t]he Partners will eventually be subject to a large tax liability resulting from phantom income with no material projected cash distribution." Id. Because Partnership expenses and debt are paid first and cash distributions are limited by HUD,

_____

the debt. Id. Any remaining cash may be distributed to the Investor Limited Partners, subject to limits imposed by HUD. Id.

-4-

> [i]t is therefore likely that no cash flow would be
> available for distribution to the Investor Limited
> Partners for many years.  While the Investor Limited
> Partners have received substantial tax benefits over
> the year, those benefits have now ceased.

Id.

Slavet also noted that the Investor Limited Partners were unlikely to recoup their investment through a refinancing or sale of the Partnership.  Id.  He claimed that the General Partners had no such plans, and even if they did, the proceeds were "unlikely" to be sufficient to repay all of the Partnership debt and the Investor Limited Partners' capital contribution even in the "best case scenario."  Id.  To illustrate the situation, Slavet showed how the proceeds of a hypothetical $7 million loan would be used.  Id.  After paying off the first mortgage loan, "Rehab", transaction costs, and reserves, only $3 million would remain available to the Partnership; significantly less than the $7.3 million purchase money loan.  Id.

After this discussion of the Partnership's prospects for generating cash distributions to the Investor Limited Partners, Slavet presented the tender offer with a disclaimer as to the fairness of the offer price:

> The Purchaser is offering to purchase the interests of
> the Investor Limited Partners for $50,000 per Unit
> ($25,000 for a half Unit).  This is approximately 50%
> of the original capital contribution made by an
> Investor Limited Partner who purchased one Unit.  This
> Offer should not be construed as a representation or
> statement made by the Purchaser as to the value of a
> Unit or the fairness of the Purchase Price.  The
> Purchase Price was not determined by the Purchaser

> based on any current appraisal of the value of the
> Project.  No independent person has been retained to
> evaluate or render any opinion with respect to the
> fairness of the Purchase Price and no representation is
> made by the Purchaser, the General Partners or any
> affiliate or thereof as to such fairness.  Investor
> Limited Partners are urged to consider carefully all of
> the information contained herein before accepting this
> Offer.

Id. at 3.

Slavet then repeated his prediction that it was unlikely that the Investor Limited Partners would receive any cash return on their investment and would likely continue to receive phantom income.  Id. at 4.  The letter concluded with a suggestion that the Investor Limited Partners consult with their tax attorneys before accepting the Tender Offer, and yet another reminder of the unlikelihood of cash distributions.  Id.  The Tender Offer was to remain outstanding for 30 days.

Relying upon this letter, the Plaintiffs tendered their interests in the Partnership to BSR in accordance with the terms of the Tender Offer.  Complaint at ¶ 5.  After the transaction was completed, Plaintiffs learned that the Partnership was eligible to participate in a federally sponsored subsidy program known as the "Markup-to-Market" program.  Id. at ¶ 7.  This program allows owners of Section 8 housing projects to "mark up" their rent levels to market rates and distribute the increased cash flow from such rents.[4]  Id. at ¶ 59.  The Plaintiffs

---

[4] HUD established this program to in response to rising market rental rates and the increasing numbers of property owners

estimate that the Partnership could have increased its annual

rental income by nearly $800,000, or 45%, through the Markup-to-

Market program.  Id. at ¶¶ 109, 110.

The Defendants formally began the process of participating

in the Markup-to-Market program within days of the October 30,

2004, closing of the Tender Offer.  Id. at ¶ 97.  In a letter

addressed to HUD dated November 10, 2004, the Defendants

requested to participate in the Markup-to-Market program for 220

of the Project's units.  Id. at ¶ 98 (Exhibit C).  The Defendants

also submitted to HUD a Contract Renewal Form, dated November 3,

2004, ("Contract Renewal Form") seeking initial renewal of the

HAP contracts mentioned in the September 30 Letter.  Complaint at

¶ 102.  This letter, signed by Slavet, sought waiver of the

requirement that the current rents of Markup-to-Market

participants meet 100% of the Fair Market Rent.[5]  Id. at ¶ 103.

---

dropping out of Section 8 programs.  Complaint at ¶ 57.
Traditionally, HUD contracted with property owners to provide
housing at lower rents for low-income tenants.  Id. at ¶ 50.  HUD
then paid the owners subsidies to make up the difference between
the amount that the tenants could afford and what HUD determined
to be the fair market rent.  Id. at ¶ 51.  As rents rose beyond
HUD's fair market rent, project owners declined to renew their
contracts.  Id. at ¶ 56.
    In response to this situation, the Markup-to-Market program
allows participants to increase their rents up to 150% of the
fair market value as determined by HUD.  Id. at ¶ 61.  HUD then
pays the property owners the difference between the rent received
and this increased fair market rent.  Id.

    [5] The Defendants met all of the criteria for participation
in the Markup-to-Market program, except that the comparable
market rent potential was projected to be slightly below the Fair
Market Rent set by HUD.  Complaint at ¶ 101.

The Defendants informally took steps towards participating in the Markup-to-Market program as early as mid-October, 2004. Id. at ¶ 105.  In conjunction with the Contract Renewal Form, the Defendants submitted a Rent Comparability Study ("RCS") that provides estimated current market rents for the 220 Project units that were the subject of the Markup-to-Market request.  The RCS was prepared by an employee of MB Management, a real estate development and management company of which Bowditch, Slavet, and Rioff are General Partners.  Complaint at ¶¶ 65, 105.  The RCS is dated October 21, 2004.  Id. at ¶ 105.  It indicates, among other things, that the appraiser began working on the RCS as early as October 11, 2004.  Id.

In a letter received on April 5, 2005, HUD approved the Markup-to-Market increases as requested by the Defendants.  Id. at ¶ 110.  In early May 2005, the Defendants formally renewed their HAP contracts within the Markup-to-Market program.  Id. at ¶ 111.  The Plaintiffs allege that following final HUD approval and subsequent amendment, the 220 participating units stood to realize additional annual rent of approximately $621,000.  Id. at ¶ 112.

In addition to information about the Markup-to-Market program, the Plaintiffs learned after tendering their interests that the market value of the Partnership was approximately $15 million.  Id. at ¶¶ 113, 118.  The Plaintiffs claim that a representative of MassHousing told an individual named Daniel

-8-

Smith in or around January 2005, that MassHousing would be prepared to refinance the Partnership's existing debt for at least $15 million.[6]  <u>Id.</u>  Bowditch, Slavet, and Rioff also received and rejected an offer from AHP Holdings Company LLC ("AHP") to purchase the Partnership's assets for $14.5 million. <u>Id.</u> at ¶¶ 116, 117.  AHP was willing to put up an earnest money deposit of $250,000 as security for its performance.  <u>Id.</u> at ¶ 116.  Had the Partnership pursued either the refinancing or the sale, it would have been able to repay all partnership debt, return each Investor Limited Partner's capital contribution, and provide for additional cash distributions.  <u>Id.</u> at ¶ 119.

Bowditch, Slavet, and Rioff have extensive experience in the ownership and management of multi-family residential housing. <u>Id.</u> at ¶ 67.  Bowditch founded MB Management in 1971.  <u>Id.</u> at ¶ 66.  Slavet joined in 1977, and Rioff in 1978.  <u>Id.</u>  The company focuses on the development of low and moderate-income multi-family rental housing.  <u>Id.</u> at ¶ 65.  Rioff served as a Senior Management Officer for MassHousing.  <u>Id.</u> at ¶ 67.

Based upon these allegations, the Plaintiffs claim that the Defendants deliberately failed to disclose the Partnership's possible participation in the Markup-to Market program, its debt refinancing options, and its fair market value in order to induce

_____

[6] Plaintiffs have provided no further details about Mr. Smith himself or his communications with the unnamed MassHousing representative.

the Plaintiffs to tender their interests at a discount.  The Plaintiffs insist that they relied upon the September 30 Letter to disclose all material information, and would not have tendered their interests had they known about the Partnership's potential for increased income.  Id. at ¶ 14.

As a result of the Plaintiffs' tender, the Defendants acquired the economic interests of the Investor Limited Partners as well as voting control over the Partnership.[7]  Id. at ¶ 95.

---

[7] The terms and conditions of the Partnership are set forth in a written limited partnership agreement ("Limited Partnership Agreement").  Complaint at ¶ 38.  The Limited Partnership Agreement grants the General Partners the power and obligation to manage the Partnership and control its business, and expressly prohibits the limited partners from participating in ordinary business decisions.  Id. at ¶¶ 39, 40.  Extraordinary transactions, such as sales of real property, mortgage refinancing, sale/leaseback of Partnership property, and additional mortgage loans, require the approval of the limited partners.  Id. at ¶ 41.

## II. LEGAL FRAMEWORK

### A.    Standard of Review

In considering a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a court must take well-pled factual allegations in the complaint as true and must make all reasonable inferences in favor of the plaintiff.  <u>Aldridge</u>, 284 F.3d at 78.  The court, however, need not credit "bald assertions, unsupportable conclusions, or opprobrious epithets."  <u>Chongris v. Bd. of Appeals</u>, 811 F.2d 36, 37 (1st Cir. 1987).  Dismissal under Rule 12(b)(6) is only appropriate if the complaint, so viewed, presents no set of facts justifying recovery.  <u>Cooperman v. Individual, Inc.</u>, 171 F.3d 43, 46 (1st Cir. 1999).

### B.    Pleading requirements

The Private Securities Litigation Reform Act of 1995(PSLRA), 15 U.S.C. §78u-4(b), and Fed.R.Civ.P. 9(b), impose heightened pleading requirements in securities fraud actions such as this one.  When a plaintiff alleges that the defendant made a misleading statement or omission of material fact in connection with the purchase or sale of securities, the PSRLA requires that the complaint

> specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. §78u-4(b)(1).  Fed.R.Civ.P. 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

In the First Circuit, the PSLRA and Rule 9(b) pleading standards are equally strict.  See Greebel v. FTP Software, Inc., 194 F.3d 185, 188 (1st Cir. 1999)("The PSLRA imposes requirements for pleading with particularity that are consistent with this circuit's prior rigorous requirements for pleading fraud with particularity under Fed. R. Civ. P. 9(b)."); Garvey v. Arkoosh, 354 F. Supp. 2d 73, 80 (D. Mass. 2005) ("The PSLRA and Rule 9(b) pleading standards are for all practical purposes identical.").

In order to state a claim for securities fraud, a plaintiff must (1) "specify each allegedly misleading statement or omission including its time, place and content"; (2) provide "facts that show exactly why the statements or omissions were misleading"; and (3) raise an inference of scienter that is "both reasonable and strong".  Aldridge, 284 F.3d at 78 (internal citations and quotations omitted).  As to claims based upon information and belief, the plaintiff must "set forth the source of the information and the reasons for the belief." Id. at 78.  This holds true, "even when the fraud relates to matters particularly within the knowledge of the defendant." Greebel, 194 F.3d at 193.

There is no checklist of facts that a plaintiff is required to plead to satisfy the PSLRA and Rule 9(b).  In re Cabletron

_Systems_, 311 F.3d 11, 32 (1st Cir. 2002).  Whether a plaintiff
has met the pleading standard is a fact-dependent determination;
each complaint must be analyzed on its own set of facts and
considered in light of the totality of the circumstances.  _Id._
The First Circuit adopted this fact-specific approach, as opposed
to a categorical one, because it better achieves the balance that
Congress intended the PSLRA to strike:  preventing frivolous
strike suits yet allowing meritorious claims to proceed.  _Id._ at
30 ("PSLRA 'was not enacted to raise the pleading burdens... to
such a level that facially valid claims, which are not brought
for nuisance value or as leverage to obtain a favorable or
inflated settlement, must be routinely dismissed'" (quoting _ABC
Arbitrage Plaintiffs Group v. Tchuruk_, 291 F.3d 336, 354 (5th
Cir. 2002))).

The standard for pleading securities fraud is rigorous.
However, plaintiffs need not allege all facts that may be related
to their claims.[8]  The pleadings may leave some questions
unanswered and still survive a motion to dismiss, "provided the
complaint as a whole is sufficiently particular to pass muster
under the PSLRA."  _Id._

### III. DISCUSSION

The Plaintiffs assert the following eight causes of action
arising from the September 30 Letter and subsequent tendering of

---

[8] This is particularly so where, as here, no discovery has
been conducted.  _See_ _In re Cabletron Systems, Inc._, 311 F.3d 11,
33 (1st Cir. 2002) (scrutinizing post-discovery motions to
dismiss more stringently than pre-discovery motions).

the Investor Limited Partnership interests to BSR: violation of
Section 10(b) of the Securities and Exchange Act, 15 U.S.C.
§78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5 (Count
I); rescission of BSR's purchase of the Plaintiffs' Partnership
interests pursuant to Section 29(b) of the Securities and
Exchange Act of 1934, 15 U.S.C. §78cc(b)(Count II); common law
fraud and misrepresentation (Count III); breach of fiduciary duty
(Count IV); negligent misrepresentation (Count V); breach of
contract (Count VI); civil conspiracy (Count VII); and aiding and
abetting breach of fiduciary duty (Count VIII).

## A.    Counts I, II, and III

Counts I, II, and III raise claims of securities fraud based
on both federal and common law.  Section 10(b) makes it unlawful
for any person to "use or employ, in connection with the purchase
or sale of any security ... any manipulative device or
contrivance in contravention of such rules and regulations as the
[SEC] may prescribe."  15 U.S.C. §78j(b).  Rule 10b-5 prohibits
misleading statements and omission of material facts.  17 C.F.R.
§24.10b-5.

To state a claim under Rule 10b-5, a plaintiff must allege
the following elements with particularity:  (1) a material
misstatement or omission; (2) scienter; (3) connection with a
purchase or sale of a security; (4) reliance; (5) causation; (6)

economic loss.[9]  In re Stone & Webster, Inc., Securities Litigation, 414 F.3d 187, 193 (1st Cir. 2005).

The Plaintiffs have satisfied the pleading requirements with respect to elements (3), (4), (5), and (6).  The transaction that gave rise to this action was a sale of Limited Investor Partnership interests, thus satisfying element (3).  Taking the Plaintiffs' allegations as true, they meet requirements (4), (5) and (6) because Plaintiffs tendered their interests to BSR in reliance upon the statements in the September 30 Letter, and incurred economic loss as a result.  The following discussion addresses elements (1) and (2).

1.   Material misstatement or omission

The Plaintiffs point to several statements in the September 30 Letter that they allege were material and misleading.[10] First, the Plaintiffs claim that the September 30 Letter misportrayed the Partnership as a tax shelter that had run its

_____

[9] Common law fraud in Massachusetts contains nearly identical elements: a knowingly false statement; intent to deceive; materiality; reliance; and injury as a result of the reliance.  See Kenda Corp., Inc. v. Pot O'Gold Money Leagues, Inc., 329 F.3d 216, 225 (1st Cir. 2003).  In this Memorandum, I focus on the requirements of Rule 10b-5, but my conclusions apply equally to the claim of common law fraud.

[10] Because the September 30 Letter is "integral to and explicitly relied upon in the complaint", I may consider it in deciding this motion to dismiss without converting the motion into one for summary judgment.  See Shaw v. Digital Equipment Corp., 82 F.3d 1194, 1220 (1st Cir. 1996).  Under this principle, I also consider MB Management's financial statements and the correspondence between HUD and the defendants.

course, with little or no chance of cash distributions in the
future.  Complaint at ¶ 82.  In support, the Plaintiffs cite the
following language in the September 30 Letter:

> The Partners will eventually be subject to a large tax
> liability resulting from phantom income allocated to
> the Partners, with no material projected cash
> distribution.... It is... likely that no cash flow
> would be available for distribution to the Investor
> Limited Partners for many years.  While the Investor
> Limited Partners have received substantial tax benefits
> over the years, those benefits have now ceased.

Complaint at ¶ 83.  The Plaintiffs cite two other parts of the
September 30 Letter in which the Defendants state that it is
unlikely that the Plaintiffs would ever receive a cash return on
their investment.[11]

Second, the Complaint alleges that the Defendants falsely
stated that a refinancing in the best-case scenario would not
likely result in proceeds sufficient to repay all Partnership

---

[11] The first passage reads:
Pursuant to the Partnership Agreement and the terms of
the Purchase Money Loan, any available capital
transaction proceeds and any next available cash flow
would continue to be applied to the Purchase Money
Loan, and therefore, while the Investor Limited
Partners will continue to be allocated income (and at a
further increased amount and rate as the Partnership
cash flow amortizes debt) it is unlikely that the
Investor Limited Partners would receive any cash
distributions from the Partnership.
Complaint at ¶ 86.

The second passage states:
As indicated in this discussion, and pursuant to the
terms of the current Partnership Agreement, if current
Project operations are maintained, it is unlikely that
the Investor Limited Partners would ever receive a cash
return on their investment.
Complaint at ¶ 87.

debt and return capital to Investor Limited Partners.  Complaint at ¶ 84.  The Plaintiffs point to this paragraph in the September 30 Letter:

> In the event the Partnership does, however, pursue a refinancing of the Mortgage Loan, it is unlikely that the proceeds of a refinancing (or a sale) would be sufficient to repay all partnership debt and return any portion of each Limited Partner's capital contribution in the best case scenario.

Id.  The Plaintiffs also cite an example that the Defendants provided to illustrate the expected distribution of funds, "assum[ing] a $7,000,000 loan to the Partnership is supportable." Complaint at ¶ 85.  The example showed that after money was allocated to the existing first mortgage loan, reserves, and expenses, only $3,000,000 would remain.  Id.

The Plaintiffs argue that the above-quoted portions of the September 30 Letter were misleading because the Defendants failed to disclose the Partnership's potential for increased income through the Markup-to-Market program and misrepresented the Partnership's market value.  Complaint at ¶ 97.  The Plaintiffs allege that the Defendants were pursuing rent increases of up to nearly $800,000 per year in the Markup-to-Market program.  Id. at ¶ 110.  In support, the Plaintiffs point to a letter from Slavet dated November 11, 2004, requesting to participate in the Markup-to-Market program; a contract renewal form dated November 3, 2004, seeking initial renewal of the Partnership's two contracts with HUD; and a Rent Comparability Study ("RCS") dated October 21, 2004, which was prepared as part of the Markup-to-Market

-17-

application.  Id. at ¶¶ 98, 102, 105.

The Plaintiffs contend that the September 30 Letter implied that the Partnership could not support a $7 million loan and that the Plaintiffs would not see a return on their investment even in the "best case scenario."  Complaint at ¶ 120.  The Plaintiffs claim that the market value of the Partnership was actually closer to $15 million than $7 million.  To support this contention, the Plaintiffs assert that an individual named Daniel Smith was informed by a representative of MassHousing, in or around January 2005, that MassHousing would be prepared to refinance the Partnership for up to $15 million.[12]  Id. at ¶ 113.

The Plaintiffs also offer a letter from AHP Holdings Company LLC, an investor in low-income housing projects, offering to purchase the Partnership's assets for $14.5 million, with an earnest money deposit of $250,000.  Id. at ¶ 116.  Although the letter was dated April 5, 2005, AHP has informed the Plaintiffs that it would have paid at least $14.5 million for the Partnership in September 2004 and at any time thereafter.  Id. at ¶ 118.

The Defendants contend the Plaintiffs have failed to meet the pleading standards of the PSLRA and Rule 9 because they did not explain why the September 30 Letter was misleading.  Specifically, they argue that neither Mr. Smith's testimony, the

---

[12] As noted in footnote 6, Plaintiffs have provided no further information about Mr. Smith or the MassHousing representative.

AHP offer, nor the Markup-to-Market contract prove that a sale or refinancing of the Partnership could have yielded sufficient funds to return capital to the Investor Limited Partners.

With respect to Mr. Smith, the Defendants claim that because his statements were made out of court and are being offered to prove the truth of the matter asserted -- that the Partnership could support a $15 million refinancing -- they are inadmissible hearsay and should be disregarded.  This hearsay evidence would be excluded at trial or in consideration of a motion for summary judgment if offered in this form.  See Fed. R. Evid. 801, 802. However, in a pre-discovery motion to dismiss, "the rigorous standards for pleading securities fraud do not require a plaintiff to plead evidence."  Cabletron, 311 F.3d at 33.  If offered by a declarant competent to provide such an opinion, it would be admissible.

Because MassHousing is responsible for administering the Project's HAP contracts and facilitating the Defendants' Markup-to-Market request, a competent MassHousing employee's opinion of the Partnership's refinancing capability carries some weight. The Defendant is correct, however, that the lack of details about Mr. Smith and the reliability of the circumstances under which the statement was communicated reduces its pleading value. Nevertheless, given the lower standard for pre-discovery pleadings, I will consider the statement as part of the totality of the circumstances.

The Defendants claim that AHP's offer to purchase the

Partnership was "illusory" because it lacked "all relevant detail", such as information as to when the offer was made, through whom and in what form it was conveyed to the Partnership, whether AHP actually had the necessary financing, the exact terms and conditions of the proposed purchase, and how the Plaintiffs learned of the purchase.

The Complaint is not so devoid of detail as the Defendants portray. The Plaintiffs have provided the letter in which AHP offered to purchase the Partnership. The letter identifies AHP, specifies the purchase price and deposit amount, and includes a sale agreement. To be sure, the letter was dated six months after the close of the Tender Offer, but AHP claims that it would have offered the same amount in September 2004 and at all times since. Complaint at ¶ 118. This level of detail is sufficient to meet the pleading requirements. The pre-discovery pleading standard is not so strict as to require that plaintiffs provide pre-discovery the minutiae demanded by the Defendants. See Maldonado v. Dominguez, 137 F.3d 1, 9 (1st Cir. 1998) ("While Fed. R. Civ. P. 9(b) proscribes the pleading of 'fraud by hindsight,' we also cannot expect plaintiffs to plead 'fraud with complete insight' before discovery is complete").

Of greater concern than the amount of detail provided, is the Defendants' claim that AHP's offer was not bone fide, but merely a litigation tactic. They note that the same law firm that represents the Plaintiffs communicated AHP's offer to the Defendants after the Plaintiffs had threatened the Defendants

with this lawsuit, and enclosed with the offer a copy of the draft complaint.

This may call into question the credibility of AHP's offer. Nevertheless, on a motion to dismiss, I must "take the plaintiff's allegations to be true and draw inferences in the plaintiff's favor." <u>Aldridge</u>, 284 F.3d at 79.  Given the facts as alleged in the Complaint, it is reasonable to infer that the offer was bone fide.  I note, however, that the Plaintiffs will be put to their proof at a later stage; the Defendants "may yet prevail once the facts of the case are further developed."  <u>Id.</u> at 84.

The Defendants' final challenge to the AHP offer is that it does not prove that the Partnership had a market value of $14.5 million.  The Defendants cite case law dating back to 1859 holding that an unaccepted offer to purchase property is not reliable evidence of market value.  <u>See, e.g.</u>, <u>Dickenson v. Fitchburg</u>, 79 Mass. 546, 554 (1859) (refusing to admit evidence of the value of property based upon an unaccepted offer).

Again, I must emphasize that this is a pre-discovery motion to dismiss, and the Plaintiffs are not required to "plead evidence." <u>Cabletron</u>, 311 F.3d at 33.  Both the AHP offer and the MassHousing employee's statement regarding refinancing put the market value of the company at approximately $15 million. These two facts together are sufficient to draw the reasonable inference that the Partnership had a market value of significantly more than $7 million and had viable options to sell

-21-

or refinance that were not disclosed in the September 30 Letter.

The Defendants also argue that the rent increases resulting from the Markup-to-Market program were too uncertain to guarantee a return on the Plaintiffs' capital, and moreover, that participation in the program was disclosed in the September 30 Letter and the Partnership's financial statements.  These arguments are both unavailing.

First, the Plaintiffs do not allege that Participation in the Markup-to-Market program guaranteed them a specific cash distribution, or any cash distribution at all.  Rather, the Complaint alleges that the Defendants failed to inform the Plaintiffs of the Partnership's possible participation in the Markup-to-Market program and the potentially significant increase in rental income.  Complaint at ¶¶ 8, 9.  The Plaintiffs argue, and the Defendants do not appear to dispute, that such information is material and informed the Plaintiffs' decision to tender their interests to BSR.[13]  Id. at ¶ 14.

The Defendants correctly point out that the September 30 Letter mentioned that the Partnership had applied to HUD for a contract renewal and that the Partnership's 2003 audited

_____

[13] In the securities fraud context, a fact is material if it is substantially likely "that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988).  In other words, information will be considered material if a reasonable investor would have considered it important in making the decision to buy or sell a security.  See Garvey v. Arkoosh, 354 F. Supp. 2d 73, 80 (D. Mass. 2005).

financial statements disclose that, in 2003, 220 of the Project's housing units were under contract with HUD in which the rents were marked up to market. The Defendants claim that these statements satisfy their duty of disclosure and that the venerable doctrine of caveat emptor relieves them of further responsibility. I disagree.

The language and tone of the September 30 Letter portray a dismal future for Old Salem. While mere (reverse) "puffing" or sales talk is not actionable, the repeated statements that the Plaintiffs were unlikely to recoup their investment, the detailed description of the tax consequences of phantom income, and the example of the distribution of a $7 million loan are not the "diffuse expressions of opinion" upon which no person could reasonably rely. Shaw v. Digital Equipment Corp., 82 F.3d 1194, 1218, n. 32 and 1219 (1st Cir. 1996). Rather, they invite an inference that the Partnership had little to no prospects for increased income. In this context, the single reference in the September 30 Letter to a possible HUD contract renewal and the statement in the Partnership's 2003 financials of the pending expiration of the existing HUD contracts are insufficient for me to find as a matter of law that the Defendants satisfied their duty of disclosure.

The Defendants advance one final argument in support of their claim that the Plaintiffs have failed to plead with sufficient particularity. They analogize this case to those

brought against banks a decade ago in the wake of the collapse of
the real estate market.  See, e.g., Lindner Dividend Fund, Inc.
v. Ernst & Young, 880 F. Supp. 49 (D. Mass. 1995).  Courts at
that time were flooded with Section 10(b) cases asserting that
bank loan loss reserves were inadequate and should have been
higher.  Id. at 58.  Those complaints generally did not survive
scrutiny under Rule 9(b) because they merely quoted verbatim from
the banks' published financial statements immediately followed by
conclusory allegations pertaining more to mismanagement than
fraud.  Id. at 58-59.  In contrast, the Complaint here supports
its allegations with facts suggesting that the Defendants had
plans to increase the Partnerships' income through the Markup-to-
Market program and that the Partnership was worth more than the
September 30 Letter implied.

In sum, the letters showing that the Partnership was
pursuing the Markup-to-Market program, the potential for
increased rent from participation in the Markup-to-Market
program, the statements from Mr. Smith that a MassHousing
employee put the Partnership's refinancing ability at $15
million, and the $14.5 million offer from AHP combine to satisfy
the PSLRA and Rule 9(b) requirements for pleading material
statements and omissions with particularity.

2.  Scienter

The more difficult issue is whether the Plaintiffs have
satisfied the pleading requirements with respect to scienter.

A plaintiff may not overcome the particularity requirements

of the PSLRA and Rule 9 "simply through a general averment that defendants 'knew' earlier what later turned out badly." <u>Shaw</u>, 82 F.3d at 1223 (internal citation omitted).  Contrasting a defendant's past optimism, or in this case, pessimism, with the actual results and contending that the difference must be attributable to fraud is merely "fraud by hindsight." <u>Id.</u>  This is not sufficient to satisfy the PSLRA and Rule 9. <u>Id.</u>  To prevail in a securities fraud action, the plaintiff must set forth "specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading," <u>id.</u> at 1223-24; in other words, the plaintiff must show that the defendants acted with scienter. <u>Greebel</u>, 194 F.3d at 188.

Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 193 (1976).  It can be proven by showing "either that the defendants consciously intended to defraud or acted with a high degree of recklessness." <u>Aldridge</u>, 284 F.3d at 82.  The concept of recklessness is narrowly defined; it "does not include ordinary negligence, but is closer to being a lesser form of intent." <u>Greebel</u>, 194 F.3d at 188.  Specifically, reckless conduct is defined as:

> a highly unreasonable omission, involving not merely simple, or even inexcusable, negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it.

Id. (quoting Sundstrand Corp. v. Sun Chemical Corp., 553 F.2d 1033, 1045 (7th Cir. 1977)).

A plaintiff may prove scienter through indirect and circumstantial evidence. Greebel, 194 F.3d at 195. But the plaintiff must allege facts that give rise to a "strong" inference of scienter rather than a merely "reasonable" inference. Id. at 188. In other words, the plaintiff "must show that his characterization of the events and circumstances is highly likely." Aldridge, 284 F.3d at 82.

The First Circuit has refused to list particular facts that will satisfy this standard in every case. Id. Instead, it has adopted a case-by-case approach and provided some general guidelines. Id. For example, motive and opportunity alone are rarely sufficient. Id. at 197 ("Catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme are [not] sufficient") (quoting In re Advanta Corp. Sec. Lit., 180 F.3d 525, 535 (3d Cir. 1999)). However, facts showing a motive and opportunity may be relevant to establishing scienter. Greebel, 194 F.3d at 197.

In addition to the facts alleged in the above discussion, the Plaintiffs rely primarily on the Defendants' knowledge and experience in the Section 8 housing market and the timing of the Markup-to-Market application process to raise an inference of scienter. They also allege that the Defendants were motivated by the opportunity to acquire the Plaintiffs' economic interests and

voting control at below-market cost.  Complaint at ¶ 92.

Bowditch, Slavet, and Rioff are all general partners of MB
Management Company ("MB Management"), a real estate development
and management company with a focus on the development of low and
moderate-income multi-family housing.  Complaint at 65.  Bowditch
joined MB Management in 1971; Slavet joined in 1977; and Rioff in
1978.  Id. at ¶ 66.  Rioff was also a Senior Management Officer
for MassHousing.  Complaint at ¶ 67.  The MB Management web site
touts its "over 30 years of experience specializing in multi-
family residential housing", "extensive capabilities" and "full
range of management and consulting services".  Complaint at ¶¶
70, 71; Exhibit A.  Under the Defendants' direction, MB
Management has developed or acquired over fifty properties,
totaling over 8,000 units, valued at over $300 million.
Complaint at ¶ 68.  Given this expertise, the Plaintiffs argue,
the Defendants knew or should have known that the Partnership
might have been eligible to participate in the Markup-to-Market
program, and that a significant increase in rental income could
result.  Complaint at ¶ 90.

With respect to timing, the Plaintiffs allege that the
Defendants began the process of applying for the Markup-to-Market
program at least as early as October 11, 2004, which was within
the Tender Offer period, and formally requested to participate in
the program on November 10, 2004, less than two weeks after the
close of the Tender Offer period.  Complaint at ¶¶ 98, 105.

The Defendants do not deny that Bowditch, Slavet, and Rioff

-27-

have extensive experience in the industry, but they contend that
no inference of scienter can be drawn from this experience or the
timing of the Defendants' application to the Markup-to-Market
program.  They note that the September 30 Letter and the 2003
financial statements disclosed that the General Partners would be
requesting renewal of the HUD contracts, so the possibility of a
HUD contract was "no secret."

The Defendants contend that they did not disclose their
application to the Markup-to-Market program in greater detail
because of the uncertainty of the outcome.  They point to the
Plaintiffs' varying estimates of the rent increases in their
earlier complaints as evidence of the unpredictable impact of the
program.  Moreover, they claim, an inaccurate prediction of the
proceeds from the Markup-to-Market program could also have misled
the Plaintiffs.

Whether the complaint as a whole is sufficient to find
scienter is a close question.[14]  It is reasonable to infer from

_____

[14] The Defendants rely heavily on Sturm v. Marriott Marquis
Corp., 26 F. Supp. 2d. 1358 (N.D. Georgia 1998), to support their
contention that the Plaintiffs have not adequately pled scienter
in this case.  In Sturm, the general partner of a hotel
partnership mailed a solicitation to the limited partners seeking
approval to restructure the partnership.  Id. at 1362-63.  The
solicitation proposed a merger of the original limited
partnership into a new one allegedly in order to facilitate the
refinancing of the existing mortgage on the hotel and avoid
foreclosure.  Id. at 1363.  The merger was approved.  Id. at
1364.  Prior to the closing, the plaintiffs filed suit alleging
that the merger was unfair to the limited partners because the
general partner failed to disclose fully the terms of the merger
and its financial consequences to the limited partners.  Id.
    The court held that the plaintiffs' allegations that the
general partner misrepresented the market value of the hotel

the Defendants' experience in the industry that they knew or
should have known the fair market value of the Partnership and
its prospects for increased revenues.  As I have already
discussed, the statements in the September 30 Letter and the 2003
financial statements were arguably misleading.  The close

---

property and that it failed to disclose the likely erosion of the
plaintiffs' equity satisfied the particularity requirements of
Rule 9(b).  Id. at 1365-66.  The plaintiffs' general allegations
that the defendants were "taking the equity, value and profits of
the Hotel from the Limited Partners and giving it to themselves"
did not survive scrutiny under Rule 9(b).  Id.

    The court reached the question of scienter only with respect
to the alleged misrepresentation of the market value of the
hotel.  Id. at 1369.  The plaintiffs claimed that the property
had a value of over $300 million.  Id. at 1365.  The defendants,
relying upon the estimate of its financial advisor instead of an
independent appraiser, stated the value in the solicitation of
$250-255 million.  Id.  Although the plaintiffs showed the
defendants had motive and opportunity to defraud, it was
insufficient to show scienter.  The court found that the
plaintiffs failed to allege that the defendants knew the hotel
had a value of over $300 million and that they deliberately or
recklessly misrepresented the property's value in the
solicitation.  Id. at 1370.  The court based its decision on its
finding that the solicitation appeared to have made significant
disclosures as to potential conflicts of interest, the detailed
basis for its decision, and its opinions of alternative courses
of action.  Id. at 1370-71.

    Sturm provides little guidance in this case.  Although both
involve allegations of misrepresentations of the value of a
partnership by limited partners against general partners in the
context of a tender offer, the similarities end there.  The
defendants in this case made no disclosures as to the source of
the $50,000 per unit offer price, allegedly suggested that the
Partnership was worth half of its market value, and allegedly
represented that the partnership had no viable prospects for
increasing its revenue while working towards a lucrative
contract.  In contrast, the Sturm defendants disclosed the source
of its $250-$255 million valuation and were only about 15% below
the fair market value.  Consequently, while the court in Sturm
easily found that the Plaintiffs did not satisfy the pleading
standard, it is not so clear in this case.

-29-

temporal proximity of those statements and the allegedly
inconsistent actions of the Defendants weigh in favor of a
finding of scienter.  See Shaw, 82 F.3d at 1224-25 (holding that
the temporal proximity of an allegedly fraudulent statement or
omission and the later disclosure of inconsistent information may
be considered as evidence of scienter).

On the other hand, although the Defendants formally applied
to the Markup-to-Market program in November 2004, they were not
approved, and consequently did not know exactly how much they
would receive, until April of the next year.[15]  To fault the
Defendants for failing to predict HUD's actions would run counter
to the goals of the heightened pleading requirements.  See
Maldonado, 137 F.3d at 9 (explaining that the First Circuit has
applied Rule 9(b) rigorously in order to "minimize the chance
that a plaintiff with a groundless claim will... conduct
extensive discovery in hopes of obtaining an increased
settlement, rather than in the hopes that the process will reveal
relevant evidence").

Moreover, the motivation that the Plaintiffs allege drove
the Defendants to misrepresent the Partnership's value --
acquiring voting control and economic rights at a discount to
market -- is no different from that of any seller.  This
allegation alone is certainly not sufficient to raise a strong

---

[15]  The final rent increases were calculated on or about May
4, 2005, when the Defendants executed the renewal HUD contracts.
Complaint at ¶ 110.

-30-

inference of scienter.  <u>See</u> <u>Greebel</u>, 194 F.3d at 197.

On balance, I find that the complaint as a whole narrowly clears the pleading hurdle.  The September 30 Letter provides a decidedly pessimistic view of the Partnership's opportunities for increased revenue.  It repeatedly mentions that the Investor Limited Partners are unlikely to see a return on their investment.  It suggests that a loan of even $7 million would be insufficient to repay the Investor Limited Partners. Importantly, although it counsels the Investor Limited Partners to consult their own tax attorneys and not to take the offer price as an indication of the fair market value, it urges them "to consider carefully all of the information contained <u>herein</u> before accepting this Offer." (emphasis added).  This last statement suggests that the Defendants expected the Investor Limited Partners to rely upon the September 30 Letter in making their decision to sell their interests.

Given the Defendants' experience in the industry, it is reasonable to infer that they knew or should have known that the Partnership's possible, even likely, participation in the Markup-to-Market program was material to the Investor Limited Partners decision to accept the Tender Offer, and that the $7 million example grossly underestimated the Partnership's market value. These alleged facts, combined with the timing of the Defendants' application to the Markup-to-Market program raise an inference of scienter that sufficiently satisfies the PSLRA and Rule 9(b).

It bears restating that my conclusion that the Plaintiffs

-31-

survive a motion to dismiss on Counts I, II, and III implies
nothing further; "the defendants may yet prevail once the facts
of this case are further developed." Aldridge, 284 F.3d at 84.

**B.    Counts IV - VIII**

The Defendants seek dismissal of the remaining counts on two
grounds.  First, they argue that the claims sound in fraud and
fail to meet the heightened pleading standard.  Second, they
contend that the claims of mismanagement are derivative in nature
and must be dismissed because the Plaintiffs did not and cannot
bring a derivative suit against the Defendants.

1.   Pleading standard

Generally, a plaintiff pleading a claim for breach of
fiduciary duty, breach of contract, or negligence, need only
comply with Rule 8(a).  Fed. R. Civ. Proc. 8(a); see Precision
Vascular Systems, Inc. v. Sarcos, L.C., 199 F. Supp. 2d 1181,
1191 (D. Utah 2002).  Rule 9(b) imposes a heightened pleading
standard for claims based on fraud.  Greebel, 194 F.3d at 193.
This rule extends to all claims of fraud, "whatever may be the
theory of legal duty statutory, tort, contractual, or fiduciary."
Shapiro v. Miami Oil Producers, Inc., 84 F.R.D. 234, 236 (D.
Mass. 1979).  Accordingly, the threshold inquiry is whether the
Plaintiffs' breach of fiduciary duty, breach of contract, and
related secondary claims are based in fraud.[16]

---

[16] The Plaintiffs' claim of negligent misrepresentation
(Count V) sounds, as its title implies, in negligence.

The Defendants argue that because the claims arise from a single occurrence, and that occurrence was the alleged fraudulent misrepresentations in the September 30 Letter, all of the Plaintiffs' claims necessarily sound in fraud and are subject to the heightened pleading requirement.  The Plaintiffs respond that Counts IV - VIII involve the same parties and subject matter, but they are distinct causes of action with differing elements and based upon different factual allegations.

The claims of breach of fiduciary duty and breach of contract (Counts IV and VI) are based on the following allegations: the Defendants failed to pursue increased federal subsidies under the Markup-to-Market program prior to the Tender Offer; they presented false and misleading statements of material fact in the September 30 Letter; they failed to advise the Plaintiffs of the fair market value of the Partnership; they failed to disclose that the Partnership would pursue increased rent subsidies following the Tender Offer; they induced the

---

Therefore, it is subject to the pleading standard imposed by Rule 8(a).  In Massachusetts, a claim for negligent misrepresentation requires either privity between the parties or proof that the defendant had actual knowledge of the plaintiff's reliance. Hurley v. FDIC, 719 F. Supp. 27, 34 (D. Mass. 1989).  Here the Plaintiffs satisfy that requirement by alleging that the Defendants made representations and omissions in the September 30 Letter that they knew or should have known were misleading. Complaint at ¶¶ 154-155.  It follows from my conclusion that the securities fraud claims meet the heightened pleading standard that the claims for negligent misrepresentation, which are based upon the same facts, meet both the higher standard and the lower one set by Rule 8(a).

Plaintiffs to tender their interests in the Partnership to BSR at an unfair price; they incurred excessive management fees; and they failed to ensure that the Plaintiffs received a fair value for their interests in the Partnership.   Complaint at ¶ 149.

Each of these allegations, with the exception of the excessive management fees, amount to fraudulent conduct and are subject to the heightened pleading requirements.   Because I have found that the claims meet this strict standard, I do not dismiss them on these grounds.

As for the claims of excessive management fees, they do not sound in fraud and need only meet the lower pleading standard set forth by Rule 8(a).   However, because the Plaintiffs have failed to allege any facts to support the contention that the Defendants incurred inflated and excessive management and administrative fees, this claim does not satisfy even Rule 8(a)'s minimal requirements and must be dismissed.   See Krantz v. Fidelity Mgmt & Research Co., 98 F. Supp. 2d 150, 158 (D. Mass. 2000) ("a complaint must state more than a legal conclusion that a fee is excessive in order to survive a motion to dismiss").

Counts VII and VIII allege, respectively, that the Defendants engaged in a civil conspiracy to breach their fiduciary duties and that Rioff and BSR aided and abetted Bowditch and Slavet's breach of fiduciary duty.   These claims make the same allegations as the underlying tort claims, and are

therefore subject to the pleading standard set by Rule 9(b).[17]

To state a claim for aiding and abetting, the plaintiff must show (1) that the primary actor committed a wrongful act that causes injury; (2) the aider and abettor was aware of his role in the overall wrongful activity when he provided the assistance; and (3) the aider and abettor knowingly and substantially assisted the primary actor's wrongful act.  In re McMullen, 386 F.3d 320, 332 (1st Cir. 2004).

The Plaintiffs have satisfied the first element by alleging with sufficient particularity that Bowditch and Slavet committed the underlying tort of breach of fiduciary duty.  However, they fail to provide any facts to support elements (2) and (3), let alone satisfy the rigorous standard of Rule 9(b).  Consequently, I must dismiss Count VIII.

In the context of this case, to state a claim for civil conspiracy, the Plaintiff must show that the Defendants (1) committed a breach of fiduciary duty in concert with each other or pursuant to a common design or (2) the Defendants knew that their conduct constituted a breach of duty and still gave substantial assistance or encouragement to each other. Restatement (Second) of Torts §876; see Kyte v. Philip Morris,

---

[17] Only the claims of excessive management fees are not subject to the heightened pleading standard, but as discussed above, they fail to state a claim under Rule 8(a) and have been dismissed.

<u>Inc.</u>, 408 Mass. 162, 166-67 (1990) (generally adopting the principles of §876 as the law in Massachusetts, but noting that this question is not settled).

Again, under even the lower pleading standard, the Plaintiffs fail to make a claim for civil conspiracy.  They make conclusory statements and allege no facts as to the relationship between the defendants and their relative roles in the alleged conspiracy.

2.    <u>Derivative causes of action</u>

The Defendants contend that the Plaintiffs' claims of mismanagement, such as the charging of excessive management fees, are derivative in nature, and the Plaintiffs have not brought, and as former shareholders cannot bring, these claims derivatively.  With respect only to the claims of excessive management fees, I agree.

General principles of corporate law provide that limited partners may not sue general partners directly if the only alleged injury is a diminution of the partnership's net worth.  <u>See</u> <u>Blasberg v. Oxbow Power Corp.</u>, 934 F. Supp. 21, 26-27 (D. Mass. 1996); <u>Hurley v. FDIC</u>, 719 F. Supp. 27, 30 (D. Mass. 1989).  To bring a direct action against general partners, limited partners must show both that the right to recover belongs to them, rather than the partnership, and that they sustained injury.  <u>Blasberg</u>, 934 F. Supp. at 26.

Claims for breach of fiduciary duty based upon unreasonable

-36-

management fees or excessive salaries belong to the partnership, and must be brought derivatively.  See Abeloff v. Barth, 119 F.R.D. 332, 334 (D. Mass. 1988); Bessette v. Bessette, 385 Mass. 806, 809 (1982).  Claims of mismanagement, or even fraud perpetrated on the partnership, that result in a lower market value also belong to the partnership.  Hurley, 719 F. Supp. at 30.  In contrast, where the shareholders themselves have been defrauded, they may sue the wrongdoer directly; this holds true even if all of the shareholders are victims of the fraud.  Id.

    With the exception of the claims of excessive fees, the Plaintiffs allege that they were personally defrauded by the general partners.  The Plaintiffs alone, not the Partnership, suffered injury by tendering their shares based upon the Defendants' alleged misrepresentations. Thus, the Plaintiffs have properly sued the Defendants directly on these claims.

    In contrast, it was the Partnership that incurred injury from the alleged excessive management fees.  The Plaintiffs themselves state that any excessive management fees "had an adverse impact on the Partnership's financial condition by depressing its net income and available cash flow.  This, in turn, negatively affected the Partnership's value and financing prospects." Plaintiffs' Memo at 31.  This injury falls squarely upon the Partnership, and an action to redress it must be brought derivatively.

    As former Investor Limited Partners, the Plaintiffs cannot

-37-

bring a derivative action on behalf of the Partnership.  Mass. Gen. Laws ch. 109, §57 expressly requires the plaintiff in a derivative action to be a partner at the time the lawsuit is commenced.  Fed. R. Civ. Proc. 23.1 does not explicitly state that a plaintiff must be a shareholder at the time the action is brought, but this requirement is implied.  <u>See</u> C. Wright & A. Miller, 7C Fed. Prac. & Proc. Civ. 2d §1826 (2005).  Thus, even if the Plaintiffs were restored to partnership through a remedy of rescission, they would still not have standing to bring their claims of excessive fees.

## IV. CONCLUSION

For the reasons set forth more fully above, I deny the Defendants' motion to dismiss with respect to Counts I, II, III, and V; grant the motion with respect to the claims of excessive management fees in Counts IV and VI, but deny it with respect to the remainder of those claims; and grant the motion to dismiss Counts VII and VIII.

/s/ Douglas P. Woodlock

_____

DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE