## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT M. GERBER, *et al.*, | : |
| | : |
| Plaintiffs, | : CIVIL ACTION NO: 05-10782-DPW |
| | : |
| v. | : |
| | : |
| ROBERT S. BOWDITCH, JR., *et al.*, | : |
| | : |
| Defendants. | : |
| | : |

### THIRD AMENDED COMPLAINT

Plaintiffs Robert M. Gerber, as Trustee of the Rosalie Gerber Trust, William J. and Jayne Gilligan, husband and wife, Sanford R. and Beth L. Hoffman, husband and wife, James D. Burns, George S. Bournakel, Nancy Marcotte, Muriel G. Miller, David A. Olshan, Victor Parsonnet, Betty Perl, Leslie Prosterman, as Personal Representative of the Estate of Betryce Prosterman and as Trustee of the Albert M. Prosterman Revocable Trust, George E. Reed, Donald Day, as Personal Representative of the Estate of Robert Scheur, William Wishnick, and Donald Thiry, by and through their undersigned attorneys and as and for their Complaint against Defendants Robert S. Bowditch, Jr. ("Bowditch"), Gerald Slavet ("Slavet"), Steven Rioff ("Rioff"), and BSR Associates ("BSR") (collectively, "Defendants"), hereby aver as follows:

### Nature Of The Action

1. This action arises out of a scheme conceived and implemented by Defendants to acquire Plaintiffs' interests in a limited partnership for substantially less than fair value.

2. The limited partnership at issue is known as Old Salem Associates Limited Partnership ("Old Salem" or the "Partnership"). The Partnership is a single purpose entity,

created to acquire, own, and operate four multi-unit, federally subsidized rental-housing projects located in the Boston suburbs (collectively, the "Project").

3.    Plaintiffs are former "Investor Limited Partners" of the Partnership.  Defendants Bowditch and Slavet are Old Salem's general partners (collectively, the "General Partners"). Defendant Rioff is the Partnership's initial limited partner and the Partnership's only "Class A Limited Partner."

4.     The transaction at issue is a tender offer in which Plaintiffs tendered their interests in the Partnership to Defendant BSR for $50,000 per limited partnership unit (the "Tender Offer").  BSR is an affiliate of the General Partners and Rioff (the "Tender Offer").

5.    Plaintiffs tendered their interests in Old Salem in reliance upon (i) Defendants' written representations concerning, among other things, the market value of the Project, the amount of debt refinancing the Partnership could support; and whether the Investor Limited Partners would ever receive a cash return on their investment; and (ii) the absence of any other material information concerning the value of their Partnership interests that was known or should have been known by Defendants.

6.    Since tendering their interests in Old Salem, Plaintiffs have learned that many of Defendants' representations were false and misleading, and that Defendants failed to state material facts necessary to make such representations not false and/or misleading.

7.    Among other things, Plaintiffs have learned that at the time of the Tender Offer the Partnership was eligible to participate in a federally sponsored subsidy program known as the "Markup-to-Market Program," which permitted the Project to significantly increase its rents.

8. As set forth below, the availability of the Markup-to-Market Program substantially increased the market value of the Project and, correspondingly, Plaintiffs' respective interests in the Partnership.

9. Defendants never even advised Plaintiffs of the existence, availability, or effect of the Markup-to-Market Program on the financial condition of the Partnership in connection with the Tender Offer.

10. The Partnership's General Partners never took advantage of the increased rental subsidies offered by the Markup-to-Market Program prior to the Tender Offer for its HAP Contract MA06-L000-189, nor did they inform Limited Partners in the Tender Offer that they would be seeking substantial rental increases under a Markup-to-Market renewal for its HAP Contract MA06-L000-185.

11. Within days of the closing of the Tender Offer, Defendants sought to increase the Project's annual rental income under the Markup-to-Market Program by an additional $798,912, or approximately 44.6%.

12. Plaintiffs have further learned that based on the availability of the Markup-to-Market Program and other factors not disclosed by Defendants: (i) the market value of the Project was substantially greater than the amount represented by Defendants; and (ii) the Project could have supported a refinancing of substantially more than the amount represented by Defendants.

13. Based on the Project's enhanced market value, the Partnership would have been able to refinance its debt or sell the Project outright to a third party as an alternative to the Tender Offer. Under either scenario, the net return to Plaintiffs would have been substantially greater than the amount they received in the Tender Offer.

14.     Had Defendants truthfully disclosed all material information concerning the Project and the Partnership, Plaintiffs would have realized that the value of their limited partnership interests was substantially greater than the amount offered by BSR, and would not have tendered their Partnership interests to BSR.

15.     The end result of Defendants' wrongful conduct is that Plaintiffs were duped into tendering their interest in the Partnership to BSR at a grossly unfair price.

16.     In this action Plaintiffs seek equitable relief in the form of rescission of the sale of their limited partnership interests to BSR as well as damages, attorneys' fees, interest, and costs for: (i) Defendants' violation of the federal securities laws; (ii) Defendants' fraud and misrepresentation; (iii) Defendant Bowditch and Slavet's breach of fiduciary duty; (iv) Defendants' negligent misrepresentation; (v) Defendant Bowditch and Slavet's breach of contract; (vi) Defendants' civil conspiracy; and (v) Defendant Rioff and BSR's aiding and abetting breach of fiduciary duty.

### Jurisdiction and Venue

17.     This Court has original subject matter jurisdiction over this action under 15 U.S.C. § 78aa, which provides that "[t]he district courts of the United States . . . shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder."

18.     This Court also has original subject matter jurisdiction over this action under 28 U.S.C. § 1331, in that it arises under the Constitution, laws, or treaties of the United States, namely, Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b).

19.     This Court also has jurisdiction over this action under 28 U.S.C. § 1332, in that the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

20.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367, in that all other claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the Constitution.

21.     Venue is proper in this District under 15 U.S.C. § 78aa, in that Defendants are found in, are inhabitants of, and transact business in this District.  Venue also is proper in this District under 28 U.S.C. § 1391(b), in that all Defendants reside in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

**<u>The Parties</u>**

22.     Plaintiff Robert M. Gerber is an adult individual, a citizen of the State of Connecticut, and has an address at 157 Riverside Avenue, Westport, CT 06880.

23.     Plaintiffs William J. and Jayne Gilligan are adult individuals, citizens of the State of Illinois, and have an address at 3400 N. Adams Road Oak Brook, IL 60521.

24.     Plaintiffs Sanford R. and Beth L. Hoffman are adult individuals, citizens of the State of Arizona, and have an address at 10328 E. Sierra Pinta Drive, Scottsdale, AZ  85255.

25.     Plaintiff James D. Burns is an adult individual, a citizen of the State of Washington, and has an address at 2200 4th Avenue, Seattle, WA 98121.

26.     Plaintiff George S. Bournakel is an adult individual, a citizen of the State of Maine, and has an address at 133 Atlantic Avenue, Unit 72B, Boothbay Harbor, ME 04538.

27.     Plaintiff Nancy Marcotte is an adult individual, citizen of the State of Florida, and has an address at 5300 Gulf Drive #507, Bradenton Beach, FL 34217.

28.    Plaintiff Muriel G. Miller is an adult individual, a citizen of the State of Maryland, and has an address at 8000 Aberdeen Road, Bethesda, MD 20814.

29.    Plaintiff David A. Olshan is an adult individual, a citizen of the State of New York, and has an address at 8545 Main Street, Williamsville, NY 14221.

30.    Plaintiff Victor Parsonnet is an adult individual, a citizen of the State of New Jersey, and has an address at 1601 Farley Road, Whitehouse Station, NJ 08889.

31.    Plaintiff Betty Perl is an adult individual, a citizen of the State of Florida, and has an address at 2580 S. Ocean Boulevard, Palm Beach, FL 33480.

32.    Plaintiff Leslie Prosterman, as Personal Representative of the Estate of Betryce Prosterman, is an adult individual, a citizen of the District of Columbia, and has an address at 6002 34th Place, Washington, DC, 20015

33.    Plaintiff Leslie Prosterman, as the Trustee of the Albert M. Prosterman Revocable Trust, is an adult individual, a citizen of the District of Columbia, and has an address at 6002 34th Place, Washington, DC, 20015.

34.    Plaintiff George E. Reed is an adult individual, a citizen of the State of New York, and has an address at P.O. Box 157, Germantown, NY 12526.

35.    Plaintiff Donald Day, as Personal Representative of the Estate of Robert Scheur, is an adult individual, a citizen of the State of Florida, and has an address at 2 Brentwood Drive, Boynton Beach, FL 33436.

36.    Plaintiff William Wishnick is an adult individual, a citizen of the State of Utah, and has an address at P.O. Box 681869, Midway, UT 84049.

37.    Plaintiff Donald Thiry is an adult individual, a citizen of the State of Wisconsin, and has an address at 3300 Squaw Island Road, Sturgeon Bay, WI 54235.

38.     Defendant Bowditch is, upon information and belief, an adult individual, a citizen of the Commonwealth of Massachusetts, and has addresses/domiciles at 230 Congress Street, 12th Floor, Boston, MA 02110 and 99 High Street, Brookline, MA 02146.

39.     Defendant Slavet is, upon information and belief, an adult individual, a citizen of the Commonwealth of Massachusetts, and has a domicile at 15 Winthrop Road, Wellesley, MA 02482.

40.     Defendant Rioff is, upon information and belief, an adult individual, a citizen of the Commonwealth of Massachusetts, and has a domicile at 25 Oakland Street, Lexington, MA 02420.

41.     Defendant BSR is, upon information and belief, a partnership, organized and existing under the laws of the Commonwealth of Massachusetts, with its principal place of business located at 220 Forbes Road, Braintree, MA 02184.

42.     Upon information and belief, BSR is owned and controlled by Bowditch, Slavet, and Rioff.

## Background

### A.     The Partnership And Its Partners

43.     The Partnership was formed in or around December 1982 for the purposes of acquiring, owning, repairing, rehabilitating, altering, renting, leasing, and otherwise dealing with the Project.

44.     The Project is comprised of four multi-unit rental housing projects located in Beverly, Danvers, Peabody, and Salem, Massachusetts.  The Project, which contains a total of 321 residential units, is commonly known as the "Fairweather Apartments."

45.     The Partnership has four classes of partners:  two General Partners, one Class A Limited Partner, one Class B Limited Partner, and a number of Investor Limited Partners.

46.     Bowditch and Slavet are the Partnership's General Partners.  The General Partners collectively hold an 11.9% interest in the Partnership and have controlled the business of the Partnership for over twenty years.

47.     Rioff is the partnership's Class A Limited Partner.  Rioff holds a 2.1% interest in the Partnership.

48.     BVS Associates (not a party to this action) is the Partnership's Class B Limited Partner.  BVS holds a 1% interest in the Partnership.

49.     Plaintiffs, along with other individuals and entities, were formerly holders of Units of Old Salem Limited Partner interests, which comprise 85% of the interest in the Partnership.

**B.      The Limited Partnership Agreement**

50.     The terms and conditions of the Partnership are set forth in a written limited partnership agreement (the "Limited Partnership Agreement").

51.     Among other things, the Limited Partnership Agreement grants the General Partners the power and obligation to manage the Partnership and control its business.

52.     The Limited Partnership Agreement expressly prohibits the limited partners from participating in the Partnership's business.

53.     The General Partners do not, however, have unfettered discretion with respect to all Partnership transactions.  The Limited Partnership Agreement expressly requires limited partner approval and consent to certain, extraordinary transactions such as sales of real property, mortgage refinancing, sale/leaseback of Partnership property, and additional mortgage loans.

54.     The Limited Partnership Agreement also expressly requires that the sale of an interest in Partnership property to an affiliate of any partner be at fair market value as determined by an independent appraiser or as agreed upon by a majority of the limited partner interests.

**C.    The Partnership's Debt**

55.     The Partnership is a party to two secured loans.

56.     One is a mortgage loan payable to and held by HUD, which is secured by a first mortgage on the Project (the "HUD Mortgage Loan").  The maturity date of the HUD Mortgage Loan is July 1, 2010.

57.     The other Partnership loan obligation is evidenced by a purchase money note, which was issued by an affiliate of the General Partners in connection with the Partnership's acquisition of the Project (the "Purchase Money Loan").  The Purchase Money Loan is secured by each partners' interest in the Partnership.

58.     The maturity date of the Purchase Money Loan was August 31, 2003; however, as of September 30, 2004 it had yet to be paid, and continued to accrue interest at 12.5% per annum.

59.     Upon information and belief, as of December 31, 2003, the total unpaid principal and interest due under the HUD Mortgage Loan and the Purchase Money Loan was $9,011,929.

60.     Upon information and belief, as of December 31, 2003, the unpaid principal balance of principal and interest due under the HUD Mortgage Loan was $1,723,341.

61.     Upon information and belief, as of December 31, 2003, the unpaid balance of principal and interest due under the Purchase Money Loan was $7,288,588.

**D.    HUD's Section 8 Program And The Partnership's HAP Contracts**

62.    The Project is a "Section 8" subsidized housing project, which receives subsidies provided for under Section 8 of the Housing and Community Development Act of 1974.  Section 8 housing assistance is the primary means through which the Department of Housing and Urban Development ("HUD") "aid[s] low-income families in obtaining a decent place to live and . . . promot[es] economically mixed housing."  42 U.S.C. §1437f(a).

63.    Under the Section 8 Program, the federal government provides supply side, project-based subsidies.  These subsidies, which are paid to the owner of the project, rather than the tenant, cover the difference between what tenants can afford to pay -- up to a maximum of 30% of household income -- and HUD's estimated fair market rent for the unit.

64.    The terms and conditions of a housing project's Section 8 subsidies are set forth in long term (typically twenty years) "Housing Assistance Payments" ("HAP") contract between the property owner and the Federal Housing Authority.

65.    Upon expiration of a HAP Contract, Section 8 property owners have the option of renewing the contract or opting out of the Section 8 Program.  If the Section 8 Program property owner chooses to opt out of the Program, it is permitted to set rents to prevailing market rates.

66.    The Partnership is party to two HAP Contracts pursuant to which it receives rental subsidies from HUD for 220 of the 321 rental units.

67.    Sixty (60) units of the Project are subject to a contract with HUD that is administered by the Massachusetts Housing Finance Agency ("MassHousing"), referred to as MA06-M000-189 ("HAP Contract 189").  One hundred and sixty (160) units of the Project are subject to a similar contract with HUD that is administered by MassHousing, referred to as MA06-L000-185 ("HAP Contract 185").

E.    **HUD's Markup-to-Market Program**

68.    HUD's Section 8 Program went into effect in 1974, and the first of its Section 8 HAP Contracts began expiring in the mid-1990s.  In certain metropolitan areas where Section 8 fair market rent ceilings had fallen below prevailing market rates, Section 8 property owners increasingly decided not to renew their respective HAP Contracts.

69.    In response to these circumstances, HUD introduced an emergency initiative in or around June 1999, which came to be known as the Markup-to-Market Program.   The purpose of the Program was to preserve the availability of below-market Section 8 multi-family housing by offering economic incentives to the owners of such projects to remain in HUD's Section 8 Program.

70.    The Markup-to-Market Program was later codified as revisions to the Multifamily Assisted Housing Reform and Affordability Act, 42 U.S.C. §1437(f) (2000).

71.    Under the Markup-to-Market Program, owners of Section 8 housing projects who remain in the Section 8 Program are able to "mark up" rent levels to market rates and distribute the increased cash flow resulting from such rents.

72.    In order to obtain the economic incentives offered by the Markup-to-Market program, property owners are required to renew their respective HAP Contracts for a minimum of five years and meet certain other criteria.

73.    Upon reconciliation of owner and HUD rent comparability studies, HUD will generally permit rent increases up to 150% of "Fair Market Rent," a term of art defined by HUD ("FMR"), and increase the federal rent subsidy to equal the difference between the current rents and the newly marked up rents.  In addition, properties eligible for the Markup-to-Market

Program meeting certain additional criteria are eligible to apply to HUD for a waiver permitting rent increases, which exceed 150% of FMR.

74.     Properties that do not meet all of HUD's criteria still can qualify for a Markup-to-Market discretionary waiver if: (i) the project has a high percentage (>50 %) of units rented to elderly, disabled or large families;  (ii) the project is located in a low-vacancy area (<3 %) where tenant-based assistance is difficult to be used and there is a lack of comparable rental housing; and/or  (iii) the project is a high priority for the local community as evidenced by State or local funding ("Option 1-B").

75.     Prior to the Tender Offer, the Partnership had not pursued Markup-to-Market rent increases on HAP Contract 189.

76.     Prior to the Tender Offer, the Partnership had not pursued Markup-to-Market rent increases on HAP Contract 185 beyond the initial contract concluded with HUD five years earlier, in 2000.

**F.     Defendants' Vast Experience In Multi-Family Rental Housing**

77.     Defendants Bowditch, Slavet, and Rioff are all general partners of MB Management Company ("MB Management"), a real estate development and management company with a focus on the development of low and moderate-income multi-family rental housing.

78.     Bowditch founded MB Management in 1971; Slavet joined MB Management in 1977; Rioff joined MB Management in 1978.  Each is identified on MB Management's Internet website as a General Partner.

79.    Bowditch, Slavet, and Rioff have extensive experience in the ownership and management of multi-family residential housing.  In addition to his twenty-five plus years at MB Management, Rioff has also served as a Senior Management Officer for MassHousing.

80.    Under the direction of Bowditch, Slavet, and Rioff, MB Management has developed or acquired over fifty properties, totaling over 8,000 units and valued in excess of 300 Million Dollars, including the Project.

81.    Upon information and belief, Bowditch, Slavet, and Rioff have substantial knowledge and experience with HUD's Markup-to-Market Program, the valuation of Section 8 Housing projects, and financing of such projects.

82.    For example, MB Management's Internet website expressly states that it offers consulting services that include "[a]sset management services including highest and best use analysis, financing recommendations and packaging, and restructuring analysis/implementation (including HAP renewals and 'Mark to Market' processing)."

83.    MB Management's Internet website also makes representations regarding the ability and expertise of Defendants Bowditch, Slavet and Rioff in relation to the development, acquisition and management of affordable multi-family housing.  True and correct copies of MB Management Company's relevant website postings are attached hereto as Exhibit A.

**Facts**

**A.    The Tender Offer And The September 30 Letter**

84.    Some time prior to September 2004, Defendants made the decision to attempt to acquire the interests of the Investor Limited Partners of the Partnership for less than fair value.

85.    Defendants' plan was designed both to acquire these limited partners' economic interests in the Partnership, and to obtain voting control over Partnership decisions that require a

majority vote of the limited partners, such as sale of the Project or refinancing of the Partnership's debt.

86.    Defendants' scheme ultimately took the form of the Tender Offer whereby BSR would acquire the interests of the Investor Limited Partners in the Partnership.

87.    In connection with the Tender Offer, Defendants prepared and submitted to Plaintiffs a written offer, dated September 30, 2004, which sets forth the terms of the Tender Offer and other information (the "September 30 Letter").  A copy of the September 30 Letter is attached hereto as Exhibit B.

88.    The September 30 Letter is written on Old Salem letterhead, and is signed by Slavet.  Slavet executed and sent the September 30 letter on behalf of and as agent for Defendants.

89.    The Tender Offer states that it must be accepted "within 30 days of the date of this letter unless extended by the Purchaser in its sole and absolute discretion."

90.    Enclosed with the September 30 Letter was a purchase agreement setting forth the terms of the proposed acquisition of Investor Limited Partner interests (the "Purchase Agreement").

91.    The September 30 Letter describes the terms of the Tender Offer as follows:

> [T]he General Partners, acting through an affiliate thereof [sic] (the 'Purchaser'), are offering to purchase the interests of all Investor Limited Partners (the 'Offer') for a purchase price equal to $50,000 per investment unit ('Unit').  The Purchaser is offering to purchase 100% of the Units.  The Offer is conditioned upon 85% of the Units (i.e. 17 of the 20 Units) being tendered by the Investor Limited Partners.  (Emphasis added).

92.    The September 30 Letter goes on to provide additional information relating to the Partnership, the Project, and the Tender Offer.

93.     This additional information contains false and misleading statements of material fact, and fails to state material facts necessary to make the statements made not misleading, with respect to, among other things, the fairness of the offering price and the value of the limited partners' interests in the Partnership.

94.     In particular, the September 30 Letter misportrays the Partnership as a tax shelter investment that had run its course for the Investor Limited Partners, and presents only the prospect of generating substantial phantom income tax liabilities, with no little or no chance of cash distributions in the future.

95.     In that regard, the September 30 Letter states:

> As you may have seen in your K-1 annual statements, in recent years Partnership losses available to the Investor Limited Partners have declined and you have been allocated income. Partnership income allocable to the Investor Limited Partners is expected to increase steadily. The Partners will eventually be subject to a large tax liability resulting from phantom income allocated to the Partners, with no material projected cash distribution. . . . It is . . . likely that no cash flow would be available for distribution to the Investor Limited Partners for many years. While the Investor Limited Partners have received substantial tax benefits over the years, those benefits have now ceased.

96.     The September 30 Letter also falsely claims that the Partnership had no current plans to refinance the Partnership debt or sell the Project. Importantly, it claims that:

> In the event the Partnership does, however, pursue a refinancing of the Mortgage Loan, *it is unlikely that the proceeds of a refinancing (or a sale) would be sufficient to repay all partnership debt and return any portion of each limited Partner's capital contribution in the best case scenario.* (Emphasis added).

97.     The September 30 Letter purports to support this claim by the following example:

> For example, based on current rents and expenses, *assume a $7,000,000 loan to the Partnership is supportable*. (Emphasis added). The proceeds of the loan would likely be applied as follows:

| | |
|---|---|
| New Loan: | $7,000,000 |
| Pay-Off Existing Loan: | 1,700,000 |
| Rehab | 1,250,000 |
| Transaction Costs: | 600,000 |
| Reserves: | 450,000 |
| Available to Partnership: | $3,000,000 |

98.     Building upon this example, the September 30 Letter claims:

> [A]ny available capital transaction proceeds and any next available cash flow would continue to be applied to the Purchase Money Loan, and therefore, while the Investor Limited Partners will continue to be allocated income (and at a further increased amount and rate as the partnership cash flow amortizes debt) *it is unlikely that the Investor Limited Partners would receive any cash distributions for the Partnership*. (Emphasis added).

99.     The September 30 Letter concludes its discussion of the state of the Partnership with the following bleak, but inaccurate, projection:

> As indicated in this discussion, and pursuant to the terms of the current Partnership Agreement, if current Project operations are maintained, *it is unlikely that the Investor Limited Partners would ever receive a cash return on their investment*. (Emphasis added).

100.    Nowhere in the September 30 Letter is any mention made of the Markup-to-Market Program or its effect on the Project's market value or the Partnership's ability to refinance its debt. The omission of this material information made the September 30 Letter profoundly misleading. The omitted information would have shown that the Partnership's condition and prospects were excellent, and that Plaintiffs' shares had far greater value than represented in the September 30 Letter.

101.    After painting this incomplete, one-sided picture of the future of the Partnership, the September 30 Letter sets forth BSR's offer to acquire Investor Limited Partnership interests for a price of $50,000 per unit.

102.    Given Defendants' vast experience controlling the business of the Partnership and with respect to other Section 8 housing projects, Plaintiffs believe and therefore aver that Defendants knew that the omissions from and representations in the September 30 Letter concerning the Markup-to-Market Program, the market value of the Project, the amount of debt refinancing the Partnership could support, and whether the Investor Limited Partners would ever receive a cash return on their investment were misleading and/or false.

103.    Plaintiffs further believe, and therefore aver, that Defendants deliberately refrained from seeking increased rent subsidies for the Project under the Markup-to-Market Program prior to the Tender Offer in order to be better able to support their claims concerning the value of Plaintiffs' Partnership Interests.

104.    Plaintiffs further believe and therefore aver that Defendants' motivation for their omissions and misrepresentations was to: (i) acquire Plaintiffs' economic interests in the Partnership; (ii) acquire voting control over the Partnership's sale of the Project or refinancing of its debt; and (iii) enrich themselves unfairly at the expense of and to the detriment of Plaintiffs.

105.    Plaintiffs believe and therefore aver that Defendants omitted material disclosures and made misrepresentations in order to: (i) prevent the Plaintiffs from making further inquiry into the value of the Partnership; (ii) prevent the Plaintiffs from learning the Partnership's true value; and (iii) induce Plaintiffs to sell their interests in the Partnership for less than fair value.

106.    In reliance upon the above representations made by Defendants in the September 30 Letter, and because of the omission of material information from the September 30 letter, Plaintiffs tendered their interest in the Partnership to BSR in accordance with the terms of the Tender Offer.

107.    In addition to acquiring the economic interests represented by the tendered Units, Defendants acquired voting control over partnership acts requiring the consent of a majority of the limited partners.  Accordingly, Defendants now have unbridled authority to undertake any and all actions concerning the Partnership and the Project, including a sale of the Project or a refinancing of the Partnership's debt.

**B.    Defendants' Pursuit Of Market Rent Increases**

108.    Plaintiffs have since discovered that the statements and representations made by Defendants in the September 30 Letter were false, misleading, and incomplete, thereby rendering the price paid by BSR for their respective Partnership Units patently unfair.

109.    The falsity of these statements is revealed in documents obtained from MassHousing, which demonstrate, among other things, that within days of the closing of the Tender Offer (excluding discretionary time extensions), Defendants formally commenced the process of seeking substantially increased rents for the Project under the Markup-to-Market Program.

110.    Pursuant to a letter dated November 10, 2005, Defendants sent a request on MB Management Company letterhead to Ms. Ellen Connolly of HUD requesting to participate in HUD's Markup-to-Market program for 220 of the Project's units.  A true and correct copy of this letter (the "Markup Request") is attached hereto as Exhibit C.

111.    As set forth in the Markup Request, which is signed by Defendant Slavet, Markup-to-Market rent increases pursuant to Option 1-B were sought for 160 units under HAP Contract 185 and 60 units under HAP Contract 189.

112.    The Markup Request states that the Project's "financial and physical conditions make the development and ideal candidate for a conversion to an alternative use other than

affordable housing." The Markup Request further states that "[i]t is clear that the current contract rents for the property, whether Section 8 or Section 236, are well below market."

113. The Markup Request further states that the Project meets all of the eligibility criteria for participation in the Markup-to-Market Program, with the exception that comparable market rent potential was projected to be slightly below the requirement of 100 percent of published FMR, but further notes that the Project qualifies for discretionary participation in the Markup-to-Market Program because it meets two of the waiver criteria under Option 1-B.

114. In relation to the Markup Request, Defendants also submitted to HUD a Contract Renewal Form, dated November 3, 2004 (the "HUD Contract Renewal Form") seeking initial renewal of HAP Contract 189 and subsequent renewal of HAP Contract 185. Notably, this date is just four days after the close of the Tender Offer (exclusive of time extensions to Limited Partners granted by Defendants in their sole and absolute discretion, as set forth in the Tender Offer).

115. The HUD Contract Renewal Form, which is signed by Defendant Slavet, seeks a waiver of the requirements to participate in the Markup-to-Market program, despite not meeting the 100 percent FMR requirement, based on compliance with two of three Option 1-B waiver criteria, namely: (i) the project has a high percentage (>50 %) of units rented to elderly, disabled or large families; and (ii) the project is located in a low-vacancy area (<3 %) where tenant-based assistance is difficult to be used and there is a lack of comparable rental housing.

116. In relation to the Markup Request and in conjunction with the HUD Contract Renewal Form, Defendants submitted to HUD a Rent Comparability Study that provides estimated current market rents for the 220 Project units that were the subject of Defendants' request to Markup-to-Market (the "RCS").

117.    The RCS was prepared for Kevin Baptista of MB Management.  Notably, RCS is dated October 21, 2004, which is within the Tender Offer period of September 30, 2004 to October 30, 2004.  The RCS indicates, among other things, that the appraiser commenced work on the RCS as early as October 11, 2004.

118.    Analyzing market rents and data among five comparable properties, the RCS estimated a current market rent of $960 per month for 181 of the Project's studio units (each totaling 380 square feet), and a current market rent of $1075 per month for 39 of the Project's one-bedroom units (each totaling 416 square feet).

119.    Under HAP Contract 189, actual rental rates for the Project's studio apartments as of the date of the September 30 Letter ranged from $408 per month to $491 per month, while rates for one-bedroom units ranged from $523 per month to $552 per month.  Based on the five-year Markup-to-Market increase sought by Defendants, the Project would have realized an annual revenue increase of $351,432, or approximately 97.9%.

120.    Under HAP Contract 185, the actual rental rate for the Project's studio apartments as of the date of the September 30 Letter was $712 per month, while the rate for a one-bedroom unit was $874 per month.  Based on the five-year Markup-to-Market increase sought by Defendants, the Project would have realized an annual revenue increase of $447,480, or approximately 31.3%.

121.    In the aggregate, Defendants, through the Markup Request, HUD Contract Renewal Form and RCS, sought potential annual rent increases totaling $798,912, or approximately 44.6%, for 220 of the Project's units pursuant to the Markup-to-Market program.

122.    As set forth in a letter of or near April 5, 2005 from Vincent Benvenuto of HUD to Peter Wong of the MassHousing (the "HUD Approval"), a true and correct copy of which is

20

attached hereto as Exhibit D, HUD approved the Markup-to-Market increases sought by Defendants, namely an increase to $960 per month for the Project's 181 studio units and to $1075 per month for the Project's 39 one-bedroom units, resulting in an aggregate annual rent increase for the Project of $798,912.

123.    On or about May 4, 2005, Defendants executed Renewal HAP Contracts for Section 8 Markup-to-Market Project for HAP Contract 185 and HAP Contract 189 (the "Markup Contracts").  Pursuant to a subsequent amendment of the HUD Approval, the final rent amounts decreased slightly, to $894 per month for the Project's 181 studio units and $1,001 per month for the Project's 39 one-bedroom units.  This slight decrease in rent levels was attributable to the Partnership's concurrent participation in a different government program, the so-called Section 236 Program, through which it received interest rate subsidies on the HUD Mortgage Loan, and did not reflect any decrease in the market valuations for rents submitted by Defendants in the RCS and approved by HUD.

124.    Following the HUD Approval and subsequent amendment thereof, the Project's 220 units that were the subject of Defendants' Markup Request, HUD Contract Renewal Form and RCS ultimately stand to realize $620,928 in additional annual potential income pursuant to the Markup-to-Market Program.

**C**.    **MassHousing's Willingness To Refinance The Partnership's Debt And AHP Holding's Offer to Purchase The Project**

125.    Plaintiffs also have learned that at all relevant times the Partnership was capable of supporting a loan of at least $15 Million to refinance its debt.  Plaintiffs have been told by Mr. Daniel Smith that in a discussion he had with a representative of MassHousing in or around January 2005, Mr. Smith was informed that MassHousing, would be prepared to refinance the

Partnership's existing debt for at least $15 Million. This amount is more than twice the amount of the loan Defendants claimed that the Partnership could support.

126.    Had the Partnership pursued such a refinancing of its debt, there would have been substantial additional proceeds available to return each Investor Limited Partner's capital contribution and provide for additional cash distributions.

127.    Plaintiffs have further learned that at all relevant times the Partnership could have sold the Project for at least $15 Million, and likely much more.

128.    Prior to the commencement of this action, AHP Holdings Company LLC ("AHP Holdings") made an offer to the Partnership to purchase its assets for $14.5 Million.  As security for its performance, AHP Holdings agreed to put up an earnest money deposit of $250,000, which the Partnership would be entitled to retain if AHP Holdings was not able to finance the purchase or obtain regulatory approval.

129.    The Partnership, presumably acting through Bowditch, Slavet, and Rioff, rejected this offer, evidencing or at least suggesting their understanding that the Project was worth more than $14.5 Million.

130.    AHP Holdings has informed Plaintiffs that it would have paid at least $14.5 Million for the Partnership in September, 2004 and at any time thereafter.  AHP Holdings also has represented to Plaintiffs that anyone with the level of knowledge and experience in low-income housing as represented in MB Management's web site would readily understand that the Project was worth no less than $15 million at all relevant times.

131.    Had the Partnership pursued such a sale of the Project, the proceeds of the sale would have been well in excess of the amount necessary to repay all partnership debt, return

each Investor Limited Partner's capital contribution, and provide for additional cash distributions.

132.   Under either scenario -- an arm's length sale of the Partnership Property or a refinance of the Partnership's debt -- Plaintiffs would have received substantial cash distributions from the Partnership, which would have greatly exceeded the amount paid by BSR for their respective Limited Partnership Units.   The Defendants' omissions and misrepresentations deprived Plaintiffs of this value.

## COUNT I
### Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Thereunder
### (<u>Plaintiffs v. Defendants</u>)

133.   Plaintiffs incorporate by reference, as if set forth at length herein, each and every allegation of paragraphs 1 through 132 of this Complaint.

134.   In connection with the Tender Offer, Defendants used the means of interstate commerce, including the mails and telephone system.

135.   Plaintiffs sold securities -- their Units of limited partnership interests in the Partnership -- to BSR pursuant to the terms of the Tender Offer.

136.   Defendants made misleading statements of fact in the September 30 Letter and omitted to state facts necessary to make the statements made in the September 30 Letter not false and/or misleading.

137.   The statements and omissions made in the September 30 Letter were false and/or misleading in the ways specified *supra*.

138.   Each Defendant participated in the making of such false and misleading statements or was under a duty to disclose facts to Plaintiffs.

139.   The false and misleading statements and omissions of fact were material to

Plaintiffs decision whether to sell their Units of limited partnership interests in the Partnership to BSR.

140.    Plaintiffs reasonably relied upon these misrepresentations and Defendants' duty to disclose all material facts in selling their securities to BSR.

141.    Defendants acted with knowledge of the falsity of the statements made in the September 30 Letter or with reckless disregard for their truth, and with knowledge of the misleading nature of their omissions of fact.

142.    Defendants made these false and misleading statements and omissions with the intent to deceive, manipulate, and defraud Plaintiffs.

143.    Plaintiffs were damaged by Defendants' false and misleading statements and omissions, in that such misrepresentations were the proximate cause of Plaintiffs' damages.

144.    Plaintiffs are entitled to rescission of the Tender Offer or, alternatively, damages as a result of Defendants' violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §77j and Rule 10b-5 promulgated thereunder, 17 CFR 240.10b.

## COUNT II
### Rescission Pursuant to Section 29(b) of the Exchange Act
### (<u>Plaintiffs v. BSR</u>)

145.    Plaintiffs incorporate by reference, as if set forth at length herein, each and every allegation of paragraphs 133 through 144 of this Complaint.

146.    Plaintiffs are within the class of persons that Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §77j, and Rule 10b-5 promulgated thereunder, 17 CFR 240.10b, seek to protect.

147.    As set forth above, Plaintiffs and BSR are in contractual privity on account of the Tender Offer and BSR's purchase of Plaintiffs' Partnership interests.

148.    Each Plaintiff is an innocent party to a contract with the BSR that was made and performed in violation Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §77j and Rule 10b-5 promulgated thereunder, 17 CFR 240.10b, in the ways specified *supra*.

149.    Pursuant to Section 29(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78cc(b), Plaintiffs are entitled to rescission of BSR's purchase of their Partnership Units pursuant to the Tender Offer.

## COUNT III
## Fraud and Misrepresentation
## (<u>Plaintiffs v. Defendants</u>)

150.    Plaintiffs incorporate by reference, as if set forth at length herein, each and every allegation of paragraphs 145 through 149 of this Complaint.

151.    Defendants made affirmative misrepresentations of material facts in the September 30 Letter and/or omitted statements that would otherwise have made the statements made therein not misleading

152.    At the time the statements in the September 30 Letter were made, Defendants knew that they were false and/or misleading.

153.    Defendants' misrepresentations and omissions in the September 30 Letter were made for the purpose of (i) acquiring Plaintiffs' economic interests in the Partnership at a price that was substantially less than their fair value; (ii) acquiring voting control over the Partnership's decision to sell the Project or refinance of its debt; and (iii) enriching themselves at the expense of and to the detriment of Plaintiffs.

154.    Plaintiffs justifiably relied to their detriment upon the statements made in the September 30 Letter in making their decision to sell their interests in the Partnership to BSR.

155.    Plaintiffs have suffered losses and damages as a proximate result of Defendants'

misrepresentation and fraud.

156.    Defendants' fraud and misrepresentation in connection with the Tender Offer was willful, wanton, and outrageous, and performed with callous disregard for the rights of Plaintiffs.

**COUNT IV**
**Breach of Fiduciary Duty**
**(Plaintiffs v. Bowditch and Slavet)**

157.    Plaintiffs incorporate by reference, as if set forth at length herein, each and every allegation of paragraphs 150 through 156 of this Complaint.

158.    At all relevant times, Bowditch and Slavet, as the Partnership's General Partners, stood in a fiduciary relationship with respect to the Partnership and its limited partners, including Plaintiffs.

159.    In their capacity as fiduciaries, Bowditch and Slavet owed a duty of utmost good faith, fairness, and loyalty toward the Partnership and its limited partners, including Plaintiffs.

160.    Bowditch and Slavet's fiduciary duties toward the limited partners included the obligation (i) to make full disclosure of all material information; (ii) to refrain from self-dealing and reaping an individual profit not shared with the other partners in connection with a transaction relating to the Partnership, whether directly or indirectly through an affiliate; (iii) to manage the affairs of the Partnership with skill, prudence, and judgment; and (iv) to ensure that Plaintiffs received a fair price for their interests in the Partnership in connection with the Tender Offer.

161.    Bowditch and Slavet breached their fiduciary duties to Plaintiffs by, among other things, (i) failing to pursue increased federal rent subsidies for the Project under the Markup-to-Market Program prior to the Tender Offer; (ii) presenting false and misleading statements of material fact in the September 30 Letter concerning a sale of the Project, refinancing of the

26

Partnership's debt, and whether the Investor Limited Partners would ever receive a cash return on their investment; (iii) failing to advise Plaintiffs that the offering price for Units of Partnership in the Tender Offer was inadequate and unfair; (iv) failing to disclose that the Partnership would pursue increased rent subsidies following the Tender Offer; (v) inducing Plaintiffs to tender their interests in the Partnership to their affiliate, BSR, at a grossly unfair price; and (vi) failing to ensure that Plaintiffs received fair value for their interests in the Partnership.

162.    There may be other instances of breach of fiduciary duty by Bowditch and Slavet of which Plaintiffs are unaware, and Plaintiffs reserve their right to assert claims for such additional breaches following discovery.

163.    Plaintiffs suffered losses and damages as a result of Bowditch and Slavet's breach of their fiduciary duties.

164.    Bowditch and Slavet's conduct in breach of their fiduciary duties was willful, wanton, and outrageous, and performed with callous disregard for the rights of the Partnership or its other partners.

## COUNT V
### Negligent Misrepresentation
### (Plaintiffs Against All Defendants)

165.    Plaintiffs incorporate by reference, as if set forth at length herein, each and every allegation of paragraphs 157 through 164 of this Complaint.

166.    Defendants made affirmative representations of fact in the September 30 Letter and/or omitted statements that would otherwise have made the statements made therein not misleading.

167.    Defendants knew or should have known that their representations in the September 30 Letter were false and/or that the September 30 Letter omitted statements that would otherwise have made the statements made therein not misleading.

168.    A reasonable person would have considered the representations made in the September 30 Letter to be material to their decision whether to accept or reject the Tender Offer.

169.    Plaintiffs justifiably relied to their detriment upon the statements made in the September 30 Letter in making their decision to accept the Tender Offer and transfer their interests in the Partnership.

170.    Plaintiffs have suffered losses and damages as a proximate result of Defendants' misrepresentation.

**COUNT VI**
**Breach of Contract**
**(<u>Plaintiffs Against Bowditch and Slavet</u>)**

171.    Plaintiffs incorporate by reference, as if set forth at length herein, each and every allegation of paragraphs 165 through 170 of this Complaint.

172.    Under the terms of the Limited Partnership Agreement, the General Partners were charged with both the right and the obligation to manage and operate the business of the Partnership to the advantage of all partners.

173.    Plaintiffs performed all of their respective obligations under the Limited Partnership Agreement.

174.    Bowditch and Slavet beached their obligations under the Limited Partnership Agreement by, among other things, (i) failing to pursue increased federal rent subsidies for the Project under the Markup-to-Market Program prior to the Tender Offer; (ii) presenting false and misleading statements of material fact in the September 30 Letter concerning a sale of the Project, refinancing of the Partnership's debt, and whether the Investor Limited Partners would

ever receive a cash return on their investment; (iii) failing to advise Plaintiffs that the offering price for Units of Partnership in the Tender Offer was inadequate and unfair; (iv) failing to disclose that the Partnership would pursue increased rent subsidies following the Tender Offer; (v) inducing Plaintiffs to tender their interests in the Partnership to their affiliate, BSR, at a grossly unfair price; and (vi) failing to ensure that Plaintiffs received fair value for their interests in the Partnership.

175.    There may be other instances of breach of contract by Bowditch and Slavet of which Plaintiffs are unaware, and Plaintiffs reserve their right to assert claims for such additional breaches following discovery.

176.    Plaintiffs have suffered losses and damages as a result of Bowditch's and Slavet's breach of the Limited Partnership Agreement.

## **Prayer for Relief**

WHEREFORE Plaintiffs Robert M. Gerber, William J. and Jayne Gilligan, husband and wife, Sanford R. and Beth L. Hoffman, husband and wife, James D. Burns, George S. Bournakel, Nancy Marcotte, Muriel G. Miller, David A. Olshan, Victor Parsonnet, Betty Perl, Leslie Prosterman, as Personal Representative of the Estate of Betryce Prosterman and as Trustee of the Albert M. Prosterman Revocable Trust, George E. Reed, Donald Day, as Personal Representative of the Estate of Robert Scheur, William Wishnick, and Donald Thiry respectfully request that this Court enter judgment in their favor and against Defendants Robert S. Bowditch, Jr., Gerald Slavet, Steven Rioff, and BSR Associates, jointly and severally, as follows:

1.    On Count One Ordering rescission of Plaintiffs sale of their Partnership Units to BSR and/or awarding damages in an amount to be determined at trial, plus interest, costs, and such other and further relief as this Court deems just and proper.

2.      On Count Two Ordering rescission of Plaintiffs sale of their Partnership Units to BSR, plus costs, and such other and further relief as this Court deems just and proper.

3.      On Count Three awarding damages in an amount to be determined at trial, plus interest, costs, and such other and further relief as this Court deems just and proper.

4.      On Count Four awarding damages in an amount to be determined at trial, plus interest, costs, and such other and further relief as this Court deems just and proper.

5.      On Count Five awarding damages in an amount to be determined at trial, plus interest, costs, and such other and further relief as this Court deems just and proper.

6.      On Count Six awarding damages in an amount to be determined at trial, plus interest, costs, and such other and further relief as this Court deems just and proper.

Pursuant to Fed. R. Civ. P. 38, Plaintiffs hereby demand a trial by jury of all issues triable of right by a jury.

Dated:  June 23, 2006

THE PLAINTIFFS

By their attorneys,

/S/ Daniel Murphy
Paul McDonald
*Pro Hac Vice* Granted
Daniel Murphy
BBO # 656021
Bernstein, Shur, Sawyer & Nelson
100 Middle Street
P. O. Box 9729
Portland, Maine 04104-5029

/S/ John J. O'Connor
John J. O'Connor
BBO # 555251
Peabody & Arnold LLP
30 Rowes Wharf
Boston, MA  02110
(617) 951-2077

## CERTIFICATE OF SERVICE

I, Daniel J. Murphy, being over the age of 18, hereby certify that on June 23, 2006, I served the foregoing document by causing a true copy of same to be delivered by first-class U.S. mail and via ECF to counsel for the Defendants, as follows:

Donald Savery, Esq.
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110

/s/   Daniel J. Murphy
Daniel J. Murphy

Exhibit B

ALL-STATE® INTERNATIONAL

Old Salem Associates
Limited Partnership

September 30, 2004

Investor Limited Partners of
    Old Salem Associates Limited Partnership

Re:  *Proposed Purchase of Limited Partner Units*

Ladies and Gentlemen:

As you are aware, Old Salem Associates Limited Partnership, a Massachusetts limited partnership (the "*Partnership*") is the owner of a rental housing project commonly known as Fairweather Apartments comprised of four complexes located in Beverly, Danvers, Peabody and Salem, Massachusetts (the "*Project*"). As you are also aware, the Project and the Partnership are subject to a first a mortgage loan insured by the Department of Housing and Urban Development ("*HUD*") under Section 236 of the National Housing Act, as well as a purchase money note and accrued interest thereon due to an affiliate of the General Partners of the Partnership. To date, the Investor Limited Partners of the Partnership (the "*Investor Limited Partners*") have received certain tax benefits in connection with the Project. These tax benefits have diminished over the years, and will continue to diminish steadily. In fact, the Partnership generated phantom income to the Investor Limited Partners in excess of $12,000 per unit in 2003, which phantom income is expected to increase in 2004, and each year thereafter.

In response to the requests of certain Investor Limited Partners and to avoid the continued allocation of phantom income to the Investor Limited Partners, the General Partners, acting through an affiliate thereof (the "*Purchaser*"), are offering to purchase the interests of all Investor Limited Partners (the "*Offer*") for a purchase price equal to $50,000 per investment unit ("*Unit*"). The Purchaser is offering to purchase 100% of the Units. The Offer is conditioned upon 85% of the Units (i.e. 17 of the 20 Units) being tendered by the Investor Limited Partners.

Below is additional information relative to the Partnership, the Project, and the proposed Offer for your review. Also enclosed is a Purchase Agreement for your signature. If you wish to accept this Offer of purchase of your Unit(s), please execute the Purchase Agreement where indicated, and return it to the General Partners in the enclosed self-addressed stamped envelope.

## Partnership Operations

The Project was acquired by the Partnership in 1983. In connection with the acquisition of the Project, the Partnership gave a purchase money note, secured by a security interest in each Partner's interest in the Partnership, to an affiliate of the General Partners in the amount of $2,800,000 (the "*Purchase Money Note*"). The Purchase Money Note bears interest at the rate of 12.5% per annum and is paid from all available cash flow and capital

BUSDOCS/1360221 4

-2-

transaction proceeds. The Purchase Money Note, although due upon the earlier to occur of a sale or refinancing of the Project or August 31, 2003, has yet to be re-paid and continues to accrue interest. (Further detail is contained in the Year 2003 audited financial statement that you recently received.) **As reflected in the audited financial statements, as of December 31, 2003, the total amount due under the Purchase Money Note for principal and interest was $7,288,588 (the "*Purchase Money Loan*").** In addition, as reflected in the audited financial statements, the Partnership is subject to a first mortgage loan in the amount of $1,723,341 which does not mature until July 1, 2010. The Partnership currently receives interest reduction payments from HUD as well as rental subsidies pursuant to two Section 8 Housing Assistance Payments ("*HAP*") Contracts that subsidize 220 of the 321 rental units. These Section 8 contracts will expire on March 31, 2005. The General Partners will request a renewal of each Section 8 contract but it is not known what rent level HUD will approve at this time.

As you may have seen in your K-1 annual statements, in recent years Partnership losses available to the Investor Limited Partners have declined and you have been allocated income. Partnership income allocable to the Investor Limited Partners is expected to increase steadily. The Partners will eventually be subject to a large tax liability resulting from phantom income allocated to the Partners, with no material projected cash distribution. In fact, as you know, as a limited dividend organization, distributions are limited by HUD. After payment of Partnership expenses (including payments in respect of the Purchase Money Note) there has been no cash flow available for distribution to the Investor Limited Partners for some time. Even if there were cash available for distribution, it would not be available to the Investor Limited Partners. Pursuant to the terms of the Amended and Restated Certificate and Agreement of Limited Partnership of the Partnership dated August 25, 1983 (as amended, the "*Partnership Agreement*"), Project cash flow and capital transaction proceeds must be applied to pay Partnership debt including the first mortgage and the Purchase Money Loan. It is therefore likely that no cash flow would be available for distribution to the Investor Limited Partners for many years. While the Investor Limited Partners have received substantial tax benefits over the years, those benefits have now ceased.

There are no current plans to either refinance or market the Project for sale. In the event that the Partnership does, however, pursue a refinancing of the Mortgage Loan, it is unlikely that the proceeds of a refinancing (or a sale) would be sufficient to repay all Partnership debt and return any portion of each Limited Partner's capital contribution in the best case scenario. For example, based on current rents and expenses, assume a $7,000,000 loan to the Partnership is supportable. The proceeds of the loan would likely be applied as follows:

| | |
|---|---|
| New Loan: | $7,000,000 |
| Pay-Off Existing Loan: | 1,700,000 |
| Rehab | 1,250,000 |
| Transaction Costs: | 600,000 |
| Reserves: | 450,000 |
| Available to Partnership | $3,000,000. |

-3-

Pursuant to the Partnership Agreement and the terms of the Purchase Money Loan, any available capital transaction proceeds and any next available cash flow would continue to be applied to the Purchase Money Loan, and therefore, while the Investor Limited Partners will continue to be allocated income (and at a further increased amount and rate as the Partnership cash flow amortizes debt) it is unlikely that the Investor Limited Partners would receive any cash distributions from the Partnership.

### Purchase Offer

The Purchaser is offering to purchase the interests of the Investor Limited Partners for $50,000 per Unit ($25,000 for a half Unit). This is approximately 50% of the original capital contribution made by an Investor Limited Partner who purchased one Unit. This Offer should not be construed as a representation or statement made by the Purchaser as to the value of a Unit or the fairness of the Purchase Price. The Purchase Price was not determined by the Purchaser based on any current appraisal of the value of the Project. No independent person has been retained to evaluate or render any opinion with respect to the fairness of the Purchase Price and no representation is made by the Purchaser, the General Partners or any affiliate thereof as to such fairness. Investor Limited Partners are urged to consider carefully all of the information contained herein before accepting this Offer.

As indicated in this discussion, and pursuant to the terms of the current Partnership Agreement, if current Project operations are maintained, it is unlikely that the Investor Limited Partners would ever receive a cash return on their investment. In fact, if current operations are maintained, the Partners will continue to be charged with significant income, as much as $13,000 per Unit for 2004, with no cash distribution to them. As described herein, the Partnership Agreement provides that cash flow and the proceeds of a sale or refinancing be used to pay creditors of the Partnership, including Partners. Further, any increased cash flow must first be used to repay creditors of the Partnership including any mortgages and the Purchase Money Loan; therefore it is unlikely that any cash flow would be available for distribution to the Investor Limited Partners for many years.

To create liquidity to the Investor Limited Partners, the Purchaser is offering to purchase the interests of each Investor Limited Partner for the price of $50,000 per Unit. It is a condition to the purchase that at least 85% of the Investor Limited Partners agree to sell their Units. The Purchaser may waive any such requirement as to one or more Partners but are not required to do so. In such case, the Purchaser reserves the right to proceed with the Plan of Purchase, and the Plan of Purchase would only be applicable to those Investor Limited Partners who consent to the purchase of their Units as described below. As discussed above, it is not likely that proceeds from any refinancing would produce a distribution to the Investor Limited Partners under the terms of the current Partnership Agreement which provide for the repayment of all Partnership debt prior to distributions to the Investor Limited Partners, and it is anticipated that the Investor Limited Partners will continue to be allocated phantom income in the amount of $13,000 per Unit in 2004, taxable at the ordinary income rate. The sale of your interest now will allow you to avoid such continued allocation of phantom income at increasing rates.

BUSDOCS/1360221.4

-4-

The purchase of your interest will trigger a tax of approximately $69,237.50 per Unit assuming a 25% capital gains rate. As of December 31, 2003, each one Unit of Investor Limited Partner interest had a negative tax basis, as shown in the K-1s, of approximately $236,950. If you sell your Unit, such amount would result in a capital gain, federally taxable at 25% to the extent of certain depreciation previously taken and 20% for an amount in excess thereof. An Investor Limited Partner may have unused losses which may be available to offset such gain. A purchase will result in a capital gains tax on such negative basis plus the $50,000 purchase price at the capital gains rate of 25% (i.e., (.25 times $236,950) plus (.20 times $50,000) = $69,237.50) *unless an Investor Limited Partner has unused losses which could currently be treated as an ordinary loss and offset such gain, or has received a step-up in basis with respect to such Unit.*

*Each Investor Limited Partner is encouraged to seek his or her own independent advice relative to the income tax consequences of a sale of his or Unit.*

The Purchaser is prepared to purchase 100% of the Units. It is a condition to this Offer, however, that at least 85% of the Investor Limited Partners agree to sell their Units. The Purchaser may waive any such requirement as to one or more Partners, but is not required to do so. This Offer must be accepted within 30 days of the date of this letter unless extended by the Purchaser in its sole and absolute discretion.

### Conclusion

By consenting to the Plan of Purchase, you will avoid the allocation of phantom income, taxable at ordinary income tax rates of up to 40%, and receive a cash payment of $50,000 per Unit. Cash distributions to the Investor Limited Partners are not otherwise expected to be made in any case. We believe that this is a beneficial plan for all Partners. Please feel free to contact Kevin C. Baptista at MB Management Company (781-356-2719), x129 acting on behalf of the Purchaser, if you have any questions. Each Partner should consult his or her own accountants with respect to the particular tax considerations to him or her presented herein.

**Please sign the enclosed Purchase Agreement and return it in the postage prepaid and addressed envelope provided so that the Purchaser may work toward an expeditious closing of this transaction.**

Sincerely,

Gerald Slavet, General Partner

BUSDOCS/1360221 4

November 10, 2004 MASS HOUSING

(Overnight for 11/12/04 delivery)
2004 NOV 12  9: 27

····· RIGHT. DEPT.

**MB MANAGEMENT COMPANY**

■ 220 FORBES ROAD, SUITE 205
BRAINTREE, MASSACHUSETTS 02184-2709
781 / 356-2719  ■  FAX 356-2765

Ms. Ellen Connolly, Director
New England Multifamily Housing HUB
U.S. Department of Housing & Development
Thomas P. O'Neill, Jr. Federal Building
10 Causeway St. – 3rd floor
Boston, MA  02222-1092

*[handwritten margin notes:]*
*11/26 Cm*
*Stephen*
*Roberts*
*to call me*
*back*
*re-missing*
*stuff in*
*submission*
*RCS*
*cover.*

RE:   **Fairweather Apartments/Beverly, Danvers, Peabody and Salem, MA**
      **FHA Project #023-44805**
      **HAP Contracts #MA06-L000-185(160 units)/MA06-L000-189(60 units)**

Dear Ms. Connolly:

Old Salem Associates, the owners of Fairweather Apartments are submitting this request to Mass Housing and HUD-Boston to once again participate in HUD's "Mark-up to Market" initiative which has the objective of preserving the Section 8 housing stock for developments with expiring Housing Assistance Payment (HAP) contacts.  This request is being made in conjunction with the renewal of the Section 8 HAP contracts referenced above which provide subsidy for 220 households at Fairweather.  We have attached HUD Form 9624 with this request.

The request is being made pursuant to the requirements of the HUD Section 8 Renewal Policy Guidebook issued on January 19, 2001, as amended.  More specifically, we are requesting a renewal of both Section 8 HAP contracts for Fairweather Apartments under Option One-B of the Mark-up to Market initiative, Discretionary Authority Eligibility. The reason for this request is that the estimated market rent potential for Fairweather Apartments is 95% of the FMR potential as detailed in the enclosed Rent Comparability Study dated October 21, 2004.  This was prepared by Antonelli Professional Resources, Ltd. for the owner pursuant to HUD requirements.  Fairweather Apartments meets all other eligibility criteria, including a sufficient REAC score.  Furthermore, on April 1, 2000 HUD approved discretionary participation in the Mark-up to Market initiative for the HAP contract that subsidizes 160 units (MA06-2000-185).  We are simply requesting to participate again to preserve these units as affordable housing in the four affected communities.

**Background**

Financed in 1970 under HUD's FHA-Insured Section 236 program, Fairweather Apartments consists of 321 units located in four buildings in the contiguous communities indicated above.  The development has two Section 8 HAP contracts which subsidize 220 households. Virtually 100% of the resident population is elderly or disabled consistent

11/10/2004                                                                Page 1 of 4

with the original HUD requirements for the development and consistent with one of the criteria indicated in Section 3-3,B,1 of Chapter 3 of the HUD Section 8 Renewal Policy Guidebook.

████████████████████████████████████████e participated in the Section 8 Mark-up-to Market initiative on April 1, 2000 entitles the owners to pre-pay the FHA-insured mortgage and convert the housing to an alternative use as of March 31, 2005 without the approval of HUD. However, the owners will preserve the housing as affordable if we can once again be eligible to participate in the program. The current HUD-insured mortgage, which matures July 1, 2010, has an outstanding balance of only $1.7 million ($5,296/unit). The recent physical assessment by HUD's Real Estate Assessment Center (REAC) resulted in a score of 86 for the development. Thus, Fairweather's financial and physical conditions make the development an ideal candidate for a conversion to an alternative use other than affordable housing.

### Contract Renewal Proposal

The Fairweather Apartments have provided crucial affordable housing to elders in these four communities for over 30 years. During that time, the Fairweathers have been both a good neighbor and an important housing resource. Recent meetings with local, State and Federal officials have served to reinforce the notion that they consider the preservation of these affordable units at the Fairweathers as essential to their communities.

For that reason and despite the financial incentives of opting out of the Section 8 HAP contracts and pre-paying the FHA-insured loan, the owners wish to work with HUD to keep this much needed affordable housing available to low and moderate income, elderly and disabled residents. To accomplish this continued access to an increased return on investment for this aging limited partnership would provide a reasonable alternative for the next five years to mitigate the risk of losing this housing stock to the open market.

We are proposing that the Boston HUD office endorse our request for discretionary participation in the mark-up to market program for renewal of the above referenced HAP contracts, waiving the provision that the owner's comparable gross potential rent equal or exceed 100% of area FMR as required under Section 3-2 of the Section 8 Policy Renewal Guidebook. (Substantiation of two waiver provisions will be discussed in detail below). Given that some current rents are below 40% of FMR, and estimated market rents in our October 21, 2004 comparability study are 94 to 99.9% of the HUD FMR, rents are substantially below market.

### Vulnerable Population

Section 3-3,B,1 of Chapter 3 of the Section 8 Policy Renewal Guidebook concerns itself with the resident profile, and more specifically with the percentage of units occupied by elderly, disabled or large families. Of the households receiving the benefit of Section 8 under both HAP contracts 99.9% of these are elderly persons and 0.1% are disabled.

11/10/2004

These statistics also hold true for the remaining units at Fairweather. Thus, the development provides affordable housing for the most vulnerable population.

*Low Vacancy Area*

Chapter 3 also references properties located in low vacancy areas for affordable housing or lack of available comparable rental housing in the communities in which the subject development is located. Based upon a survey of the following subsidized developments in the same communities in which the Fairweather buildings are located, occupancy is subsidized housing is 99 to 100%, with vacancies only resulting from recent unit turnover. The chart below, which is a representative sample of affordable housing in these communities, indicates a virtually non-existent vacancy rate.

| Property | Location | Subsidy Type | Occupancy | Type |
|---|---|---|---|---|
| Turtle Creek/Turtle Woods | Beverly | Section 8 | 100% | Elderly |
| Apple Village | Beverly | Section 8 | 99% | Elderly |
| Peabody House | Peabody | Section 8 | 100% | Elderly |
| Tannery II | Peabody | 13A/Section 8 | 100% | Elderly |
| Loring Towers | Salem | 236/Rent Sup. | 100% | ELD/FAM |

Most of the developments have extensive waiting lists for their units, including those for smaller apartments. Furthermore, our rent comparability study of the unassisted housing in the four communities in which the Fairweather buildings are located indicated occupancy rates of up to 99 to 100%. Thus, we feel it is easy to substantiate the waiver requirement that affordable housing properties in affected communities have very low vacancy rates, as is true for much of the Boston PMSA. The lack of available market units where vouchers could be used only strengthens our contention.

Additionally, our appraiser found that there are very few multifamily developments that offer studio apartments in these communities (only two comparable developments have studio apartments so adjustments were made from one bedroom units in some instances to arrive at the rent for Fairweather). With very few exceptions, there is a scarcity of comparable properties that offer affordable, studio apartments for the elderly with the physical amenities (including extensive community space in each building) and the scope of resident services provided to tenants at Fairweather (including an on-site Resident Service Coordinator and the extensive service program offered for tenants). Thus, there is a lack of comparable rental housing in these communities.

*Summary*

It is clear that the current contract rents for the property, whether Section 8 or Section 236, are well below market. The owners are only requesting the opportunity to once again mark-up to market. The owners of Fairweather Apartments meet all eligibility criteria for participation in the HUD initiative except for 100% of FMR requirement. However, many current rents are so far below market, that a mark-up to current market levels, even

though these are projected to be slightly below 100% of FMR, would provide sufficient incentive to commit the owners to a five-year deferment of any pre-payment and conversion of this critical affordable housing stock. Furthermore, we have demonstrated that we qualify for the discretionary participation under the requirements of the HUD Guidebook for two very critical reasons.

We respectfully request that you endorse our request and submit it to Mr. Willie Spearman, Director, Office of Housing Assistance and Grant Administration pursuant to Chapter 3 of the guidebook. For your information, we have also enclosed our one-year notice to the residents dated March 31, 2004.

If you have any questions, please feel free to call me or the CEO of MB Management Company, Stephen C. Roberts, at (781)356-2719, X128.

Sincerely,

Gerald Slavet
General Partner
Old Salem Associates

c.c.    Alan Sharkey, Mass Housing (w/enclosures)
        Carl A. S. Coan, Jr. Esquire
        Robert S. Bow ditch, Jr.
        Steven Rioff
        Stephen C. Roberts, MB

11/10/2004                                                    Page 4 of 4



**U.S. Department of Housing and Urban Development**

MASSACHUSETTS STATE OFFICE, NEW ENGLAND AREA
Office of Housing
Thomas P. O'Neill, Jr. Federal Building
10 Causeway Street - Third Floor
Boston, Massachusetts 02222-1092

Fax (617) 565-6557

2005 APR -7 A 7:41

Peter Wong
Subsidy Analyst
MassHousing
One Beacon Street
Boston, MA 02108

RECEIVED APR 5 2005

| Subject: | Project Name:  Fairweather Apartments |
| | Project No.:    023-44805 |
| | Section 8 No.:  MA06-L000-185 and MA06-M000-189 |
| | Section 8 Mark-up-to-Market (MU2M) |

Dear Mr. Wong:

This office has reviewed and approves your recommendation to fund the Section 8 renewal contract for the subject development as follows:

1) **MA06-L000-185**

Initial Renewal-Option 1B, MU2M, for 5 years (3/11/05-3/10/10), with a rent increase of 31.3%, resulting in an annual potential increase of $447,480.

| Unit Type | No. of Units | Current Rent | New Rent | Tenant Allowance |
|---|---|---|---|---|
| 0 | 135 | $721 | $960 | $0 |
| 1 | 25 | $874 | $1,075 | $0 |

2) **MA06-M000-189**

Initial Renewal-Option 1B, MU2M, for 5 years (3/11/05-3/10/10), with a rent increase of $97.9%, resulting in an annual potential increase of $351,432.

| Unit Type | No. of Units | Current Rent | New Rent | Tenant Allowance |
|---|---|---|---|---|
| 0 | 4 | $408 | $960 | $0 |
| 0 | 42  46 | $491 | $960 | $0 |
| 1 | 2 | $523 | $1,075 | $0 |
| 1 | 12  14 | $552 | $1,075 | $0 |



Exhibit D
ALL-STATE® INTERNATIONAL

Should you have any questions please feel free to contact Nancy Gentile, Project Manager, at 617-994-8532 or email at Nancy_Gentile@hud.gov.

Very Sincerely Yours,

Vincent Benvenuto
Director, Project Management
New England Multifamily HUB

Exhibit A

ALL-STATE® INTERNATIONAL



**M B MANAGEMENT COMPANY**

- Home
- Our Mission
- Our Business
- Management Services
- Consulting Services
- Properties Under Management
- Our Professional Staff
- The Administrative Team
- Response From Residents
- Response From Regulators
- Credentials
- Professional Affiliations
- Awards

**Stephen Roberts**
Chief Executive Officer
Director of Property Mgmt
(781) 356-2719, ext. 128
stever@mbmanagement.com

**Peter Rioux**
Director of Operations
(781) 356-2719, ext. 146
peter@mbmanagement.com

**Kathy Franco, CPM**

# CONSULTING SERVICES



*Sugar River Mills, Claremont, New Hampshire*

We offer a full compliment of property management consulting services to assist in the effective and successful operation of your rental property:

• Asset management services including highest and best use analysis, financing recommendations and packaging, and re-structuring analysis/implementation (including HAP renewals and "Mark to Market" processing). We can help deal with lenders, agencies, and investors, including HUD and state/local agencies

• Marketing and advertising programs to ensure initial and ongoing rental success, resident retention programs and training of leasing staff.

• Low Income Housing Tax Credit application and procedures to assure ongoing

**Director Marketing/Business
Development**
(781) 356-2719, ext 127
kathyf@mbmanagement.com

**Eric Vogt, CPM**
Regional Senior Manager
New York Region
(315) 475-6390
ericv@mbmanagement.com

**Patrick Wolfgang**
Regional Senior Manager
New England & West Coast
patrickw@mbmanagement.com

**Pam Hunt**
Regional Senior Manager
Southeastern Region
(678) 493-5381
pamh@mbmanagement.com

compliance.

- Subsidy management including eligibility determination, verification, certification, fair housing, tenant-selection and waiting list management.

- Comprehensive maintenance service programs including preventative maintenance systems.

- Operating systems to achieve efficiency in rental collection, purchasing, accounts payable, contractor selection, personnel management, and budgeting.

- Financial management and reporting systems to assure control over property revenue and expenses

- Short and long-term capital improvement programs and reserve planning.

- Effective applicant screening and selection procedures

- Risk management programs to reduce exposure to property and liability loss including safety and security programs.

- Resident services programs including the preparation of funding assistance proposals.

We have over 30 years of experience specializing in multi-family residential housing. Our extensive capabilities serve a diverse array of properties throughout the country. We offer a full range of management and consulting services supporting market rate, assisted and Tax Credit properties. We have the ability to improve your property

management capability since we also successfully manage approximately 4,400 apartments at over 40 residential communities in six states.

We have been recognized for our property management excellence – National Site Manager of the Year (US Dept. Agriculture), 3-Time New England Regional Site Manager of the Year (US Dept. Agriculture), 2001 & 2002 Elderly Community of Quality (New England Affordable Housing Management Assoc.).

Home Office: 220 Forbes Road, Braintree Massachusetts  02184  Telephone: (781) 356-2719  Fax: (781) 356-2765
Regional Offices:  Arizona, Georgia, Maine, Massachusetts, New Hampshire, New York & Washington

*Website by MB Management*



**MB MANAGEMENT COMPANY**

- ► Home
- ► Our Mission
- ► Our Business
- ► Management Services
- ► Consulting Services
- ► Properties Under Management
- ► Our Professional Staff
- ► The Administrative Team
- ► Response From Residents
- ► Response From Regulators
- ► Credentials
- ► Professional Affiliations
- ► Awards

Stephen Roberts
Chief Executive Officer
Director of Property Mgmt
(781) 356-2719, ext. 128
stever@mbmanagement.com

Peter Rioux
Director of Operations
(781) 356-2719, ext. 146
peter@mbmanagement.com

Kathy Franco, CPM

# <u>Our Credentials</u>

We have an especially strong track records in property performance, particularly where value added management is required. We are dedicated to a very **personal, hands-on approach** to all the details of management.

We have established an enviable reputation for our professional and diligent approach to real estate management, which has been frequently noted by state and federal regulatory agencies in providing "exceptional management practices" ratings to the Company. **This reputation - a reputation that differentiates us from other real estate management companies - is based upon our unique ability to effectively combine our skill in providing detailed management and financial services with our demonstrated commitment in fulfilling the needs of residents.**

Our staff is consistently rewarded for meeting specific property goals to each owner's satisfaction, as well as MB Management's own high standards. Delivering this level of service is made possible by the firm's resources and experience as well as our personalized and detailed communication with the owners of our managed properties.

### *Experience Managing Market Rate Housing*

We have had extensive experience in the successful management of conventionally financed market rate housing. Through a carefully researched understanding of market trends, the application of customized marketing plans and leasing techniques, the diligent attention to the continuing promotion of property attractiveness, and the establishment of practical cost-effective approaches to the control of operating expenses, we have been able to significantly contribute to the appreciation of each

Director Marketing/Business
Development
(781) 356-2719, ext 127
kathryf@mbmanagement.com

Eric Vogt, CPM
Regional Senior Manager
New York Region
(315) 475-6390
ericv@mbmanagement.com

Patrick Wolfgang
Regional Senior Manager
New England & West Coast
patrickw@mbmanagement.com

Pam Hunt
Regional Senior Manager
Southeastern Region
(678) 493-5381
pamh@mbmanagement.com

property's asset value maximizing the return for owners and investors of our managed properties. In doing so, we aggressively undertake those marketing, advertising, and cost effective physical enhancement efforts that are needed so that the property will be in a strong position to drive the market as opposed to relying upon local market forces to dictate rental success.

### _Experience Managing Publicly Financed and Subsidized Housing_

 MB Management Company has had extensive experience in managing residential property which is financed through such public agencies as the Department of Housing and Urban Development (HUD), MassHousing, Massachusetts Executive Office of Communities and Development (EOCD), New York Division of Housing and Community Renewal (NYDHCR), municipal housing authorities, and the Federal Rural Housing Service. As a result, we are closely familiar with all of these agencies' financial and property management requirements, including reporting, fees, auditing, record maintenance, replacement reserve and special escrow procedures, bid/contract approvals, and cost allocation authorization.

 The following is a partial listing of residential properties currently under management classified by public finance agency.

- **HUD:** 11 developments totaling 1,111 apartments

- **MassHousing:** 7 developments totaling 704 units

- **Mass. Exec. Office of Communities and Development:** 1 development of 107 units

- **Other State Housing Finance Agencies:** 3 developments totaling 784 units

➤ **Municipal Housing Authority (Syracuse):** 1 development of 176 units

➤ **Rural Housing Service:** 4 developments totaling 159 apartments

### _Experience Managing Non-Profit Owned and Sponsored Housing_

MB Management Company is extensively experienced in the management of housing which is owned and sponsored by non-profit, including religious affiliated, organizations having performed such service over the past fifteen years.   We have established close working relationships with such sponsoring organizations, keeping them consistently informed of important property issues, obtaining advice and suggestions regarding important property issues and priorities, undertaking physical improvements and coordinating effective resident services programs that have been responsible for promoting each property's attractiveness and marketing appeal.  Pine Oaks Village and Inter-Church Elderly Housing were recently named by the New England Affordable Housing Management Association as the Community of Quality/Exemplary Elderly Properties for 2001 and 2002.

### _Experience Managing Low Income Housing Tax Credits Projects_

 At the present time, we are managing several residential properties that have been funded through low income housing tax credits.  We have successfully completed the rent-up for all properties in strict compliance with income limitation guidelines, provided ongoing compliance monitoring including investor reporting, and implemented a complete array of compliance-related responsibilities to ensure each property's continuing adherence to low income housing tax credit requirements.  In order to effectively enhance our capability of ensuring ongoing compliance, we have coordinated extensive training for all staff assigned to these tax credit financed properties and established an in-house expertise within the central office at MB

Management to monitor each property's compliance on an ongoing basis throughout the year as well as providing year end reporting to meet the requirements of the Internal Revenue Service.

### Experience Managing Condominium Developments

MB Management Company's professional senior management staff have had extensive experience in the provision of management services for condominium associations as well as individual unit owners.

Patrick Wolfgang , Senior Manager, is responsible for the management of residential properties located in Haverhill, Randolph, and Boston, Massachusetts. He formerly served as a Trustee for Meadow View Condominiums where he was responsible for specific management issues.

Kathy Franco, Director of Marketing/Business Development, is responsible for the management of residential properties located in Cambridge, Massachusetts, Washington and Arizona and the Hidden Bay Condominiums in South Dartmouth, Massachusetts.

Home Office: 220 Forbes Road, Braintree Massachusetts 02184  Telephone: (781) 356-2719  Fax: (781) 356-2765
Regional Offices:  Arizona, Georgia, Maine, Massachusetts, New Hampshire, New York & Washington

*Website by MB Management*



**M B MANAGEMENT COMPANY**

- Home
- Our Mission
- Our Business
- Management Services
- Consulting Services
- Properties Under Management
- Our Professional Staff
- The Administrative Team
- Response From Residents
- Response From Regulators
- Credentials
- Professional Affiliations
- Awards

Stephen Roberts
Chief Executive Officer
Director of Property Mgmt
(781) 356-2719, ext. 128
stever@mbmanagement.com

Peter Rioux
Director of Operations
(781) 356-2719, ext. 146
peter@mbmanagement.com

Kathy Franco, CPM

# OUR PROFESSIONAL STAFF

### ROBERT S. BOWDITCH, JR.
### General Partner



The firm was founded in 1971 by Robert S. Bowditch, Jr. A graduate of Harvard College, the University of Washington School of Law and Harvard Law School, Mr. Bowditch practiced law for two years in Boston at Goodwin, Procter & Hoar before establishing MB Associates.  Under his direction, the company has built a reputation for excellence, developing luxury housing, low-and-moderate income housing, retail and office complexes.  Mr. Bowditch has become known as a leader in the development community for his urban renewal and adaptive reuse development projects.

### GERALD SLAVET
### General Partner



Gerald Slavet graduated from Bowdoin College and received his Masters Degree in Fine Arts from Catholic University.  Mr. Slavet joined MB Associates in 1977, and during his tenure with the company, MB has developed more than $100,000,000 of multi-family housing.  Prior to joining MB, Mr. Slavet spent fifteen years as an executive producer in theater in the

Director Marketing/Business
Development
(781) 356-2719, ext 127
kathyf@mbmanagement.com

Eric Vogt, CPM
Regional Senior Manager
New York Region
(315) 475-6390
ericv@mbmanagement.com

Patrick Wolfgang
Regional Senior Manager
New England & West Coast
patrickw@mbmanagement.com

Pam Hunt
Regional Senior Manager
Southeastern Region
(678) 493-5381
pamh@mbmanagement.com

Washington, DC area, working with his own company as well as with other companies including Wolftrap Farm Park for the Performing Arts in Vienna, Virginia.  In 1976, Mr. Slavet represented the U.S. Department of State as a goodwill ambassador in the arts.  In 1992, Mr. Slavet founded Concert Productions, Inc., a charitable, educational non-profit organization involved in the performing arts, primarily to encourage and celebrate the development of youth through music.  Its affiliate, From the Top, made its debut in January 2000 and has become the fastest growing program in  public radio history.  Mr. Slavet is a Trustee of New England Conservatory and is on the Board of Directors of the American Symphony Orchestra League and the National Foundation for Jewish Culture.

### STEVEN RIOFF
### General Partner



Mr. Rioff is a graduate of Grinnell College and Northwestern University Law School.  Prior to joining MB Management Company in 1978 as Chief Executive Officer, he served as Senior Management Officer for the Massachusetts Housing Finance Agency.  Before joining MHFA, Mr. Rioff served as Assistant to the Commissioner for the Commonwealth of Massachusetts Department of Community Affairs.

Mr. Rioff has had extensive experience in both affordable housing development, syndication, and management as well as conventional housing acquisition and disposition. He also consults on troubled property financial restructuring.  He presently serves as the President of the Metropolitan Boston Housing Partnership, Boston's non-profit regional housing partnership.